**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

NISSAN NORTH AMERICA, INC.,

                Plaintiff,

    v.

WOODFIELD NISSAN, INC., and
ROY CARR,

                Defendants.

Case No. 23-CV-16084

Judge Martha M. Pacold

Mag. Judge Heather K. McShain

**DEFENDANT WOODFIELD NISSAN, INC.'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS**

Ira M. Levin
Eric P. VanderPloeg
Chase E. Bullock
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, 21st Floor
Chicago, Illinois 60611
Tel.: (312) 840-7000
Fax: (312) 840-7900
ilevin@burkelaw.com
evanderploeg@burkelaw.com
cbullock@burkelaw.com
*Counsel for Woodfield Nissan, Inc.*

## INTRODUCTION

Plaintiff, Nissan North America, Inc. ("*NNA*"), a manufacturer and distributor of motor vehicles, brings this action against defendant, Woodfield Nissan, Inc. ("*Woodfield Nissan*"), one of NNA's authorized U.S. dealers, and its former service manager, Roy Carr ("*Carr*"), alleging a "scheme to defraud" arising out of the submission of warranty repair claims. (Complaint, Doc. 1, ¶¶ 1-2.)[1] This is the third complaint filed by Plaintiff asserting some version of the claims here, the first and second filings being made in Tennessee state and federal court, respectively.

Plaintiff alleges that it discovered the alleged fraud during a warranty audit performed <u>on September 24, 2018</u>, when it reviewed 358 warranty claims and was "unable to substantiate" 343 of them. (*Id.*, ¶ 25.) Plaintiff even alleges that during the 2018 audit, it found "evidence" of the "false-claim manufacturing." (*Id.*, ¶ 38.) Plaintiff references and relies on the Dealer Sales and Service Agreement between it and the dealership (the "*Dealer Agreement*") (Docs. 1-1, 1-2), which sets out the rights and obligations of the parties concerning warranty claims. (*Id.*, ¶¶ 10–19.) Plaintiff contends that, "irrespective of intent, these actions . . . constituted a serious and obvious breach of Woodfield Nissan's obligations and responsibilities to NNA . . . ." (*Id.*, ¶ 3.) The Complaint contains three counts against Woodfield Nissan: **Count I** – common law fraud; **Count II** – negligent misrepresentation; and **Count III** – breach of contract. NNA also asserts a fourth count against Carr only, **Count IV** – Unjust Enrichment. (Compl., ¶¶ 70 - 75.)

The Dealer Agreement—which governs Woodfield Nissan's relationship with NNA, including warranty matters—contains a choice-of-law clause:

> This Agreement shall be deemed to have been entered into in the State of California, and *all questions* concerning the validity, interpretation, *or performance of any of its terms or provisions*, **or any** rights or obligations of the parties hereof, shall be

---

[1]       No proof of service or appearance for Carr has been filed with the Court.

governed by and resolved in accordance with the internal laws of the State of California, ***including, without limitation, the statute of limitations***.

(Doc. 1-2 at 34, § 17.F (emp. add.).) The statute of limitations in California for claims based on allegations of fraud or mistake is three (3) years. Cal. Code Civ. P. § 338(d). This applies to claims couched in contract when also based on allegations of fraud.

For the reasons below, NNA has pleaded itself out of court and this action should be dismissed. The complaint on its face reflects that NNA discovered the alleged "fraud" during the audit conducted on September 24, 2018. Under the California statute of limitations that NNA and Woodfield Nissan agreed to apply, Counts I, II, and III had to be brought by September 23, 2021, nearly a year before NNA sought a tolling agreement with the dealership. Finally, should this Court wish to look past the limitations issue, the claims are defective under Federal Rule of Civil Procedure 9(b). Accordingly, dismissal is appropriate.

