# EXHIBIT 1

IN THE CHANCERY COURT FOR THE STATE OF TENNESSEE
TWENTY FIRST JUDICIAL DISTRICT

| | |
|---|---|
| **NISSAN NORTH AMERICA, INC.,**<br><br>   Plaintiff,<br><br>v.<br><br>**WOODFIELD NISSAN, INC., and ROY CARR,**<br><br>   Defendants. | Case No. _____<br>**JURY DEMAND** |

## COMPLAINT

Plaintiff Nissan North America, Inc. ("NNA") brings this Complaint for injury to its business and property as a direct result of defendants' fraud, negligence, and breach of contract. NNA alleges as follows:

### NATURE OF THE ACTION

1. Defendants engaged in an ongoing scheme to defraud NNA. Defendant Woodfield Nissan, Inc. ("Woodfield Nissan"), is an authorized dealer of Nissan automobiles. Defendant Roy Carr is a former service director of Woodfield Nissan.

2. Defendants defrauded NNA out of millions of dollars by submitting fraudulent warranty and repair claims to NNA for payment. These warranty and repair claims were fraudulent for a variety of reasons including, but not limited to: Woodfield Nissan did not perform the service work; the service work was not necessary; defendants used aftermarket parts (rather than genuine Nissan parts) to perform the work; the technicians who performed the work were not certified; the service work was intentionally coded incorrectly (e.g., knuckle instead of wheel hub

4889-8568-2735.1                                                1

bearings); the service work was performed on vehicles with a branded title; and defendants intentionally and fraudulently altered warranty records they submitted to NNA.

## THE PARTIES

3. NNA is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, Williamson County, Tennessee.

4. Woodfield Nissan is, and at all times mentioned herein has been, a corporation duly organized and existing under the laws of the State of Illinois. Woodfield Nissan's principal place of business is at 700 W. Higgins Road, Hoffman Estates, Illinois, 60195.

5. Roy Carr is an individual who resides in Barrington, Illinois. Defendants Woodfield Nissan and Glendale Nissan employed Carr as service director during certain of the times relevant hereto.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of this action pursuant to Tenn. Code Ann. § 16-1-101 *et seq*. Venue is proper pursuant to Tenn. Code Ann. § 20-4-101 *et seq* because the causes of action asserted herein all arose in Franklin, Williamson County, Tennessee.

7. This Court has personal jurisdiction over Woodfield Nissan because it, either directly or indirectly, (a) transacted business in this state and county; (b) purposefully availed itself of the benefits of doing business with NNA in this state and county; (c) caused tortious damage by deceptive and fraudulent acts or omissions

in this state and county; (d) caused tortious damage in this state and county by acts or omissions committed outside this state while (i) regularly doing or soliciting business in this state, and/or (ii) engaged in other uniform and persistent courses of conduct within this state, and/or (iii) derived substantial revenue from doing business with NNA goods in this state and county; (e) engaged in a fraudulent scheme that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business in this state and county; (f) purposefully targeted false warranty claims via electronic submissions to NNA's Tennessee claim center or (g) otherwise had the requisite minimum contacts with this state and county, such that, under the circumstances, it is fair and reasonable to require it to defend this action in Tennessee. *See* TENN. CODE ANN. § 20-2-223.

8. Defendant Carr was a primary participant in the fraudulent warranty scheme at Woodfield Nissan. This Court may properly exercise personal jurisdiction over him pursuant to ***Calder v. Jones***, 465 U.S. 783 (1984)

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9. NNA is engaged in the business of manufacturing, distributing, wholesaling, advertising, and providing limited warranty coverage for new motor vehicles and related accessories and parts. NNA distributes new Nissan vehicles to authorized dealers located throughout the United States for sale to the public.

10. Woodfield Nissan holds an automobile dealer license from the Illinois Department of Motor Vehicles. NNA entered into a Nissan Dealer Sales and Service Agreement ("Dealer Agreement") with Woodfield Nissan. The Dealer Agreement

incorporates the Standard Provisions attached thereto and any applicable policies, program rules, and Manuals and Instructions incorporated therein (collectively, the "Standard Provisions"). The Dealer Agreement authorized, among other things, Woodfield Nissan to sell Nissan products and to service those products from its facility located in Hoffman Estates, Illinois.

11. A true and correct copy of the current Dealer Agreement and Standard Provisions entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 1.

12. Under Section 5 of the Standard Provisions, Woodfield Nissan agreed, in accordance with bulletins issued from time to time by NNA, to perform both warranty and customer-paid maintenance and service on Nissan vehicles.

13. Pursuant to Section 5 of the Standard Provisions, NNA pays Woodfield Nissan for all warranty repairs performed on Nissan vehicles, including payment for labor, diagnostics, and parts used in making such repairs, in accordance with a specified process.

