# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| **NISSAN NORTH AMERICA, INC.,**<br><br>  Plaintiff,<br><br>v.<br><br>**WOODFIELD NISSAN, INC., and ROY CARR,**<br><br>  Defendants. | Case No. 3:23-cv-0716<br>Judge Crenshaw<br>Mag. Judge Frensley |

## AMENDED COMPLAINT

Plaintiff Nissan North America, Inc. ("NNA") brings this Complaint for injury to its business and property as a direct result of defendants' fraud, negligence, and breach of contract. NNA alleges as follows:

### NATURE OF THE ACTION

1. Defendants engaged in an ongoing scheme to defraud NNA. Defendant Woodfield Nissan, Inc. ("Woodfield Nissan"), is an authorized dealer of Nissan automobiles. Defendant Roy Carr is a former service director of Woodfield Nissan.

2. Defendants defrauded NNA out of millions of dollars by submitting fraudulent warranty and repair claims to NNA for payment. These warranty and repair claims were fraudulent for a variety of reasons including, but not limited to: Woodfield Nissan did not perform the service work; the service work was not necessary; defendants used aftermarket parts (rather than genuine Nissan parts) to perform the work; the technicians who performed the work were not certified; the service work was intentionally coded incorrectly (e.g., knuckle instead of wheel hub

bearings); the service work was performed on vehicles with a branded title; and defendants intentionally and fraudulently altered warranty records they submitted to NNA.

## THE PARTIES

3. NNA is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, Williamson County, Tennessee.

4. Woodfield Nissan is, and at all times mentioned herein has been, a corporation duly organized and existing under the laws of the State of Illinois. Woodfield Nissan's principal place of business is at 700 W. Higgins Road, Hoffman Estates, Illinois, 60195.

5. Roy Carr is an individual who resides in Barrington, Illinois. Defendant Woodfield Nissan employed Carr as service director during certain of the times relevant hereto.

## JURISDICTION AND VENUE

6. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332. Venue is proper in this District pursuant to 28 U.S.C. § 1441(a). Venue was proper in the State court pursuant to Tennessee Code Ann. § 20-4-101 *et seq.* because the causes of action asserted herein all arose in Franklin, Williamson County, Tennessee.

7. This Court has personal jurisdiction over Woodfield Nissan because it, either directly or indirectly, (a) transacted business in this state and county; (b) purposefully availed itself of the benefits of doing business with NNA in this

state and county; (c) caused tortious damage by deceptive and fraudulent acts or omissions in this state and county; (d) caused tortious damage in this state and county by acts or omissions committed outside this state while (i) regularly doing or soliciting business in this state, and/or (ii) engaged in other uniform and persistent courses of conduct within this state, and/or (iii) derived substantial revenue from doing business with NNA goods in this state and county; (e) engaged in a fraudulent scheme that was directed at, and had a direct, substantial, reasonably foreseeable, and intended effect of causing injury to, the business or property of persons and entities residing in, located in, or doing business in this state and county; (f) purposefully targeted false warranty claims via electronic submissions to NNA's Tennessee claim center or (g) otherwise had the requisite minimum contacts with this state and county, such that, under the circumstances, it is fair and reasonable to require it to defend this action in Tennessee.

8. Defendant Carr was a primary participant in the fraudulent warranty scheme at Woodfield Nissan. This Court may properly exercise personal jurisdiction over him pursuant to *Calder v. Jones*, 465 U.S. 783 (1984).

### FACTS COMMON TO ALL CLAIMS FOR RELIEF

9. NNA is engaged in the business of manufacturing, distributing, wholesaling, advertising, and providing limited warranty coverage for new motor vehicles and related accessories and parts. NNA distributes new Nissan vehicles to authorized dealers located throughout the United States for sale to the public.

10. Woodfield Nissan holds an automobile dealer license from the Illinois Department of Motor Vehicles. NNA entered into a Nissan Dealer Sales and Service Agreement ("Dealer Agreement") with Woodfield Nissan.

11. The Dealer Agreement incorporates NNA's Standard Provisions and applicable policies, program rules, and Manuals and Instructions, as NNA might update these from time to time. The Dealer Agreement authorized, among other things, Woodfield Nissan to sell Nissan products and to service those products from its facility located in Hoffman Estates, Illinois.