## **FACTS**

Plaintiff NNA distributes new Nissan vehicles to authorized dealers throughout the United States. (Doc. 1, ¶ 9.) NNA also provides warranty coverage on Nissan vehicles and parts. (*Id.*) Woodfield Nissan is authorized to sell and service new and used Nissan vehicles pursuant to a Dealer Agreement between NNA and Woodfield Nissan. (*Id.*, ¶ 10.) Under the Dealer Agreement and certain warranty policies and procedures that are "incorporated" into the Dealer Agreement, Woodfield Nissan services vehicles covered by NNA's warranty and NNA pays Woodfield Nissan for performing that work. (*Id.*, ¶¶ 10–19.) Woodfield Nissan is obligated to maintain warranty records under its Dealer Agreement for a period of two years. (*Id.,* ¶ 16; Doc. 1-1 at 60, § 6.G.2).

The Dealer Agreement—which became effective when NNA was a California corporation (*see* Doc. 1-1)—incorporates Standard Terms and Provisions prepared by NNA ("***Standard Terms***"). (Doc. 1, ¶ 10; Doc. 1-1 at 1-2, Article Fifth; Doc. 1-2.) Section 5.B.2 of the Standard

Terms requires Woodfield Nissan to perform repairs for customers under NNA's warranty. (Doc. 1-2 at 9, § 5.B.2.) Section 17.F of the Standard Terms, titled "California Law," provides:

> This Agreement shall be deemed to have been entered into in the State of California, and all questions concerning the validity, interpretation, *or performance of any of its terms or provisions*, *or any rights or obligations of the parties hereof*, shall be governed by and resolved in accordance with the internal laws of the State of California, *including, without limitation, the statute of limitations*.

(*Id.* at 34, § 17.F (emp. add.)

NNA alleges that "***[o]n September 24, 2018, NNA initiated an on-site audit*** to review the warranty and repair claims that Woodfield Nissan had submitted for payment during the period September 24, 2017 to September 18, 2018. ***Woodfield Nissan was unable to substantiate 343 of 358 claims that NNA reviewed during the audit***." (Doc. 1, ¶ 25 (emp. add.)) NNA also alleges, "*Moreover*, ***examination of Woodfield Nissan's supporting documentation during the 2018 audit revealed evidence of false-claim manufacturing***, such as time-clock logs, which ought to be printed contemporaneously with work performed, being printed on the copy of work orders that prepared [*sic*] only after the work is completed." (*Id.*, ¶ 38.) NNA alleges that this "fraud" occurred from January 1, 2016, through December 31, 2019. (*Id.*, ¶ 27.)

NNA and Woodfield Nissan entered into a tolling agreement that excluded *only* the time period from August 1, 2022, through June 28, 2023, from the limitations period. (Doc. 1-3, § 1.) In that tolling agreement, Woodfield Nissan reserved its right to assert any timing defense that already accrued or may apply without including the tolling period. (*Id.*)

## **PROCEDURAL BACKGROUND**

On June 28, 2023, NNA filed suit in Tennessee state court alleging fraud, negligent misrepresentation, and breach of contract. (***Exhibit 1***, Complaint, *Nissan North America, Inc. v. Woodfield Nissan, Inc. et al.*, 23-CV-52618 (Williamson Cty. Tenn. 2023).) Woodfield Nissan

removed the case and moved to dismiss for lack of personal jurisdiction. *Nissan North America, Inc. v. Woodfield Nissan, Inc., et al.*, 3:23-cv-00716 (M.D. Tenn.), Doc. 1. Woodfield Nissan also moved to dismiss under Rule 12(b)(6) because NNA's claims for fraud and misrepresentation were barred under California's three-year statute of limitations. (M.D. Tenn. Doc. 12-13).

In response to the motion, NNA dropped its fraud and misrepresentation claims, and instead filed an amended complaint pursuant to Fed. R. Civ. P. 15 containing only a breach of contract and unjust enrichment claim. (***Exhibit 2***, Amended Complaint, M.D. Tenn. Doc. 16.) Woodfield Nissan again moved to dismiss, including based on the statute of limitations. (M.D. Tenn. Doc. 21–22.) Rather than respond to that second motion, NNA voluntarily dismissed its case in Tennessee pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). (M.D. Tenn. Doc. 29.)