14. Pursuant to this process under Section 5 of the Standard Provisions, Woodfield Nissan submits written warranty claims to NNA seeking payment for necessary and qualifying warranty repairs made on customer-owned Nissan vehicles, and NNA compensates Woodfield Nissan for warranty service provided to customers, as well as Nissan parts used for that purpose, in reliance on the information Woodfield Nissan's employees and agents submitted.

15. Under Sections 5 and 6 of the Standard Provisions, Woodfield Nissan agreed to comply with all requests of NNA with respect to the performance of services pursuant to warranty claims and agreed to maintain detailed records of the repairs requested, repairs performed, and the time and parts consumption in performing specific warranty services. Woodfield Nissan also agreed to maintain any other records used as the basis for submitting warranty claims or which can be used to verify the time spent on the repairs. Woodfield Nissan submitted warranty claims to NNA electronically. In return for Woodfield Nissan's compliance with such requests and maintenance of such records, NNA reimburses each dealership for work performed on warranty claims, in accordance with its policies and procedures. It is NNA that pays for such services and, as such, functions as the true "customer" of the warranty repairs performed on its products by its dealers, including the Woodfield Nissan, in accordance with the terms as set forth in NNA's warranties, policies, and procedures.

16. Pursuant to the terms of the Dealer Agreement and Section 5 of the Standard Provisions, warranty repairs and such other inspections, repairs, service, or corrections to Nissan products to be made at NNA's expense shall be performed in accordance with the provisions of the . Assurance Products Resource Manual ("APRM"). The APRM sets forth the policies and procedures pertaining to administration of NNA's warranties and Finance and Insurance Products.

17. Pursuant to Section 2 of the APRM, by submission of a claim to Nissan for reimbursement, a dealer, including Woodfield Nissan, certifies that: (i) all parts

and/or labor described on the claim were furnished at no charge to the customer; (ii) the repairs performed were not required due to accidents involving property damage or personal injuries; (iii) all information on the claim is accurate; and (iv) the vehicle has never been issued a "salvage title."

18. Woodfield Nissan is among approximately 1,200 authorized Nissan dealers in the United States. Based on the significant warranty repair operations that these approximately 1,200 dealers perform annually (a number easily estimated to exceed one million repairs), it is neither practicable nor reasonable for NNA to monitor, audit, and/or verify each and every warranty repair operation claimed to be performed by every one of its dealers every year. Therefore, NNA must rely upon its dealers, including Woodfield Nissan, to submit reimbursement claims that are fully substantiated for qualified repair operations that have been actually and properly performed.

19. Employees of the Nissan dealers must use software programs to communicate with NNA's warranty system to submit warranty claims to NNA for payment. Woodfield Nissan sent warranty claims to, and NNA received such claims at, NNA's corporate office in Tennessee. Employees of Nissan dealers contact Nissan's call center located in Tennessee for questions on how to submit these claims.

20. Upon receipt of a properly formatted and supported warranty claim at NNA's headquarters in Franklin, NNA, on a monthly basis, credits the dealer for the costs of providing the warranty service. Such credit is made to the dealer's non-vehicle account, which account is maintained by NNA at its headquarters in Franklin,

Tennessee. For the crediting to occur, the claim must arrive in Franklin; otherwise, Woodfield Nissan and other dealers cannot get paid for their warranty work. So too, all overview and verification of warranty claims is directed by personnel in the Franklin Executive offices. All administration of the warranty claims occurs at NNA's headquarters.

21. Over the last number of years, NNA paid Woodfield Nissan millions of dollars in reimbursement for different warranty repairs or otherwise reimbursable operations to which each such defendant was not entitled.

22. Pursuant to Section 6 of the Standard Provisions, Woodfield Nissan agreed to retain all sales and service records (whether in paper or electronic form) for a minimum period of two (2) years. Further, Section 6 of the Standard Provisions provides that NNA may inspect the methods, records, and accounts of Defendant relating to its operations. Section 2of the APRM requires that all repair orders, daily time, and payroll records must include the supporting substantiation.

23. A pervasive culture of fraud existed in the service department of Woodfield Nissan.

24. On September 24, 2018, NNA initiated an on-site audit to review the warranty and repair Woodfield Nissan submitted to NNA for payment during the period September 24, 2017, to September 18, 2018. Woodfield Nissan was unable to substantiate 343 of the 358 claims NNA reviewed during the audit.

25. Numerous former technicians, service advisors and service managers later confirmed to NNA that the service department at Woodfield Nissan engaged in

a pattern of fraudulent warranty practices for many years. Roy Carr, the service director at Woodfield Nissan, was the architect of many of the fraudulent warranty schemes Woodfield Nissan used. Two service advisors at the dealership, Mike Bartolic and Jose Rodriquez, actively aided Roy Carr in his fraudulent schemes. A used car technician, Kazimierz ("Casey") Michon, and several other technicians, David Michalski, Daniel Jacob, and Michael Flansburgh, also provided material assistance to defendants in carrying out their fraudulent schemes. Roy Carr and, *inter alia*, the foregoing service advisors and technicians routinely manufactured false repairs under factory and extended warranty programs as a means to increase the revenues generated in the service department.