12. A true and correct copy of the current Dealer Agreement entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 1 and incorporated herein by reference.

13. A true and correct copy of the current Stand Provisions (excepting other documents in turn incorporated into them) is attached hereto as Exhibit 2 and incorporated herein by reference.

14. Under Section 5 of the Standard Provisions, Woodfield Nissan agreed, in accordance with bulletins issued from time to time by NNA, to perform both warranty and customer-paid maintenance and service on Nissan vehicles.

15. Pursuant to Section 5 of the Standard Provisions, NNA pays Woodfield Nissan for all warranty repairs performed on Nissan vehicles, including payment for labor, diagnostics, and parts used in making such repairs, in accordance with a specified process.

16. Pursuant to this process under Section 5 of the Standard Provisions, Woodfield Nissan submits written warranty claims to NNA seeking payment for necessary and qualifying warranty repairs made on customer-owned Nissan vehicles, and NNA compensates Woodfield Nissan for warranty service provided to customers, as well as Nissan parts used for that purpose, in reliance on the information Woodfield Nissan's employees and agents submitted.

17. Under Sections 5 and 6 of the Standard Provisions, Woodfield Nissan agreed to comply with all requests of NNA with respect to the performance of services pursuant to warranty claims and agreed to maintain detailed records of the repairs requested, repairs performed, and the time and parts consumption in performing specific warranty services. Woodfield Nissan also agreed to maintain any other records used as the basis for submitting warranty claims or which can be used to verify the time spent on the repairs.

18. In return for Woodfield Nissan's compliance with verification requests and maintenance of warranty records, NNA reimburses the dealership for work performed on warranty claims, in accordance with its policies and procedures. NNA pays for such services and, as such, functions as the true "customer" of the warranty repairs performed on its products by its dealers, including Woodfield Nissan, in accordance with the terms set forth in NNA's Warranty Manual and other policies and procedures.

19. Pursuant to the terms of the Dealer Agreement and Section 5 of the Standard Provisions, warranty repairs and such other inspections, repairs, service,

or corrections to Nissan products to be made at NNA's expense shall be performed in accordance with the provisions of the Warranty Manual. The Assurance Products Resource Manual ("APRM") sets forth the policies and procedures pertaining to administration of NNA's warranties and Finance and Insurance Products and is incorporated by reference into the Warranty Manual.

20. Pursuant to Section 2.3 of the APRM, by submission of a claim to Nissan for reimbursement, a dealer, including Woodfield Nissan, certifies that: (i) all parts and/or labor described on the claim were furnished at no charge to the customer; (ii) the repairs performed were not required due to accidents involving property damage or personal injuries; (iii) all information on the claim is accurate; and (iv) the vehicle has never been issued a "salvage title."

21. Woodfield Nissan is among approximately 1,200 authorized Nissan dealers in the United States. Based on the significant warranty repair operations that these approximately 1,200 dealers perform annually (a number easily estimated to exceed one million repairs), it is neither practicable nor reasonable for NNA to monitor, audit, or verify each and every warranty repair operation claimed to be performed by every one of its dealers every year. Therefore, NNA must rely upon its dealers, including Woodfield Nissan, to submit reimbursement claims that are fully substantiated for qualified repair operations that have been actually and properly performed.

22. Employees of the Nissan dealers must use dedicated software to communicate with NNA's warranty system to submit warranty claims to NNA for

payment. Woodfield Nissan sent warranty claims to, and NNA received such claims at, NNA's corporate office in Tennessee.

23. In addition to using dedicated software to submit warranty claims to NNA's Franklin headquarters, Woodfield Nissan placed calls and other communications to NNA call centers in Tennessee. These included calls concerning the claim-submission process and calls concerning particular repairs or putative repairs.

24. Indeed, Woodfield Nissan maintains nearly continuous communication with NNA's Franklin headquarters. From its Franklin headquarters, NNA maintains and operates computer databases that both feed information to and receive information from dealerships. Woodfield Nissan interfaces with these databases to transmit information concerning parts and vehicle inventory, sales, updates to vehicle histories, and service operations, as well as warranty and related claims.

25. NNA's Franklin headquarters sends Woodfield Nissan vast quantities of information via this mechanism as well, including listings for parts numbers, repair codes, business forms, recall and service campaigns, and vehicle history.