A few days later, NNA filed the instant, third Complaint in the Northern District of Illinois, in which NNA reasserted its dismissed breach of contract claim (and the unjust enrichment claim, but this time only as to Carr). However, NNA also resurrected its previously withdrawn fraud and misrepresentation claims that were not pending when the Tennessee action was dismissed.

## ARGUMENT

### I.      LEGAL STANDARD.

"To survive a motion to dismiss under Rule 12(b)(6), the complaint must provide enough factual information to 'state a claim to relief that is plausible on its face' and 'raise a right to relief above the speculative level.'" *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "In considering a Rule 12(b)(6) motion, '[t]he complaint's well-pleaded factual allegations, though not its legal conclusions, are assumed to be true.'" *Riviana Foods, Inc. v. Jacobson Warehouse Co.*, No. 18-

cv-06550, 2020 U.S. Dist. LEXIS 93952, at *2 (N.D. Ill. May 29, 2020) (citing *Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019 (7th Cir. 2013)).

## II. NNA'S CLAIMS AGAINST WOODFIELD NISSAN ARE TIME-BARRED.

Complaints should be dismissed pursuant to Rule 12(b)(6) when they are facially time-barred. *Logan v. Wilkins*, 644 F.3d 577, 581 (7th Cir. 2011). "A complaint that on its face reveals that the plaintiff's claim is barred by a statute of limitations or repose can be dismissed on a motion to dismiss in accordance with the principle . . . that a plaintiff can plead himself out of court . . . ." *Tregenza v. Great. Am. Communications Co.*, 12 F.3d 717, 719 (7th Cir. 1993). "A statute-of-limitations defense is appropriate in a 12(b)(6) motion to dismiss where 'the allegations of the complaint itself set forth everything necessary to satisfy the affirmative defense, such as when a complaint plainly reveals that an action is untimely under the governing statute of limitations.'" *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 847 (7th Cir. 2008) (quoting *United States v. Lewis*, 411 F.3d 838, 842 (7th Cir. 2005)).

### A. California Law Applies To Each of NNA's Claims.

The Standard Terms contain a broad choice-of-law clause that calls for the application of California's statute of limitations to any questions concerning: (a) the "performance of any of [the Dealer Agreement's] terms or provisions;" _or_ (b) "*any rights or obligations of the parties hereof.*" (Doc. 1-2 at 34, § 17.F (emp. add.).) This second clause, which is disjunctive, includes matters beyond those that merely arise from the terms of the Dealer Agreement, itself. Any other reading would render the broader language in the second clause superfluous and redundant of the first, which already discusses the terms or provisions of the Dealer Agreement. *Arnhold v. Ocean Atlantic Woodland Corp.*, 284 F.3d 693, 705 (7th Cir. 2002) (contractual language should not be

read as redundant); *Romanchuk v. Board of Trustees*, No. CV 15-08180-AB (KS), 2017 U.S. Dist. LEXIS 209636, at *48 (C.D. Cal. June 29, 2017) (same).