26. Woodfield Nissan routinely and repeatedly engaged in more than a dozen fraudulent practices in order to obtain money from NNA under false pretenses, including but limited to the following practices. First, defendants routinely used aftermarket parts, including but not limited to radiators, brake pads, alternators, and other parts, to perform warranty and repair services, despite the fact that the APRM expressly prohibits such practices. Defendants falsified the warranty claims electronically submitted to NNA in Tennessee to indicate that genuine Nissan parts were used to complete the warranty and repair services.

27. Second, defendants used technicians to perform warranty and repair services who, in violation of the APRM, are not certified to perform such repairs. Woodfield Nissan, nevertheless, in the warranty claims submitted to NNA electronically in Tennessee, altered the identification number of the technician who

performed the work, and falsified the warranty claim to indicate that a certified technician provided the warranty and repair services. NNA's audit revealed that the certified technician whom defendants claimed to have performed many of the warranty repairs was not even employed at the dealership at the time the repairs were performed.

28. Third, defendants routinely "added on" bogus warranty repairs to a repair order. Defendants invented alleged defects out of whole cloth and misrepresented to customers that a vehicle needed a repair under warranty, when in fact the vehicle was not defective in any respect. Defendants then submitted unnecessary and bogus warranty claims to NNA, which paid Woodfield Nissan for the alleged warranty repairs. In some cases, Woodfield Nissan "added-on" bogus warranty repairs to work orders without the customer's knowledge and after the customer and the vehicle have left the dealership. Defendants then submitted such warranty claims to NNA, which paid the bogus claims.

29. Fourth, Woodfield Nissan routinely invented alleged warranty defects with respect to used cars held in inventory. The used car technician at Woodfield Nissan, Casey Michon, for example, has manufactured alleged defects with transfer cases, doors, window regulators, and other automotive systems. Defendants did not repair any such alleged defects but submitted warranty claims to NNA requesting payment. Such defects never existed, and no warranty services were ever provided, yet Defendants submitted warranty claims for such alleged repairs to NNA and received payment.

30. Fifth, every warranty claim Woodfield Nissan submitted to NNA contained an operation code that dictated the amount NNA would reimburse Woodfield Nissan for having properly performed a repair under warranty. In order to inflate the reimbursement it received from NNA, Woodfield Nissan routinely falsified the operation codes stated in the warranty claims submitted to NNA. For example, Woodfield Nissan repeatedly used the operations code for a "knuckle" repair under warranty when in fact Woodfield Nissan repaired or replaced wheel hub bearings or other components of a wheel hub assembly.

31. Sixth, NNA on occasion, and in accordance with the provisions of the APRM, reimburses a dealer for a repair under "goodwill," that is, a repair that a warranty, service contract, or campaign does not otherwise cover. The purpose of providing a repair under "goodwill" is to promote customer loyalty. Woodfield Nissan routinely abused the policies and procedures regarding goodwill repairs set out in the APRM. A dealer is permitted to perform a repair under "goodwill" only on a case-by-case basis after consideration of all factors relevant to a specific repair. Woodfield Nissan, however, used free repairs under "goodwill" as a marketing device to attract customers to its service department. It then submitted repairs under "goodwill" to NNA for payment, misrepresenting that such repairs met the criteria under the APRM for a permissible repair under goodwill.

32. Seventh, Woodfield Nissan operated a car wash that was defective and would frequently damage the side moldings on certain Nissan Maxima models. Rather than repair the damage its car wash did to such Maxima automobiles,

Woodfield Nissan instead submitted false claims to NNA seeking reimbursement for repair of such Maxima models under warranty. Woodfield Nissan concealed the fact that its own car wash damaged the vehicles and falsely represented to NNA that the moldings on such vehicles were defective.

33. Eighth, in cases where a customer had purchased a Security Plus service contract with no deductible, Woodfield Nissan simply manufactured alleged defects with a customer's Nissan automobile and submitted a false and fraudulent warranty claim to NNA without ever touching the car. NNA reimbursed Woodfield Nissan for the alleged repair under the Security Plus service contract. Defendants perpetrated such fraud without advising customers that the dealership had submitted a claim under the customer's service contract.

34. Ninth, on occasion, a vehicle for which Woodfield Nissan had submitted a bogus warranty claim or a claim under a Security Plus service contract needed to be repaired under warranty or under a service contract. In order to obtain the parts and services needed to repair such a vehicle, Woodfield Nissan used the vehicle identification number (or "VIN") of another customer's vehicle, or of a vehicle in defendants' used car inventory, to obtain reimbursement for the parts and services from NNA.