26. Woodfield Nissan uses its electronic communication conduits with NNA's Franklin headquarters to order parts for its service department. In some instances, Woodfield Nissan employees send customized orders to NNA's Franklin headquarters via electronic means. In others, Woodfield Nissan has programmed its systems to place orders automatically when inventory in its service department

reaches a specified threshold. In either case, NNA receives these orders at its headquarters and causes them to be fulfilled through a shipment from a regional parts distribution center.

27. NNA also maintains at its Franklin headquarters financial accounts for all dealerships. One such account is the dealer's non-vehicle account, which is used to account for payments on items other than vehicles.

28. Upon receipt of a properly formatted and supported warranty claim at NNA's headquarters in Franklin, NNA immediately credits the dealer for the costs of providing the warranty service by providing a set-off in the dealer's non-vehicle account. For the crediting to occur, the claim must arrive in Franklin; otherwise, Woodfield Nissan and other dealers cannot get paid for their warranty work.

29. So too, all overview and verification of warranty claims is directed by personnel in the Franklin Executive offices. All administration of the warranty claims occurs at NNA's headquarters.

30. A similar process is observed for repair work performed by dealers, including Woodfield Nissan, and paid for by NNA, but that are not technically warranty repairs. Work performed pursuant to recalls, Nissan service contracts, and goodwill is reported and paid for in the same manner: the dealer transmits information concerning the work to NNA, and NNA pays the dealer through its non-vehicle account.

31. During the time at issue in this case, NNA paid Woodfield Nissan millions of dollars for different warranty repairs or other reimbursable operations for which Woodfield Nissan was not entitled.

32. Pursuant to Section 6 of the Standard Provisions, Woodfield Nissan agreed to retain all sales and service records (whether in paper or electronic form) for a minimum period of two (2) years. Further, Section 6 of the Standard Provisions provides that NNA may inspect the methods, records, and accounts of Defendant relating to its operations. Section 2.9 of the APRM requires that all repair orders, daily time, and payroll records must include the supporting substantiation.

33. NNA (then known as "Nissan Motor Corporation in U.S.A.") was originally a California corporation with its principal place of business in Gardena, California. In 2006, however, NNA relocated its principal place of business to Tennessee.

34. Since that time, NNA's operations, and its interactions with dealers such as Woodfield Nissan, have been conducted and overseen from Tennessee. NNA has, in the years since its relocation to Tennessee, promulgated updates to the APRM, Warranty Manual, and other policies and procedures. It has approved Woodfield to sell new product lines and conducted the diverse and extensive communications necessary for the parties' complex business relationship out of its Franklin headquarters.

35. And while NNA has, during this time, maintained a regional office in Aurora, Illinois, that has carried on some correspondence with Woodfield Nissan, NNA's core business functions, and all correspondence and operation concerning warranty work and other NNA-funded service operations, has taken place in or with NNA employees in Tennessee. The regional office has no role in the review, approval, or payment of warranty and other NNA-funded service claims.

36. Woodfield Nissan has elected to continue the parties' agreement, to enter into amendments thereto, and to accept amendments to the product offerings, service area, and other addenda to and incorporated terms of the Dealer Agreement over the seventeen years since NNA moved its headquarters to Tennessee.

37. A pervasive culture of fraud existed in the service department of Woodfield Nissan.

38. On September 24, 2018, NNA initiated an on-site audit to review the warranty and repair Woodfield Nissan submitted to NNA for payment during the period September 24, 2017, to September 18, 2018. Woodfield Nissan was unable to substantiate 343 of the 358 claims NNA reviewed during the audit.

39. Numerous former technicians, service advisors and service managers have confirmed to NNA that the service department at Woodfield Nissan engaged in a pattern of fraudulent warranty practices for many years. Roy Carr, the service director at Woodfield Nissan, was the architect of many of the fraudulent warranty schemes Woodfield Nissan used.

40. Two service advisors at the dealership, Mike Bartolic and Jose Rodriquez, actively aided Roy Carr in his fraudulent schemes. A used car technician, Kazimierz ("Casey") Michon, and several other technicians, David Michalski, Daniel Jacob, and Michael Flansburgh, also provided material assistance to defendants in carrying out their fraudulent schemes. Roy Carr and, *inter alia*, the foregoing service advisors and technicians routinely manufactured false repairs under factory and extended warranty programs as a means to increase the revenues generated in the service department.