Here, each of NNA's claims fall within the plain language of the California choice of law clause. *First*, each of NNA's claims relate to the performance of the terms and provisions of the Dealer Agreement itself, as NNA alleges throughout its complaint. (Doc. 1, ¶¶ 10-19.) NNA alleges that warranty submissions are governed by the Dealer Agreement. (*Id.*) In fact, NNA incorporates allegations about the Dealer Agreement into each of its fraud counts. (*Id.*, ¶¶ 42, 55, 60, 69.) NNA even references its "written policies and procedures," which NNA alleges are part of the Dealer Agreement, in its fraud counts. (*Id.*, ¶¶ 17, 43, 44.) Thus, each of NNA's claims, whether couched in contract or fraud, ultimately concerns the "performance" of "terms and provisions" of the Dealer Agreement, as to bring those claims within the choice-of-law clause. *Second*, and perhaps more importantly, NNA's claims also relate more generally to the "rights and obligations" of the parties. NNA even alleges at the outset of its Complaint, "these actions by Woodfield Nissan constitute a serious and obvious breach of Woodfield Nissan's obligations and responsibilities to NNA[.]" (*Id.*, ¶ 3.) Surely, NNA cannot contend that the alleged submission of a false warranty claim does not concern the parties' rights and obligations. As such, each of NNA's claims are subject to the broad choice-of-law clause in the Dealer Agreement.

Further, when claims are dependent on the parties' contract, courts will apply the choice-of-law clause in the contract irrespective of the nature of the claim. *Trailhead Capital, LLC v. DHL Express (USA), Inc.*, No. 11 C 7028, 2012 U.S. Dist. LEXIS 25920, at *4 (N.D. Ill. Feb. 29, 2012). To decide whether a tort claim is dependent on a contract, courts look to "whether: (1) the claim alleges a wrong based on the construction and interpretation of the contract; (2) the tort claim is closely related to the parties' contractual relationship; or (3) the tort claim could not exist without

the contract." *Id.* at *6; *see also Adams v. Raintree Vacation Exchange, LLC*, 702 F.3d 436, 444 (7th Cir. 2012) (fraud claims were subject to forum selection clause, which governed the "*interpretation and compliance with the rights and obligations*" of the parties) (emp. add.). Here, NNA's claims all satisfy one or more of these tests, in particular because NNA's fraud claims are "closely related" to the contractual relationship, and, in fact, are intertwined with that relationship.

### B.     California's Statutes Of Limitations Apply.

Provisions in contracts that specify the limitations periods are enforceable so long as they are not unreasonable. *Martinell v. Navistar International Corp.*, No. 11 C 8707, 2012 U.S. Dist. LEXIS 89432, at *11 (N.D. Ill. June 28, 2012) (enforcing contractual statute of limitations); *Medrano v. Production Engineering Co.*, 774 N.E.2d 371, 376 (Ill. App. Ct. 1st Dist. 2002) ("it is well-established that parties to a contract may agree upon a shortened contractual limitations period to replace a statute of limitations, as long as it is reasonable."). The public policy of Illinois, where this case is now pending, "strongly favors the freedom to contract" with respect to the statute of limitations. *15th Place Condominium Ass'n v. South Campus Development Team*, LLC, 2014 IL App (1st) 122292, ¶ 28. This is true, even where the contract provides for a shorter period of time than the governing statute. *Id*.; *see also Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.*, 46 Cal. Rptr. 2d 33, 43 (Cal. 1995) (courts will enforce contractual provisions that call for shorter limitations periods than those that otherwise apply).

Here, the choice-of-law clause in NNA's Dealer Agreement did not merely establish the substantive governing law between the parties. It also expressly identified the statutes of limitations that the parties intended to live by. Under both Illinois law and California law, the parties' agreement to use a specific limitation period is enforceable and should control this matter.

Moreover, there is nothing unreasonable about applying California's statute of limitations. NNA was both incorporated and headquartered in California, and the parties agreed that the Dealer Agreement would be "deemed" to be entered into in that state. (Doc. 1-1 at 1 (reflecting that NNA was acting as "Nissan Motor Corporation in U.S.A., a California corporation" when it executed the Dealer Agreement "at Carson, California").) Moreover, the California limitations period still allowed NNA *several* years to bring its claims, so it is not unreasonable. This is particularly so, given that Woodfield Nissan was only obligated to maintain warranty records for *two* years. (*Id.* at 60, § 6.G.2.) In sum, the parties agreed to certain limitation periods by contract, which should be honored no matter where the claims are now pending.