35. Tenth, to obtain reimbursement from NNA for alleged repairs under warranty, Woodfield Nissan falsified the VINs on vehicles with a "branded" title, i.e., a salvage title. Vehicles with a branded title generally are not eligible for repair under warranty. Nevertheless, in order to replace the transmission of a vehicle with a

branded title, Defendants on at least one occasion used the VIN of an unrelated vehicle and submitted a warranty claim to NNA with such false information.

## LEGAL CLAIMS

## COUNT I – FRAUD

36. NNA incorporates by reference Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

37. Defendants submitted sham warranty repair claims to NNA that stated the service referenced in each claim was completed for Nissan vehicle owners and customers.

38. Defendants submitted claims to NNA for warranty repairs that Defendants knew to be false. The sham warranty repairs were either not performed, were unnecessarily performed, or were knowingly performed in violation NNA's written policies and procedures.

39. Defendants knew that its representations and submissions to NNA were false and fraudulent at the time they were made. Defendants made such misrepresentations in order to mislead NNA and to produce a false impression in NNA. Defendants made such misrepresentations with fraudulent intent.

40. Defendants intended that NNA would rely on these materially false submissions made through Defendants to qualify—improperly—for reimbursement payments.

41. NNA reasonably relied on Defendants' false submissions.

42. Because of these submissions, actions, and inactions of Defendants, NNA incurred monetary damages in an amount to be determined at trial.

43. Defendants fraudulently concealed their wrongdoing from NNA by engaging in elaborate and creative misrepresentations and material omissions in its communications with NNA.

44. Defendants' actions were intentional, and Defendants knew that its actions would cause NNA to suffer substantial damages, in knowing disregard of the lawfulness of its actions. Defendants' willful, malicious, and fraudulent conduct and the ratification of that conduct by one or more managing agent(s) of Defendants entitle NNA to a recovery of compensatory and exemplary damages in an amount to be determined at trial.

## COUNT II – NEGLIGENT MISREPRESENTATION

45. NNA incorporates by reference Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

46. In connection with the submission of warranty claims to NNA, Defendants had a duty to exercise reasonable care represent facts to NNA accurately. In violation of this duty, Defendants falsely represented material facts to NNA concerning the warranty claims presented. Such representations were false when made and were made in the course of Defendants' business and in transactions in which Defendants had a pecuniary interest.

47. Defendants, in the exercise of ordinary and reasonable care, should have known that such representations were untrue when made. Defendants failed to exercise reasonable care either in obtaining or communicating the information. NNA did not know that such representations were false when made.

48. Defendants provided such false and faulty information to NNA to guide NNA in its business. NNA reasonably and justifiably relied upon the truth of such representations.

49. As a direct and proximate result of NNA's reliance upon Defendants' negligent misrepresentation of material facts, NNA has been damaged.

## COUNT III – BREACH OF CONTRACT.

50. NNA incorporates by reference Paragraphs 1 through 35 of this Complaint as if fully set forth herein.

51. Under the Standard Provisions, Woodfield Nissan was required to avoid all deceptive, misleading, unprofessional, or unethical practices with regard to its basic obligations to NNA.

52. By submitting false, fraudulent, and misleading warranty claims, Woodfield Nissan breached Sections 5 and 6 of the Standard Provisions. Woodfield Nissan also breached its contractual obligations with NNA by submitting warranty and repair claims that were non-compliant with NNA's policies and procedures.

53. NNA has complied with its obligations under the Dealer Agreement.

54. As a direct and proximate result of Woodfield Nissan's breach of the Dealer Agreement as alleged above, NNA has suffered harm in the form of monetary damage and injury to its business, reputation, and goodwill, and will sustain loss of revenues and profits.

## PRAYER FOR RELIEF

**WHEREFORE,** Nissan North America, Inc., prays that the Court enter judgment on its behalf and respectfully requests the following relief:

A. For a judgment of actual, compensatory, and consequential damages against Defendants in an amount in excess of $2,500,000;

B. For a judgment of punitive damages against Defendants in an amount to be shown to the Court;

D. For a judgment against Defendants for its reasonable attorneys' fees and costs associated with this litigation;

E. For a judgment of pre-judgment interest and post-judgment interest; and

F. For such other and further relief as this Court deems just and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY.

                        Respectfully submitted,

                        s/ Eugene N. Bulso, Jr.
                        Eugene N. Bulso, Jr. (No. 12005)
                        BULSO PLC
                        155 Franklin Road, Suite 400
                        Brentwood, TN 37027
                        Tel: 615-913-5200
                        gbulso@bulso.com
                        *Counsel for Nissan North America, Inc.*