41. Woodfield Nissan routinely and repeatedly engaged in more than a dozen fraudulent practices in order to obtain money from NNA under false pretenses, including but limited to the following practices. First, defendants routinely used aftermarket parts, including but not limited to radiators, brake pads, alternators, and other parts, to perform warranty and repair services, despite the fact that the APRM expressly prohibits such practices. Defendants falsified the warranty claims electronically submitted to NNA in Tennessee to indicate that genuine Nissan parts were used to complete the warranty and repair services.

42. Second, defendants used technicians to perform warranty and repair services who, in violation of the APRM, are not certified to perform such repairs. Woodfield Nissan, nevertheless, in the warranty claims submitted to NNA electronically in Tennessee, altered the identification number of the technician who performed the work, and falsified the warranty claim to indicate that a certified technician provided the warranty and repair services. NNA's audit revealed that

the certified technician whom defendants claimed to have performed many of the warranty repairs was not even employed at the dealership at the time the repairs were performed.

43. Third, defendants routinely "added on" bogus warranty repairs to a repair order. Defendants invented alleged defects out of whole cloth and misrepresented to customers that a vehicle needed a repair under warranty, when in fact the vehicle was not defective in any respect. Defendants then submitted unnecessary and bogus warranty claims to NNA, which paid Woodfield Nissan for the alleged warranty repairs. In some cases, Woodfield Nissan "added-on" bogus warranty repairs to work orders without the customer's knowledge and after the customer and the vehicle have left the dealership. Defendants then submitted such warranty claims to NNA, which paid the bogus claims.

44. Fourth, Woodfield Nissan routinely invented alleged warranty defects with respect to used cars held in inventory. The used car technician at Woodfield Nissan, Casey Michon, for example, has manufactured alleged defects with transfer cases, doors, window regulators, and other automotive systems. Defendants did not repair any such alleged defects but submitted warranty claims to NNA requesting payment. Such defects never existed, and no warranty services were ever provided, yet Defendants submitted warranty claims for such alleged repairs to NNA and received payment.

45. Fifth, every warranty claim Woodfield Nissan submitted to NNA contained an operation code that dictated the amount NNA would reimburse

Woodfield Nissan for having properly performed a repair under warranty. In order to inflate the reimbursement it received from NNA, Woodfield Nissan routinely falsified the operation codes stated in the warranty claims submitted to NNA. For example, Woodfield Nissan repeatedly used the operations code for a "knuckle" repair under warranty when in fact Woodfield Nissan repaired or replaced wheel hub bearings or other components of a wheel hub assembly.

46. Sixth, NNA on occasion, and in accordance with the provisions of the APRM, reimburses a dealer for a repair under "goodwill," that is, a repair that a warranty, service contract, or campaign does not otherwise cover. The purpose of providing a repair under "goodwill" is to promote customer loyalty. Woodfield Nissan routinely abused the policies and procedures regarding goodwill repairs set out in the APRM. A dealer is permitted to perform a repair under "goodwill" only on a case-by-case basis after consideration of all factors relevant to a specific repair. Woodfield Nissan, however, used free repairs under "goodwill" as a marketing device to attract customers to its service department. It then submitted repairs under "goodwill" to NNA for payment, misrepresenting that such repairs met the criteria under the APRM for a permissible repair under goodwill.

47. Seventh, Woodfield Nissan operated a car wash that was defective and would frequently damage the side moldings on certain Nissan Maxima models. Rather than repair the damage its car wash did to such Maxima automobiles, Woodfield Nissan instead submitted false claims to NNA seeking reimbursement for repair of such Maxima models under warranty. Woodfield Nissan concealed the fact

that its own car wash damaged the vehicles and falsely represented to NNA that the moldings on such vehicles were defective.

48. Eighth, in cases where a customer had purchased a Security Plus service contract (an extended-service contract offered by NNA) with no deductible, Woodfield Nissan simply manufactured alleged defects with a customer's Nissan automobile and submitted a false and fraudulent warranty claim to NNA without ever touching the car. NNA reimbursed Woodfield Nissan for the alleged repair under the Security Plus service contract. Defendants perpetrated such fraud without advising customers that the dealership had submitted a claim under the customer's service contract.