**C.      Claims Based On Fraud Are Governed By A Three-Year Statute Of Limitation Under California Law.**

Under Cal. Code Civ. P. § 338(d), the statute of limitations for an "action for relief on the ground of fraud or mistake" is three years. This limitations period applies not only to claims that are expressly based on a theory of fraud, but also other claims where fraud or mistake is the basis for the legal injury. *Vera v. REL-BC, LLC*, 281 Cal. Rptr. 3d 45, 50–51 (Cal. App. 2021) ("[I]f fraud or mistake is the basis of the legal injury (the 'ground' of the action), [Cal. Code Civ. P. § 338(d)] applies regardless of whether the complaint seeks legal or equitable relief or pleads a cause of action in tort or contract.") (citations omitted); *R Power Biofuels, LLC v. Chemex LLC,* No. 16-CV-00716-LHK, 2016 U.S. Dist. LEXIS 156727, at *34 (N.D. Cal. Nov. 11, 2016) (when negligent misrepresentation claim is based on "deceit," it is governed by a three-year limitations period, and a two-year period when based on negligence).

**D.      NNA's Claims Accrued On September 24, 2018, The Date Of The 2018 Audit, Which Began The Statute Of Limitations.**

Under California law, a statute of limitations begins to run once the plaintiff is put on inquiry of its claims; it does not require the plaintiff to have fully completed its investigation or

discovered all facts that could give rise to a claim. *Hamilton Materials Inc. v. Dow Chem. Corp.*, 494 F.3d 1203, 1206 (9th Cir. 2007). As the court stated in *Fox v. Ethicon Endo-Surgery, Inc.*:

> In order to rely on the 'discovery rule' for delayed accrual of a cause of action, '[a] plaintiff whose complaint shows on its face that his claim would be barred without the benefit of the discovery rule must specifically plead facts to show (1) the time and manner of discovery *and* (2) the inability to have made earlier discovery despite reasonable diligence. . . . Simply put, in order to employ the discovery rule to delay accrual of a cause of action, a potential plaintiff who suspects that an injury has been wrongfully caused must conduct a reasonable investigation of all potential causes of that injury.

27 Cal. Rptr. 3d 661, 668-69 (Cal. 2005).

Here, NNA was on notice of its claims when the 2018 Audit revealed "unsubstantiated" warranty submissions, including an alleged misrepresentation about service technicians and "evidence" of "false-claim manufacturing." (Doc. 1, ¶¶ 25, 29, 38.) These allegations reflect an acknowledgment by NNA that the 2018 audit revealed the "evidence" that now forms the basis of its claims. Yet, despite being on notice of its claims by September 24, 2018, NNA did not file a Complaint against Woodfield Nissan for years. Even giving NNA the benefit of the tolling period, which commenced on August 1, 2022, NNA's claims were already barred by September 23, 2021—three years after the audit—and well prior to the tolling agreement. Thus, the tolling agreement—and Illinois's savings clause (*see id.*, ¶ 41), if even applicable—are ultimately irrelevant to whether NNA's claims are now all barred.

Further, NNA does not allege any facts showing that it lacked knowledge or a means of discovering its claims through the exercise of reasonable diligence. *See Platt Electrical Supply, Inc. v. EOFF Electrical, Inc.*, 522 F.3d 1049, 1058 (9th Cir. 2008) (dismissing fraud claims where plaintiff had "inquiry notice" that a representation was false). To be sure, if there is an explanation for how NNA could—in the face of the 2018 audit—not be aware that it had claims against Woodfield Nissan, those facts are not alleged anywhere in the Complaint. This is so even though

9

Woodfield Nissan has now filed two prior motions to dismiss based on the statute of limitations in Tennessee, and NNA was aware that Woodfield Nissan intended to raise this defense here.