49. Ninth, on occasion, a vehicle for which Woodfield Nissan had submitted a bogus warranty claim or a claim under a Security Plus service contract needed to be repaired under warranty or under a service contract. In order to obtain the parts and services needed to repair such a vehicle, Woodfield Nissan used the vehicle identification number (or "VIN") of another customer's vehicle, or of a vehicle in defendants' used car inventory, to obtain reimbursement for the parts and services from NNA.

50. Tenth, to obtain reimbursement from NNA for alleged repairs under warranty, Woodfield Nissan falsified the VIN numbers on vehicles with a "branded" title, i.e., a salvage title. Vehicles with a branded title are not eligible for repair under warranty. Nevertheless, in order to replace the transmission of a vehicle with

a branded title, Defendants on at least one occasion used the VIN of an unrelated vehicle and submitted a warranty claim to NNA with such false information.

## LEGAL CLAIMS

### COUNT I – BREACH OF CONTRACT

51. NNA incorporates by reference Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

52. Under the Standard Provisions, Woodfield Nissan was required to avoid all deceptive, misleading, unprofessional, or unethical practices with regard to its basic obligations to NNA.

53. By submitting false, fraudulent, and misleading warranty claims, Woodfield Nissan breached Sections 5 and 6 of the Standard Provisions. Woodfield Nissan also breached its contractual obligations with NNA by submitting warranty and repair claims that were non-complaint with NNA's policies and procedures.

54. NNA has complied with its obligations under the Dealer Agreement.

55. As a direct and proximate result of Woodfield Nissan's breach of the Dealer Agreement as alleged above, NNA has suffered harm in the form of monetary damage and injury to its business, reputation, and goodwill, and will sustain loss of revenues and profits.

### COUNT II – UNJUST ENRICHMENT

56. NNA incorporates by reference Paragraphs 1 through 50 of this Complaint as if fully set forth herein.

57. In the alternative, in the event that NNA paid Woodfield Nissan for warranty or other NNA-funded service work in response to improper, false, or

fraudulent submissions as outlined herein and those submissions and payments were not, in fact, governed by the parties' agreements, then Woodfield Nissan has been unjustly enriched by the receipt and retention of those payments.

58. In that event, the parties do not have a contract governing the subject matter of the transaction.

59. Woodfield Nissan obtained payments from NNA through tortious, fraudulent, and unconscionable means.

60. As a direct and proximate result of Woodfield Nissan's conduct, NNA has suffered injuries.

61. Equity and justice require that Woodfield Nissan disgorge the amounts it received.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Nissan North America, Inc., prays that the Court enter judgment on its behalf and respectfully requests the following relief:

A. For a judgment of actual, compensatory, and consequential damages against Defendants in an amount in excess of $2,500,000;

B. For a judgment of punitive damages against Defendants in an amount to be shown to the Court;

D. For a judgment against Defendants for its reasonable attorneys' fees and costs associated with this litigation;

E. For a judgment of pre-judgment interest and post-judgment interest; and

F. For such other and further relief as this Court deems just and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,

s/ Paul J. Krog
Eugene N. Bulso, Jr. (No. 12005)
Paul J. Krog (No. 29263)
BULSO PLC
155 Franklin Road, Suite 400
Brentwood, TN 37027
Tel: 615-913-5200
gbulso@bulso.com
*Counsel for Nissan North America, Inc.*

## Certificate of Service

I hereby certify that the foregoing is being submitted via the Court's ECF system, which is expected to effect service on the following, on this day, September 21, 2023:

James Catalano
The Catalano Firm PLC
PO Box 681267
Franklin, TN 37068
615-945-2307
jim@catalanofirm.com

Ira M. Levin
Eric P. VanderPloeg
Chase E. Bullock
Burke, Warren, MacKay & Serritella PC
330 North Wabash Ave.
21st Floor
Chicago, IL 60611
312-840-7000
ilevin@burkelaw.com
evanderploeg@burkelaw.com
cbullock@burkelaw.com

and entrusted to the care of the United States Postal Service for delivery as first-class mail to the following:

Roy Carr
906 S. Hough St.
Barrington, IL 60010

s/ Paul J. Krog
Paul J. Krog