Finally, the fact that NNA is now alleging that false warranty claims were submitted through the end of 2019 does not avoid dismissal. *First*, under California law, once NNA had notice of potential claims against Woodfield Nissan in 2018, NNA was also under an obligation to investigate subsequent warranty claims as to identify whether those submissions were also actionable. NNA does not appear to have done so and did not assert any claims within three years of the audit. *Second*, these new allegations about post-audit claims in 2019, which were never referenced in Tennessee, are wholly unsupported by any factual allegations in the Complaint, as required by both the California statute of limitations and Fed. R. Civ. P. 9(b). There is not one "false" warranty submission after NNA's 2018 audit identified in the Complaint. It is likewise unclear how NNA concluded that the alleged fraud lasted precisely through New Year's Eve, December 31, 2019. (Doc. 1, ¶ 27.) Moreover, it is highly unlikely that NNA, faced with the discovery of "fraud" at a dealership in September 2018, would have allowed such actions to occur unabated for well over a year after the audit. Certainly, there are no factual allegations that explain such an unusual circumstance. Once NNA had notice of a claim, California law imposed a burden on NNA to plead *facts* to explain why it did not assert the claim sooner, and those allegations are missing from this third Complaint. Thus, allegations about post-audit warranty submissions do not avoid the statute of limitations.

**E.    NNA'S Contract Claim Is Time Barred Because It Is Grounded In Fraud.**

As noted above, California's three-year limitations period applies not only to claims based on a theory of fraud, but also claims where fraud or mistake is the basis for the legal injury. *Vera*, 281 Cal. Rptr. 3d at 50–51; *Chemex LLC,* 2016 U.S. Dist. LEXIS 156727, at \*34.

NNA's breach of contract claim (Count III) must also be dismissed as time-barred under the principles set forth above. NNA's contract claim is based on the very same allegations of fraud that form the basis for NNA's other claims. (*E.g.*, Doc. 1, ¶ 61 ("[T]he information Woodfield Nissan provided to NNA concerning the warranty repairs at issue was not accurate."); ¶ 62 ("Woodfield Nissan submitted to NNA at least $313,211 in warranty claims that were not eligible for reimbursement. NNA paid all such claims.").) To be sure, the gravamen of NNA's Complaint is fraud. (*E.g.*, *id.*, ¶ 1 ("Defendants engaged in a long-running scheme to ***defraud*** NNA.") (emp. add.), ¶ 2 ("Defendants ***defrauded*** NNA out of millions of dollars by submitting fraudulent warranty and repair claims to NNA for payment.") (emp. add.), ¶ 24 ("A pervasive culture of ***fraud*** existed[.]") (emp. add.).) The term "fraud" appears at least twenty-seven times in NNA's Complaint. Each of these allegations are incorporated into NNA's contract claims and vice-versa. Thus, Count III is also subject to a three-year limitations period.

## III.    NNA'S FRAUD CLAIMS DO NOT SATISFY FED. R. CIV. P. 9(b).

### A.    Rule 9(b) Standards Apply to Each of NNA's Claims.

Rule 9(b) "compels the plaintiff to provide enough detail to enable the defendant to riposte swiftly and effectively if the claim is groundless." *Fidelity National Title Insurance Co. v. Intercounty National Title Insurance Co.*, 412 F.3d 745, 749 (7th Cir. 2005). As a result, "[a] plaintiff claiming fraud or mistake must do more pre-complaint investigation to assure that the claim is responsible and supported, 'rather than defamatory and extortionate.'" *Payton v. Rush-Presbyterian St. Luke's Medical Center*, 184 F.3d 623, 627 (7th Cir. 1999) (citation omitted). "The rule is said to serve three main purposes: (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party." *Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1327 (7th Cir. 1994).

"Rule 9(b) requires a plaintiff to provide precision and some measure of substantiation to each fraud allegation." *Garrard v. Rust-Oleum Corp.*, 575 F. Supp. 3d 995, 999 (N.D. Ill. 2021) (citation omitted). NNA must therefore plead "'the identity of the person who made the misrepresentation, the time, place and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff.'" *Jepson, Inc.,* 34 F.3d at 1327. In other words, NNA must allege the "who, what, when, where, and how" of the alleged fraud. *See United States ex rel. Gross v. Aids Research Alliance-Chicago, 415 F.3d 601, 605 (7th Cir. 2005)* (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)). Rule 9(b) standards apply to all claims "sound[ing]" in fraud, including breach of contract and negligent misrepresentation. *Borsellino v. Goldman Sachs Group, Inc.*, 477 F.3d 502, 507 (7th Cir. 2007).

When a plaintiff alleges a "scheme" to defraud, it is still responsible under Rule 9(b) for alleging "representative examples" of the fraud with the factual particularity needed to satisfy Rule 9(b). *United States v. Ortho-McNeil Pharmaceutical, Inc.*, No. 03 C 8239, 2007 U.S. Dist. LEXIS 52666, at *10, 15 (N.D. Ill. July 20, 2007) (dismissing claims under Rule 9(b) where no "concrete examples" of fraud were pleaded); *Credit Insurance Consultants, Inc. v. Gerling Global Reinsurance Corp. of Am.*, 210 F. Supp. 2d 980, 983 (N.D. Ill. 2002) (dismissing claims based on fraudulent scheme where defendants had not alleged specific examples of fraud specificity). Thus, the representative examples must still identify the "who, what, where, when and how" that Rule 9(b) requires. *Bantsolas v. Superior Air & Ground Ambulance Transport, Inc.*, No. 01 C 6168, 2004 U.S. Dist. LEXIS 4540, at *12 (N.D. Ill. Mar. 18, 2004).

### B.       The Complaint Fails To Allege Concrete, Representative Examples Of Fraud.

NNA attempts to allege several "examples" of fraudulent warranty practices (Doc. 1, ¶¶ 27-37), but none of these examples are alleged with the specificity that Rule 9(b) requires.

First, at a minimum, the "***when***" is never alleged. Instead, for each "example," NNA merely alleges that the conduct occurred "within the False Claims Period," which is a four-year period from 2016–2019. That period of time is not sufficiently specific to satisfy Rule 9(b). Not a single "false warranty" example is identified in the Complaint by date of the warranty claim, date of the repair, date of the payment to Woodfield Nissan, or any other timing information that would allow Woodfield Nissan to identify the claim or when it was submitted. Moreover, critically, ***NNA does not identify a single claim that was submitted after the 2018 Audit that contained a misrepresentation***. There is no justification for forcing Woodfield Nissan to defend claims arising after the 2018 audit when NNA cannot even muster a single example of such a claim during the nearly 15-month period from September, 2018, through December 31, 2019.

Second, and relatedly, NNA provides insufficient facts of "***what***" transpired or "***how***" it transpired with respect to the "examples" it provides. Instead, NNA's claims are based on hyperbolic and conclusory allegations, using words like "fraudulent," "falsified," and "bogus" as surrogates for specific facts. For example, NNA alleges in **paragraph 27** that Woodfield Nissan "falsified" claims to reflect that genuine NNA parts were used instead of aftermarket parts. Yet, NNA does not identify any specific information that was "falsified," much less who did so. NNA attaches no exhibits or records reflecting "false" claims and provides no facts about how NNA knows this information is "false." Similarly, **paragraph 29** states that Woodfield Nissan used a code for a technician who did not work for the dealership, but NNA does not identify the technician code, much less who performed the repair. For example, if the wrong code was used, but the technician was certified, this is not fraud. Moreover, NNA alleges in **paragraph 30** that Woodfield Nissan "added on 'bogus' warranty repairs," made "out of whole cloth," but provides no facts to identify what those "bogus" repairs were, or how NNA concluded the repairs were "bogus."

13

The trend continues at **paragraph 31**, where NNA alleges that one of Woodfield Nissan's employees "routinely" manufactured defects in vehicles. However, stating that something was done "routinely" is not sufficient to avoid providing concrete examples of such instances. Moreover, NNA does not allege any facts to reflect what these "manufactured defects" were, or how NNA learned about or confirmed these serious allegations. Similarly, in **paragraph 32**, NNA accuses Woodfield of "routinely" or "repeatedly" using incorrect operation codes, but never identifies one, let alone two, warranty claims where this issue presented itself. Nor does NNA provide any facts about how it determined the wrong code was used.

**Paragraph 33** does not describe a misrepresentation, but rather that claims were submitted that did not meet NNA's policies. However, there are no facts about how these claims were misrepresented, what false information was provided, or how the claims failed to meet NNA's policies. **Paragraph 34** alleges that Woodfield Nissan repaired damaged caused by its "car wash" under warranty, but offers no specifics such as the claim, vehicle, damage, or how NNA knows that Woodfield Nissan's car wash was "defective" as opposed to the car that Nissan manufactured. **Paragraph 35** contains no facts about which cars are at issue, what defects were manufactured, or how NNA knows that Woodfield Nissan never performed such repairs. And neither **paragraph 36 nor 37** contain any specifics about these claims such as the VIN, date, employee who submitted the claim, the defects claimed, or any other information to support the conclusion that these are examples of intentional fraud, as opposed to errors in records or simply confusion by NNA.

Importantly, many of NNA's allegations actually appear to describe matters that are *not* fraud, but rather, disagreements about the dealership's record-keeping. In paragraph 38, which is new to this Complaint, NNA alleges that Woodfield Nissan engaged in "false claim manufacturing" involving "time-clock logs," which NNA alleges "ought to be printed

14

contemporaneously with work performed, being printed on the copy of work orders that prepare [*sic*] only after the work is completed." While this allegation is surely confusing and not specific, it also appears to describe a disagreement about when records should be printed, ***but not fraud***. No falsity is alleged, and the fact that NNA may take issue with when and where time logs are printed does not justify forcing Woodfield Nissan to defend a $2.5 million fraud suit.

On a paragraph-by-paragraph analysis, none of these allegations contain specific facts, attach specific documents, or contain any detail to establish that a fraudulent scheme is the probable inference, as opposed to an equally reasonable non-fraudulent explanation. If NNA has evidence of actual fraud, such as documents, information received from third-parties, or data pulled from its audit, as opposed to rank speculation, then Rule 9(b) requires NNA to set forth that information with particularity for each of the examples that it attempts to provide. Having failed to do so, Counts I-III should be dismissed.

## CONCLUSION

For the reasons set forth above, Defendant Woodfield Nissan, Inc. respectfully requests that this Court enter an order dismissing Counts I-III of NNA's Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), and for such other and further relief as the Court deems just and proper

Date: January 19, 2024

Respectfully submitted,

**WOODFIELD NISSAN, INC.**

By: */s/ Eric P. VanderPloeg*
One of Its Attorneys

Ira M. Levin (ilevin@burkelaw.com)
Eric P. VanderPloeg (evanderploeg@burkelaw.com)
Chase E. Bullock (cbullock@burkelaw.com)
BURKE, WARREN, MACKAY & SERRITELLA, P.C.
330 North Wabash Avenue, 21st Floor
Chicago, Illinois 60611
Tel.: (312) 840-7000
*Attorneys for Woodfield Nissan, Inc.*

15

16

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that on the 19th day of January, 2024, he caused the foregoing **DEFENDANT WOODFIELD NISSAN, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS RULE 12(b)(6) MOTION TO DISMISS** to be filed electronically with the United States District Court for the Northern District of Illinois via the Court's CM/ECF filing system, and to be served by the same system on all counsel of record:

Gino Bulso
Paul Krog
Bulso, PLC
155 Franklin Road, Suite 400
Brentwood, TN 37027
gbulso@bulso.com
pkrog@bulso.com

_/s/ Eric P. VanderPloeg_