### IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS

**NISSAN NORTH AMERICA, INC.,**

   **Plaintiff,**

**v.**

**WOODFIELD NISSAN, INC., and
ROY CARR,**

   **Defendants.**

**Case No. 1:23-cv-16084
JURY DEMAND**

---

### AMENDED COMPLAINT

---

The Plaintiff, Nissan North America, Inc. ("NNA") brings this Complaint for injury to its business and property as a direct result of defendants' fraud, negligence, and breach of contract. NNA alleges as follows:

### NATURE OF THE ACTION

1.   Defendants engaged in a long-running scheme to defraud NNA. Defendant Woodfield Nissan, Inc. ("Woodfield Nissan"), is an authorized dealer of Nissan automobiles. Defendant Roy Carr is a former service director of Woodfield Nissan.

2.   Defendants defrauded NNA out of millions of dollars by submitting fraudulent warranty and repair claims to NNA for payment. These warranty and repair claims were fraudulent for a variety of reasons including, but not limited to: Woodfield Nissan did not perform the service work; the service work was not necessary; defendants used aftermarket parts (rather than genuine Nissan parts) to perform the work; the technicians who performed the work were not certified; the

1

service work was intentionally coded incorrectly (e.g., knuckle instead of wheel hub bearings); the service work was performed on vehicles with a branded title; and defendants intentionally and fraudulently altered warranty records they submitted to NNA.

3.      Irrespective of intent, these actions by Woodfield Nissan constituted a serious and obvious breach of Woodfield Nissan's obligations and responsibilities to NNA, resulting in significant damages.

## THE PARTIES

4.      NNA is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, Williamson County, Tennessee.

5.      Woodfield Nissan is, and at all times mentioned herein has been, a corporation duly organized and existing under the laws of the State of Illinois. Woodfield Nissan's principal place of business is at 700 W. Higgins Road, Hoffman Estates, Illinois, 60195.

6.      Roy Carr is an individual who resides in Barrington, Illinois. Defendants Woodfield Nissan and Glendale Nissan employed Carr as service director during certain of the times relevant hereto.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332. The citizenship of the plaintiff is diverse from that of each defendant and the amount in controversy exceeds $75,000, exclusive of interest, costs, attorney's fees, and punitive damages.

2

8.      Venue is proper in this court pursuant to 28 U.S.C. §1391(b)(1) and (2) because each defendant resides in this district and a substantial part of the events giving rise to this action occurred in this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9.      NNA is engaged in the business of manufacturing, distributing, wholesaling, advertising, and providing limited warranty coverage for new motor vehicles and related accessories and parts. NNA distributes new Nissan vehicles to authorized dealers located throughout the United States for sale to the public.

10.     Woodfield Nissan holds an automobile dealer license from the Illinois Department of Motor Vehicles. NNA entered into a Nissan Dealer Sales and Service Agreement ("Dealer Agreement") with Woodfield Nissan. The Dealer Agreement incorporates Standard Provisions applicable to all NNA dealer agreements and any applicable policies, program rules, and Manuals and Instructions incorporated therein (collectively, the "Standard Provisions"). The Dealer Agreement authorized, among other things, Woodfield Nissan to sell Nissan products and to service those products from its facility located in Hoffman Estates, Illinois.

11.     A true and correct copy of the current Dealer Agreement entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 1. A true and correct copy of the Standard Provisions entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 2.

12.     Under Article Second of the Dealer Agreement and Section 5 of the Standard Provisions, Woodfield Nissan agreed, in accordance with bulletins issued

from time to time by NNA, to perform both warranty and customer-paid maintenance and service on Nissan vehicles.

13.     Under Section 5 of the Standard Provisions, Woodfield also committed to "make every effort to build and maintain good relations between Dealer and owners and users of Nissan Products."

14.     Pursuant to Section 5 of the Standard Provisions, NNA pays Woodfield Nissan for all warranty repairs performed on Nissan vehicles, including payment for labor, diagnostics, and parts used in making such repairs, in accordance with a specified process.

15.     Pursuant to this process under Section 5 of the Standard Provisions, Woodfield Nissan submits written warranty claims to NNA seeking payment for necessary and qualifying warranty repairs made on customer-owned Nissan vehicles, and NNA compensates Woodfield Nissan for warranty service provided to customers, as well as for Nissan parts used for that purpose, in reliance on the information Woodfield Nissan's employees and agents submitted.

16.     Under Sections 5 and 6 of the Standard Provisions, Woodfield Nissan agreed to comply with all requests of NNA with respect to the performance of services pursuant to warranty claims and agreed to maintain detailed records of the repairs requested, repairs performed, and the time and parts consumption in performing specific warranty services.  Woodfield Nissan also agreed to maintain any other records used as the basis for submitting warranty claims or which can be used to verify the time spent on the repairs. Woodfield Nissan submitted warranty claims to

4

NNA electronically. In return for Woodfield Nissan's compliance with such requests and maintenance of such records, NNA reimburses it, as it does each dealership, for work performed on warranty claims, in accordance with its policies and procedures. It is NNA that pays for such services and, as such, functions as the true "customer" of the warranty repairs performed on its products by its dealers, including the Woodfield Nissan, in accordance with the terms as set forth in NNA's warranties, policies, and procedures.

17. Pursuant to the terms of the Dealer Agreement and Section 5 of the Standard Provisions, warranty repairs and such other inspections, repairs, service, or corrections to Nissan products to be made at NNA's expense shall be performed in accordance with the provisions of the Warranty Manual. The Assurance Products Resource Manual ("APRM") sets forth the policies and procedures pertaining to administration of NNA's warranties and Finance and Insurance Products and is incorporated by reference into the Warranty Manual. The Standard Provisions incorporate the Warranty Manual, in turn, by reference.

18. Pursuant to Section 2.3 of the APRM, by submission of a claim to Nissan for reimbursement, a dealer, including Woodfield Nissan, certifies that: (i) all parts and/or labor described on the claim were furnished at no charge to the customer; (ii) the repairs performed were not required due to accidents involving property damage or personal injuries; (iii) all information on the claim is accurate; and (iv) the vehicle has never been issued a "salvage title."

19.     These same requirements govern repairs funded by NNA but not technically covered by NNA's limited warranties, including repairs performed pursuant to recalls, under extended-warranty service contracts offered by NNA or its affiliates, and authorized "goodwill" repairs.

20.     Woodfield Nissan is among approximately 1,200 authorized Nissan and Infiniti dealers in the United States.  Based on the significant warranty repair operations that these approximately 1,200 dealers perform annually (a number easily estimated to exceed one million repairs), it is neither practicable nor reasonable for NNA to monitor, audit, and/or verify each and every warranty repair operation claimed to be performed by every one of its dealers every year.  Therefore, NNA must rely upon its dealers, including Woodfield Nissan, to submit reimbursement claims that are fully substantiated for qualified repair operations that have been actually and properly performed.

21.     Employees of the Nissan dealers must use software programs to communicate with NNA's warranty system to submit warranty claims to NNA for payment.  Woodfield Nissan sent warranty claims to, and NNA received such claims at, NNA's corporate office in Tennessee.  Employees of Nissan dealers contact Nissan's call center located in Tennessee for questions on how to submit these claims.

22.     Upon receipt of a properly formatted and supported warranty claim, NNA immediately credits the dealer for the costs of providing the warranty service. Such credit is provided through a set-off in the dealer's non-vehicle account.

23.     During the period at issue, NNA paid Woodfield Nissan millions of dollars in reimbursement for different warranty repairs or otherwise reimbursable operations to which each such defendant was not entitled. By doing so, Woodfield Nissan's actions undermined consumer confidence. For example, by virtue of submitting claims for unnecessary repairs, Woodfield Nissan necessarily led customers to believe that their Nissan vehicles were more prone to breakdown and otherwise were not of the integrity expected or actually provided by NNA.

24.     A pervasive culture of fraud existed in the service department of Woodfield Nissan, thus undermining consumer confidence in NNA's vehicles.

25.     On September 24, 2018, NNA initiated an on-site audit to review the warranty and repair claims Woodfield Nissan had submitted to NNA for payment during the period September 24, 2017, to September 18, 2018. Woodfield Nissan was unable to substantiate 343 of the 358 claims NNA reviewed during the audit.

26.     Numerous former technicians, service advisors and service managers have confirmed to NNA that the service department at Woodfield Nissan engaged in a pattern of false and/or fraudulent warranty practices for many years prior to and running at least through 2019. Roy Carr, the service director at Woodfield Nissan, was the architect of many of the fraudulent warranty schemes Woodfield Nissan used.  Two service advisors at the dealership, Mike Bartolic and Jose Rodriquez, actively aided Roy Carr in his fraudulent schemes. A used car technician, Kazimierz ("Casey") Michon, and several other technicians, David Michalski, Daniel Jacob, and Michael Flansburgh, also provided material assistance to defendants in carrying out

their fraudulent schemes. Roy Carr and, *inter alia*, the foregoing service advisors and technicians routinely manufactured false and/or fraudulent repairs under factory- and extended-warranty programs as a means to increase the revenues generated in the service department.

27.     Woodfield Nissan routinely and repeatedly engaged in more than a dozen fraudulent practices in order to obtain money from NNA under false pretenses, including but not limited to the following practices.  First, during the period January 1, 2016, through December 31, 2019, (the "False Claims Period") defendants routinely used aftermarket parts, including but not limited to radiators, brake pads, alternators, and other parts, to perform warranty and repair services, despite the fact that the APRM expressly prohibits such practices. Defendants falsified the warranty claims electronically submitted to NNA in Tennessee to indicate that genuine Nissan parts were used to complete the warranty and repair services.

28.     NNA, however, paid Woodfield Nissan's claims in reliance on the representation that genuine Nissan parts had been used and thus reimbursed Woodfield Nissan for the costs of genuine parts that Woodfield Nissan never in fact purchased.

29.     Second, during the False Claims Period, defendants used technicians to perform warranty and repair services who, in violation of the APRM, are not certified to perform such repairs.  Woodfield Nissan, nevertheless, in the warranty claims submitted to NNA electronically in Tennessee, altered the identification number of the technician who performed the work, and falsified the warranty claim to indicate

that a certified technician provided the warranty and repair services. NNA's audit revealed that the certified technician whom defendants claimed to have performed many of the warranty repairs was not even employed at the dealership at the time the repairs were performed.

30. Third, during the False Claims Period, defendants routinely "added on" bogus warranty repairs to a repair order. Defendants invented alleged defects out of whole cloth and misrepresented to customers that a vehicle needed a repair under warranty, when in fact the vehicle was not defective in any respect. Defendants then submitted unnecessary and bogus warranty claims to NNA, which paid Woodfield Nissan for the alleged warranty repairs. In some cases, Woodfield Nissan "added-on" bogus warranty repairs to work orders without the customer's knowledge and after the customer and the vehicle have left the dealership. Defendants then submitted such warranty claims to NNA, which paid the bogus claims.

31. Fourth, during the False Claims Period, Woodfield Nissan routinely invented alleged warranty defects with respect to used cars held in inventory. The used car technician at Woodfield Nissan, Casey Michon, for example, manufactured alleged defects with transfer cases, doors, window regulators, and other automotive systems. Woodfield Nissan did not repair any such alleged defects but submitted warranty claims to NNA requesting payment as if it had. Such defects never existed, and no warranty services were ever provided, yet Defendants submitted warranty claims for such alleged repairs to NNA and received payment.

32.     Fifth, during the False Claims Period, every warranty claim Woodfield Nissan submitted to NNA contained an operation code that dictated the amount NNA would reimburse Woodfield Nissan for having properly performed a repair under warranty. In order to inflate the reimbursement it received from NNA, Woodfield Nissan routinely falsified the operation codes stated in the warranty claims submitted to NNA. For example, Woodfield Nissan repeatedly used the operations code for a more-expensive "knuckle" repair under warranty when in fact Woodfield Nissan performed a less-expensive repair or replacement of wheel hub bearings or other components of a wheel hub assembly.

33.     Sixth, NNA on occasion, and in accordance with the provisions of the APRM, reimburses a dealer for a repair under "goodwill," that is, a repair that a warranty, service contract, or campaign does not otherwise cover. The purpose of providing a repair under "goodwill" is to promote customer loyalty. During the False Claims Period, Woodfield Nissan routinely abused the policies and procedures regarding goodwill repairs set out in the APRM. A dealer is permitted to perform a repair under "goodwill" only on a case-by-case basis after consideration of all factors relevant to a specific repair.  Woodfield Nissan, however, used free repairs under "goodwill" as a marketing device to attract customers to its service department.  It then submitted repairs under "goodwill" to NNA for payment, misrepresenting that such repairs met the criteria under the APRM for a permissible repair under goodwill.

34.     Seventh, during the False Claims Period, Woodfield Nissan operated a car wash that was defective and would frequently damage the side moldings on

certain Nissan Maxima models. Rather than repair the damage its car wash did to such Maxima automobiles at its own expense, Woodfield Nissan instead submitted false claims to NNA seeking reimbursement for repair of such Maxima models under warranty. Woodfield Nissan concealed the fact that its own car wash damaged the vehicles and falsely represented to NNA that the moldings on such vehicles were defective.

35. Eighth, during the False Claims Period, in cases where a customer had purchased a Nissan Security Plus service contract with no deductible, Woodfield Nissan simply manufactured alleged defects with a customer's Nissan automobile and submitted a false and fraudulent warranty claim to NNA without ever touching the car. NNA reimbursed Woodfield Nissan for the alleged repair under the Security Plus service contract. Defendants perpetrated such fraud without advising customers that the dealership had submitted a claim under the customer's service contract.

36. Ninth, during the False Claims Period, on occasion, a vehicle for which Woodfield Nissan had submitted a bogus warranty claim or a claim under a Security Plus service contract needed to be repaired under warranty or under a service contract. In order to obtain the parts and services needed to repair such a vehicle, Woodfield Nissan used the vehicle identification number (or "VIN") of another customer's vehicle, or of a vehicle in defendants' used car inventory, to obtain reimbursement for the parts and services from NNA.

37. Tenth, during the False Claims Period, to obtain reimbursement from NNA for alleged repairs under warranty, Woodfield Nissan falsified the VIN numbers

on vehicles with a "branded" title, i.e., a salvage title. Vehicles with a branded title are not eligible for repair under warranty. Nevertheless, in order to replace the transmission of a vehicle with a branded title, Defendants on at least one occasion used the VIN of an unrelated vehicle and submitted a warranty claim to NNA with such false information.

38.     During the False Claims Period up through September 2018, Woodfield Nissan's monthly warranty-reimbursement numbers were at least approximately twice the national average for all but four months, and they were approximately three times or greater than that average in seven months. Moreover, examination of Woodfield Nissan's supporting documentation during the 2018 audit revealed evidence of false-claim manufacturing, such as time-clock logs, which ought to be printed contemporaneously with work performed, being printed on the copy of work orders that prepared only after the work is completed.

39.     All of these actions served to undermine the credibility of NNA to consumers by creating the false belief that Nissan vehicles were in need of repairs they were not, in fact, in need of, thus impacting NNA's ability to compete in the marketplace.

## TOLLING OF STATUTE OF LIMITATIONS

40.     On August 1, 2022, NNA and Woodfield Nissan entered into a Tolling Agreement that excluded the period August 1, 2022, through October 20, 2022, from being considered in determining the applicability of the expiration of any statute of limitations or other defense based upon the passage of time. The parties thereafter

executed eight further agreements that collectively tolled the running of any statute of limitations for the periods between November 1, 2022, and June 28, 2023. The Tolling Agreement and the eight amendments thereto are attached hereto as Collective Exhibit 3.

41.     On June 28, 2023, NNA initially filed this action in the Chancery Court for Williamson County, Tennessee. Woodfield Nissan removed the action to the U. S. District Court for the Middle District of Tennessee on July 18, 2023, and on August 31, 2023, filed a Motion to Dismiss for Lack of Personal Jurisdiction, or, in the alternative, Transfer Venue, and to Dismiss pursuant to Rule 12(b)(6). On November 9, 2023, NNA voluntarily dismissed that action without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, the period June 28, 2023, to the present is excluded from consideration in determining the applicability of the expiration of any statute of limitations pursuant to Illinois' Savings Statute, 735 Ill. Compiled Stat. Ann. § 5/13-217. *See, e.g., Stephan v. Selvic Marine Towing Co.*, 559 N.E.2d 147, 148 (Ill. App. Ct. 1990) ("Section 13-217 applies not only to actions initially filed in Illinois, but it also applies to actions originally brought in foreign courts if the dismissal in the foreign court is equivalent to the types of dismissals enumerated in section 13-217.")

## LEGAL CLAIMS[1]

### COUNT I –FRAUD

42.  NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43.  Defendants submitted sham warranty repair claims to NNA that stated the service referenced in each claim was completed for Nissan vehicle owners and customers and performed in compliance with the applicable policies and procedures.

44.  Defendants submitted claims to NNA for warranty repairs that Defendants knew to be false and/or fraudulent.  The sham warranty repairs were either not performed, were unnecessarily performed, or were knowingly performed in violation NNA's written policies and procedures.

45.  Defendants knew that its representations and submissions to NNA were false and/or fraudulent at the time they were made.  Defendants made such misrepresentations in order to mislead NNA and to produce a false impression in NNA.  Defendants made such misrepresentations with fraudulent intent.

46.  Defendants intended that NNA would rely on these materially false and/or fraudulent submissions made through Defendants to qualify—improperly—for reimbursement payments.

47.  NNA reasonably relied on Defendants' false and/or fraudulent submissions.

---

[1] On August 7, 2024, this Court heard oral argument as to defendant Woodfield's Motion to Dismiss (*See* Dkt. 15) and ruled from the bench at the conclusion thereof that the statute of limitations applicable to Counts I through IV below limits plaintiff's claims to damages suffered after August 1, 2019.

48. Because of these submissions, actions, and inactions of Defendants, NNA incurred monetary damages.

49. In 2016, NNA incurred monetary damages of at least $313,211 as a direct and proximate result of Defendants' submission of intentionally false warranty claims.

50. In 2017, NNA incurred monetary damages of at least $492,887 as a direct and proximate result of Defendants' submission of intentionally false warranty claims.

51. In 2018, NNA incurred monetary damages of at least $534,072 as a direct and proximate result of Defendants' submission of false warranty claims.

52. In 2019, NNA incurred monetary damages of at least $887,263 as a direct and proximate result of Defendants' submission of false warranty claims.

53. Defendants fraudulently concealed their wrongdoing from NNA by engaging in elaborate and creative misrepresentations and material omissions in its communications with NNA.

54. Defendants' actions were intentional, and Defendants knew that its actions would cause NNA to suffer substantial damages, in knowing disregard of the lawfulness of its actions. Defendants' willful, malicious, and fraudulent conduct and the ratification of that conduct by one or more managing agent(s) of Defendants entitle NNA to a recovery of compensatory and exemplary damages in an amount to be determined at trial.

## COUNT II – NEGLIGENT MISREPRESENTATION

55.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

56.     In connection with the submission of warranty claims to NNA, Defendants had a duty to exercise reasonable care represent facts to NNA accurately. In violation of this duty, Defendants falsely represented material facts to NNA concerning the warranty claims presented.  Such representations were false when made and were made in the course of Defendants' business and in transactions in which Defendants had a pecuniary interest.

57.     Defendants, in the exercise of ordinary and reasonable care, should have known that such representations were untrue when made.  Defendants failed to exercise reasonable care either in obtaining or communicating the information.  NNA did not know that such representations were false when made.

58.     Defendants provided such false and faulty information to NNA to guide NNA in its business.  NNA reasonably and justifiably relied upon the truth of such representations.

59.     As a direct and proximate result of NNA's reliance upon Defendants' negligent misrepresentation of material facts, NNA sustained damages of at least $313,211 in 2016; damages of at least $492,887 in 2017; damages of at least $534,072 in 2018; damages of at least $887,263 in 2019.

## COUNT III – BREACH OF CONTRACT

60.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

61.     In violation of the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, the information Woodfield Nissan provided to NNA concerning the warranty repairs at issue was not accurate.

62.     In 2016, Woodfield Nissan submitted to NNA at least $313,211 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

63.     In 2017, Woodfield Nissan submitted to NNA at least $492,887 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

64.     In 2018, Woodfield Nissan submitted to NNA at least $534,072 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

65.     In 2019, Woodfield Nissan submitted to NNA at least $887,263 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer

Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

66.     In addition to submission of claims that were not eligible for reimbursement, Woodfield Nissan's actions by and through its employees undermined consumer confidence in the Nissan brand, in breach of the Dealer Agreement.

67.     NNA has complied with its obligations under the Dealer Agreement, the Standard Provisions, and the APRM.

68.     As a direct and proximate result of Woodfield Nissan's breach of the Dealer Agreement as alleged above, NNA has suffered harm in the form of monetary damages of at least $2,227,423, plus injury to its business, reputation, and goodwill, and will sustain financial loss.

## COUNT IV – UNJUST ENRICHMENT

69.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

70.     Upon information and belief, Defendant Roy Carr earned commissions or similar revenue-sharing compensation based on revenue received from the service department at Woodfield Nissan's dealership.

71.     Such commission arrangements are common in the automotive-dealership field, are permitted by NNA, and are employed at other Nissan dealerships. The particulars of Mr. Carr's compensation agreement, however, are

uniquely within the knowledge of, and the documents evidencing the same are uniquely within the possession of, the Defendants.

72.     No contract concerning commissions or compensation exists between NNA and Mr. Carr.

73.     Mr. Carr, if he received commissions or revenue-sharing compensation at all, received funds via that mechanism on account of revenue generated by the Woodfield Nissan service department through its fraudulent activity described herein.

74.     Such fraudulent activity was wrongful as to NNA and the commissions or revenue sharing Mr. Carr received on account if it was obtained at NNA's expense.

75.     As between NNA and Mr. Carr, it would be unconscionable for Mr. Carr to retain the benefits of such funds, and he should accordingly be required to disgorge them in addition or in the alternative to the other remedies proper under this complaint.

## COUNT V – VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200 *et seq.*)

76.     NNA incorporates by reference Paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     Alternatively, the Defendants are liable for violating California's Unfair Competition Law by engaging in acts of unfair competition.

78.     The Defendants have engaged in business practices that are prohibited by law.

19

79.     The Defendants have engaged in business practices that are unfair. The practices are contrary to public policy and are immoral, unethical, and unscrupulous. Additionally, they have caused substantial consumer injury, are not outweighed by any countervailing benefits to consumers or to competition and are not an injury which the consumers themselves could have avoided.

80.     The Defendants have engaged in business practices that were likely to deceive or mislead members of the public.

81.     As a direct and proximate result of the foregoing unfair competition practices, NNA has suffered injury in fact, and the Defendants have acquired money or property from NNA by means of such unfair competition.

82.     Equitable principles necessitate that the Court restore NNA's interest in the money or property wrongfully acquired by the Defendants.

83.     Legal remedies are inadequate to remedy the injury caused by the Defendants' unfair competition.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Nissan North America, Inc., prays that the Court enter judgment on its behalf and respectfully requests the following relief:

A.     For a judgment of actual, compensatory, and consequential damages against Defendants in an amount in excess of $2,500,000.

B.     For a judgment of restitution at law against the Defendants in the amount of $2,227,423.

C.     For a judgment of punitive damages against Defendants in an amount to be shown to the Court.

D.     For a judgment against Defendants for its reasonable attorneys' fees and costs associated with this litigation.

E.     For a judgment of pre-judgment interest and post-judgment interest; and

F.     For such other and further relief as this Court deems just and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,

s/ Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr. (No. 12005)
Paul J. Krog (No. 29263)
BULSO PLC
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
(615) 913-5191
gbulso@bulso.com
pkrog@bulso.com
*Attorneys for Nissan North America, Inc.*

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served by electronic means on the following on this day, November 29, 2024:

Ira M. Levin
Eric P. VanderPloeg
Christopher A. Verdugo
BURKE, WARREN, MACKAY & SERRITELLA PC
330 North Wabash Ave.
21st Floor
Chicago, IL 60611
312-840-7000
ilevin@burkelaw.com
evanderploeg@burkelaw.com
cverdugo@burkelaw.com
*Counsel for Woodfield Nissan Inc.*

s/Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr.

**FINAL ARTICLE**

<span style="color:red">EXHIBIT 1</span>

Dealer    WOODFIELD NISSAN, INC.                      , is

a(an) (SELECT ONE)   ☐ individual   ☐ partnership   ☒ corporation,

incorporated or formed under the laws of the State of    ILLINOIS    doing business

as             N/A

("Dealer"). Dealer is located in    HOFFMAN ESTATES      IL

                                   City                    State

The Principal Owner(s) of Dealer are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|---|---|---|
| WILLIAM A. SLEVIN | 5 N. 210 HERITAGE COURT | 51% |
| | WAYNE, IL 60184 | |

The Other Owner(s) of Dealer are are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|---|---|---|
| HAROLD A. RESKIN | 425 VOLTZ ROAD NORTHBROOK, IL 60062 | 49% |

The Executive Manager of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|---|---|---|
| WILLIAM A. SLEVIN | 5 N. 210 HERITAGE COURT WAYNE, IL 60184 | 51% |

IN WITNESS THEREOF, the parties hereto have executed this Agreement in triplicate as of
October 19 , 19 93 at Carson, California.

**DEALER:**    WOODFIELD NISSAN, INC.

By _____

Title    PRESIDENT

**SELLER:**
NISSAN DIVISION
NISSAN MOTOR CORPORATION IN U.S.A.

By _____
             VICE PRESIDENT
Title   GENERAL MANAGER, NISSAN DIVISION

By _____
Title   REGIONAL GENERAL MANAGER

Form #NDA-4P/9-88

---



# NISSAN
# DEALER SALES & SERVICE AGREEMENT

THIS AGREEMENT is entered into effective the day last set forth below by and between the Nissan Division of NISSAN MOTOR CORPORATION IN U.S.A., a California corporation, hereinafter called Seller, and the natural person or entity identified as "Dealer" in the Final Article of this Agreement.

**INTRODUCTION**

The purpose of this Agreement is to establish Dealer as an authorized dealer of Nissan Products and to provide for the sale and servicing of Nissan Products in a manner that will best serve the interests of Seller, Dealer, other Authorized Nissan Dealers and owners and purchasers of Nissan Products. This Agreement sets forth: the rights which Dealer will enjoy as an Authorized Nissan Dealer; the responsibilities which Dealer assumes in consideration of its receipt of these rights; and the respective conditions, rights and obligations of Seller and Dealer that apply to Seller's grant to Dealer of such rights and Dealer's assumption of such responsibilities.

This is a personal services Agreement. In entering into this Agreement and appointing Dealer as provided below, Seller is relying upon the personal qualifications, expertise, reputation, integrity, experience, ability and representations of the individual(s) named herein as Principal Owner(s) and Executive Manager.

Achievement of the purposes of this Agreement is premised upon mutual understanding and cooperation between Seller and Dealer. Dealer has entered into this Agreement in reliance upon Seller's integrity and expressed intention to deal fairly with Dealer and the consuming public. Seller has entered into this Agreement in reliance upon Dealer's integrity and ability and expressed intention to deal fairly with Seller and the consuming public.

It is the responsibility of Seller to market Nissan Products throughout the Territory. It is the responsibility of Dealer to actively promote the retail sale of Nissan Products and to provide courteous and efficient service of Nissan Products. The success of Seller and Dealer will depend on how well they each fulfill their respective responsibilities under this Agreement. It is recognized that: Nissan Motor Co., Ltd. (hereinafter called "Manufacturer") will endeavor to provide motor vehicles that offer outstanding value to the consuming public; Seller will endeavor to establish a national network of Authorized Nissan Dealers that can provide effective sales and service effort at the retail level; and Dealer will endeavor to fulfill its responsibilities through aggressive, sound, ethical selling practices and through conscientious regard for customer service.

Seller and Dealer shall refrain from engaging in conduct or activities which might be detrimental to or reflect adversely upon the reputation of Seller, Manufacturer, Dealer or Nissan Products and shall engage in no discourteous, deceptive, misleading or unethical practices or activities.

For consistency and clarity, terms which are used frequently in this Agreement have been defined in Section 1 of the Standard Provisions. All terms used herein which are defined in the Standard Provisions shall have the meaning stated in said Standard Provisions. These definitions should be read carefully for a proper understanding of the provisions in which they appear.

To achieve the purposes referred to above, Seller and Dealer agree as follows:

**ARTICLE FIRST:** Appointment of Dealer

Subject to the conditions and provisions of this Agreement, Seller:

(a) appoints Dealer as an Authorized Nissan Dealer and grants Dealer the non-exclusive right to buy from Seller those Nissan Products specified in Dealer's current Product Addendum hereto, for resale, rental or lease at or from the Dealership Locations established and described in accordance with Section 2 of the Standard Provisions; and

(b) grants Dealer a non-exclusive right, subject to and in accordance with Section 6.K of the Standard Provisions, to identify itself as an Authorized Nissan Dealer, to display the Nissan Marks in the conduct of its Dealership Operations and to use the Nissan Marks in the advertising, promotion and sale of Nissan Products in the manner provided in this Agreement.

**ARTICLE SECOND:** Assumption of Responsibilities by Dealer

Dealer hereby accepts from Seller its appointment as an Authorized Nissan Dealer and, in consideration of its appointment and subject to the other conditions and provisions of this Agreement, hereby assumes the responsibility for:

(a) establishing and maintaining at the Dealership Locations the Dealership Facilities in accordance with Section 2 of the Standard Provisions;

(b) actively and effectively promoting the sale at retail (and, if Dealer elects, the leasing and rental) of Nissan Vehicles within Dealer's Primary Market Area in accordance with Section 3 of the Standard Provisions;

(c) servicing Nissan Vehicles and for selling and servicing Genuine Nissan Parts and Accessories in accordance with Section 5 of the Standard Provisions;

(d) building and maintaining consumer confidence in Dealer and in Nissan Products in accordance with Section 5 of the Standard Provisions; and

(e) performance of the additional responsibilities set forth in this Agreement, including those specified in Section 6 of the Standard Provisions.

**ARTICLE THIRD:** Ownership

(a) Owners. This Agreement has been entered into by Seller in reliance upon, and in consideration of, the personal qualifications, expertise, reputation, integrity, experience, ability and representations with respect thereto of the Principal Owner(s) named in the Final Article of this Agreement and in reliance upon Dealer's representations concerning the ownership of Dealer as follows:

(i) Dealer represents and agrees that the person(s) named as Principal Owner(s) in the Final Article of this Agreement, and only those person(s), shall be the Principal Owner(s) of Dealer;

(ii) Dealer represents and agrees that the person(s) named as Other Owner(s) in the Final Article of this Agreement, and only those person(s), shall be the Other Owner(s) of Dealer.

(b) Holding Company. Seller requires that a natural person be named as the Principal Owner(s) of Dealer because Seller relies on the personal qualifications, expertise, reputation, integrity, experience, ability and representations of such individuals. If one or more of the owner(s) of Dealer is a corporation, partnership or other entity and not a natural person (hereinafter called "Holding Company"), Dealer and Seller agree that the natural person listed in the Holding Company Addendum of this Agreement as owners of the Holding Company shall be deemed to be the Principal Owner(s) and Other Owner(s) of Dealer, as the case may be and that the terms and conditions of this Agreement, including without limitation the provisions of this Article Third and Sections 12, 14 and 15 of the Standard Provisions, shall apply to the owner(s) of the Holding Company as well as to Dealer. Dealer represents to Seller and agrees that the Holding Company is owned as indicated in the Holding Company Addendum to this Agreement.

(c) Changes in Ownership. In view of the fact that this is a personal services agreement and in view of its objectives and purposes, this Agreement and the rights and privileges conferred on Dealer hereunder are not assignable, transferable or salable by Dealer, and no property right or interest in or shall be deemed to be sold, conveyed or transferred to Dealer under this Agreement. Dealer agrees that any change in the ownership of Dealer specified herein requires the prior written consent of Seller, excepting only changes in the record or beneficial ownership interests of Other Owner(s) not effecting a change in majority control or interest. Dealer shall give Seller prior notice of any proposed change in said ownership requiring the consent of Seller and immediate notice of the death or incapacity of any Principal Owner. No such change, and no assignment of this Agreement or of any right or interest herein, shall be effective against Seller unless and until embodied in an appropriate amendment to or assignment of this Agreement, as the case may be, duly executed and delivered by Seller and by Dealer. Seller shall not, however, unreasonably withhold its consent to any such change. Seller shall have no obligation to transact business with any person who is not named either as a Principal Owner or Executive Manager of Dealer hereunder or otherwise to give effect to any proposed sale or transfer of the ownership or management of Dealer prior to having concluded the evaluation of such a proposal as provided in Section 15 of the Standard Provisions.

**ARTICLE FOURTH:** Management

(a) Executive Manager. Seller and Dealer agree that the retention by Dealer of qualified management is of critical importance to the successful operation of Dealer and to the achievement of the purposes and objectives of this Agreement. This Agreement has been entered into by Seller in reliance upon, and in consideration of, the personal qualifications, expertise, integrity, experience, ability and representations with respect thereto of the person named as Executive Manager in the Final Article of this Agreement and on Dealer's representation to Seller and agreement that the person identified as Executive Manager shall be Dealer's executive manager, shall have full managerial authority for the Dealership Operations, and shall continually provide his or her personal services in operating the dealership and will be physically present at the Dealership Facilities.

(b) Changes in Management. In view of the fact that this is a personal services Agreement and in view of its objectives and purposes, Dealer agrees that any change in the Executive Manager from that specified in the Final Article of this Agreement requires the prior written consent of Seller. Dealer shall give Seller prior notice of any proposed change in Executive Manager and immediate notice of the death or incapacity of any Executive Manager. No change in Executive Manager shall be effective unless and until embodied in an appropriate amendment to this Agreement duly executed and delivered by Seller and by Dealer. Subject to the foregoing, Dealer shall make its own, independent decisions concerning the hiring and firing of its employees including without limitation, its Executive Manager.

To enable Seller to evaluate and respond to Dealer concerning any proposed change in Executive Manager, Dealer agrees to provide, in the form requested by Seller and in a timely manner, all applications and information customarily requested by Seller to evaluate the proposed change. While Seller shall not unreasonably withhold its consent to any such change, it is agreed that any successor Executive Manager must possess personal qualifications, expertise, reputation, integrity, experience and ability which are, in the opinion of Seller, satisfactory. Seller will determine whether, in its opinion, the proposed change is likely to result in a successful dealership operation with capable management that will satisfactorily perform Dealer's obligations under this Agreement. Seller shall have no obligation to transact business with any person who is not named as an Executive Manager of Dealer hereunder prior to having concluded its evaluation of such person.

(c) Evaluation of Management. Dealer and Seller understand and acknowledge that the personal qualifications, expertise, reputation, ability, integrity, experience and ability of the Executive Manager and his or her ability to effectively manage Dealer's day-to-day Dealership Operations is critical to the success of Dealer in performing its obligations under this Agreement. Seller may from time to time develop standards and/or procedures for evaluating the performance of the Executive Manager and of Dealer's personnel generally. Seller may, from time to time, evaluate the performance of the Executive Manager and will advise Dealer and the Executive Manager of the results of such evaluations, and Dealer shall promptly take such action as may be required to correct any deficiencies in the Executive Manager's performance to the reasonable satisfaction of Seller.

**ARTICLE FIFTH:** Additional Provisions

The additional provisions set forth in the attached "Nissan Dealer Sales and Service Agreement Standard Provisions," bearing form number NDA-4S9-88 are hereby incorporated in and made a part of this Agreement. The Notice of Primary Market Area, Dealership Facilities Addendum, Product Addendum, Dealer Identification Addendum, Holding Company Addendum, if applicable, and all Guides referred to in this Agreement (including references contained in the Standard Provisions referred to above) are hereby incorporated in and made a part of this Agreement. Dealer further agrees to be bound by and comply with: the Warranty Manual; Seller's Manuals or Instructions heretofore or hereafter issued by Seller to Dealer; any amendment, revision or supplement to any of the foregoing; and any other manuals heretofore or hereafter issued by Seller to Dealer.

**ARTICLE SIXTH:** Termination of Prior Agreements

This Agreement cancels, supersedes and annuls all prior contracts, agreements and understandings except as stated herein, all negotiations, representations and understandings being merged herein. No waiver, modification or change of any of the terms of this Agreement or change or erasure of any printed part of this Agreement or addition to it (except filling of blank spaces and lines) will be valid or binding on Seller unless approved in writing by the President or an authorized Vice-President of Seller.

**ARTICLE SEVENTH:** Term

This Agreement shall have a term commencing on the effective date hereof and continuing until terminated by either party in accordance with Section 12 of the Standard Provisions.

**ARTICLE EIGHTH:** License of Dealer

If Dealer is required to secure or maintain a license for the conduct of its business as contemplated by this Agreement in any state or jurisdiction where any of its Dealership Operations are to be conducted or any of its Dealership Facilities are located, this Agreement shall not be valid until and unless Dealer shall have furnished Seller with written notice specifying the date and number, if any, of such license or licenses issued to Dealer, Dealer shall notify Seller immediately in writing if Dealer shall fail to secure or maintain any and all such licenses or renewal thereof or, if such license or licenses are suspended or revoked, specifying the effective date of any such suspension or revocation.

**ARTICLE NINTH:** Execution of Agreement

This Agreement, and any Addendum or amendment or notice with respect thereto, shall be valid and binding on Seller only when it bears the signature of either the President or an authorized Vice-President of Seller and, when such signature is a facsimile, the manual countersignature of an authorized employee of Seller and a duplicate original thereof is delivered personally or by mail to the main Dealership Location. This Agreement shall bind Dealer only when it is signed by: a duly authorized officer or executive of Dealer if a corporation; one of the general partners of Dealer if a partnership; or Dealer if an individual.

**ARTICLE TENTH:** Special Conditions

See **Exhibit A** which is incorporated by this reference into this agreement for all purposes.

**AMENDMENT NO. 5**
**TO**
**NISSAN DEALER**
**SALES AND SERVICE AGREEMENT**

This Agreement of Amendment is entered into and effective _____*November 24, 2014*_____ by and between the Nissan Division of NISSAN NORTH AMERICA, INC., a California corporation (hereinafter "Seller"), and WOODFIELD NISSAN, INC., an Illinois corporation (hereinafter "Dealer"). This Amendment is incorporated by reference in and is a part of the Nissan Dealer Sales and Service Agreement between Dealer and Seller dated **October 19, 1993**. The terms of this Amendment will be effective throughout the term hereof, and shall be binding on any successors. As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's stock or of Dealer's Nissan dealership assets to assume the contractual rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

**RECITALS**

WHEREAS on October 19, 1993, Seller and Dealer entered into a Nissan Dealer Sales and Service Agreement (hereinafter "the Agreement").

WHEREAS on April 29, 1996, Seller and Dealer agreed to amend the Agreement to reflect an ownership change.

WHEREAS on May 15, 2001, Seller and Dealer agreed to amend the Agreement to reflect changes to Article Tenth.

WHEREAS on September 30, 2004, Seller and Dealer agreed to amend the Agreement to reflect an executive manager change and changes to Article Tenth.

WHEREAS on April 28, 2011, Seller and Dealer agreed to amend the Agreement to reflect an executive manager change.

WHEREAS Seller and Dealer desire to amend the Agreement to reflect an executive manager change.

THEREFORE, the parties hereby agree to amend the Agreement as follows:

1. The identification of Executive Manager in the Final Article is hereby amended to read as follows:

The Executive Manager of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| Keith E. Narozny | 1636 N. Oakley<br>Chicago, IL 60637 | 0% |

The terms and conditions of the Agreement, to the extent not modified herein, shall remain in full force and effect and shall continue to bind the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate as of the day and year first above written.

Amendment No. 5
Dealer: WOODFIELD NISSAN, INC.

**DEALER**

WOODFIELD NISSAN, INC.

By _____

William A. Slevin
Principal Owner

**SELLER**

NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By _____

Leon Dorssers
Vice President, Dealer Network Development
Nissan North America

By _____

Bryan Dumais
Regional Vice President
Midwest Region

**AMENDMENT NO. 4**
**TO**
**NISSAN DEALER**
**SALES AND SERVICE AGREEMENT**

This Agreement of Amendment is entered into and effective ___*April 28,*___ 2011 by and between the Nissan Division of NISSAN NORTH AMERICA, INC., a California corporation (hereinafter "Seller"), and WOODFIELD NISSAN, INC., an Illinois corporation (hereinafter "Dealer"). This Amendment is incorporated by reference in and is a part of the Nissan Dealer Sales and Service Agreement between Dealer and Seller dated **October 19, 1993**. The terms of this Amendment will be effective throughout the term hereof, and shall be binding on any successors. As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's stock or of Dealer's Nissan dealership assets to assume the contractual rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

**RECITALS**

WHEREAS on October 19, 1993, Seller and Dealer entered into a Nissan Dealer Sales and Service Agreement (hereinafter "the Agreement").

WHEREAS on April 29, 1996, Seller and Dealer agreed to amend the Agreement to reflect an ownership change.

WHEREAS on May 15, 2001, Seller and Dealer agreed to amend the Agreement to reflect changes to Article Tenth.

WHEREAS on September 30, 2004, Seller and Dealer agreed to amend the Agreement to reflect an executive manager change and changes to Article Tenth.

WHEREAS Seller and Dealer desire to amend the Agreement to reflect an executive manager change.

THEREFORE, the parties hereby agree to amend the Agreement as follows:

1.  The identification of Owner(s) and Executive Manager in the Final Article is hereby amended to read as follows:

The Principal Owner of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| William A. Slevin | 24 Pentwater Drive<br>South Barrington, IL 60010 | 100% |

The Executive Manager of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| William A. Slevin | 24 Pentwater Drive<br>South Barrington, IL 60010 | 100% |

The terms and conditions of the Agreement, to the extent not modified herein, shall remain in full force and effect and shall continue to bind the parties hereto.

Amendment No. 4
Dealer: WOODFIELD NISSAN, INC.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate as of the day and year first above written.

**DEALER**

WOODFIELD NISSAN, INC.

By _____

William A. Slevin
Principal Owner

**SELLER**

NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By _____

Albert Castignetti
Vice President
General Manager, Nissan Division

By _____

Walter H. Burchfield, Jr.
Regional Vice President
Midwest Region

## NISSAN DEALERSHIP FACILITIES ADDENDUM

**NISSAN NORTH AMERICA, INC.**

### FACILITIES & LOCATION SIZE (Square Feet)

| Site Address | Showroom Sq. Ft | Parts Sq. Ft | Service Bays | Service Sq. Ft | Service Office Sq. Ft | Total Building Sq. Ft | New Vehicle Dept Spaces | New Vehicle Dept Sq. Ft | Used Vehicle Dept Spaces | Used Vehicle Dept Sq. Ft | Parking Spaces | Parking Sq. Ft | Total Land Sq. Ft | Total Building & Land Sq. Ft | Reserve land | Unusable Land | Total Acres |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 700 W. Higgins Road | 10,000 | 4,340 | 26 | 16,420 | | 30,760 | | 164,100 | | 66,500 | | | 230,600 | 261,360 | | | 6.00 |
| 790 W. Higgins Road | | | | | | | | 36,408 | | | | | 36,408 | 36,408 | | | 0.84 |
| | | | | | | | | | | | | | | | | | |
| **Actual** | 10,000 | 4,340 | 26 | 16,420 | | 30,760 | | 200,508 | | 66,500 | | | 267,008 | 297,768 | | | 6.84 |
| **Guide** | 8,000 | 7,250 | 29 | 15,225 | 260 | 30,735 | 174 | 52,200 | 131 | 39,300 | 149 | 52,150 | 143,650 | 174,385 | 43,596 | 34,877 | 5.80 |
| **Actual % Guide** | 125% | 60% | 90% | 108% | | 100% | | 384% | | 169% | | | 186% | 171% | | | 118% |

| Makes Sold | Planning Volume | Units In Operation |
|---|---|---|
| NISSAN | 1,042 | 5,798 |
| | | |
| | | |
| | | |
| **TOTALS** | 1,042 | 5,798 |

**FACILITY DESIGNATION**
- [x] Exclusive
- [ ] Dual
- [ ] Dual w/Exclusive Showroom

This Dealership Facilities Addendum is executed by Dealer and Seller pursuant to Section 2.A of the Nissan Dealer Sales and Service Agreement in effect between said parties and is effective as of the date set forth below. Dealer and Seller agree that as of the effective date the information above accurately describes the Dealership Location and Dealership Facilities, the purposes for which each location is used and the current Guides for such facilities based on the Planning Volumes stated herein. The execution of this Facilities Addendum shall not be construed as evidence of Dealer's fulfillment of its responsibilities under Section 2 of the Agreement. Changes in the Dealership Location, the Dealership Facilities or their usage from the locations and specific uses stated herein cannot be made by Dealer without the prior written consent of Seller. Such changes and any changes in Seller's Guides will be reflected in a new Dealership Facilities Addendum when deemed necessary by Seller. This Dealership Facilities Addendum cancels and supersedes any prior Dealership Facilities Addenda executed by Seller and Dealer.

**DEALER:**

Woodfield Nissan, Inc.
*Dealer Name*

By _____
William A. Slevin
Principal Owner

*Doing Business As*

Hoffman Estates
*City*

| IL | 60195 | 3229 |
|---|---|---|
| State | Zip | Dealer Code |

Accuracy of information verified for Seller

By _____
M. Scott Compton, Market Representation Manager

3/5/2009
*Date Verified*

**SELLER**
**NISSAN DIVISION**
**NISSAN NORTH AMERICA, INC.**

By _____
Albert Castignetti
Vice President & General Manager, Nissan Division

THIS ADDENDUM IS EFFECTIVE AS OF

*January 26, 2010*

By _____
Walter H. Burchfield, Jr.
Regional Vice President

**FOR EACH SITE COMPLETE THE FOLLOWING:**

### SITE A

**FACILITIES USE (Check one or more)**

- [x] All Dealership Operations
- [ ] New Vehicle Sales
- [ ] Used Vehicle Sales
- [ ] Parts Storage
- [ ] Vehicle Storage
- [ ] Office & Administration
- [ ] Service

Other _____

**OWNERSHIP (Check one)**
Facilities are owned by:

- [ ] Dealer
- [x] Affiliate of Dealer
- [ ] Owner of Dealer
- [ ] Third Party

**LEASE INFORMATION (Complete, if leased)**

| | |
|---|---|
| Lease Expiration Date: | December 31, 2019 |
| Net Monthly Cost (Taxes, Insurance, etc.): | $70,000 |
| Owner Name: | Slevin Capital Investments, Inc. |
| Explain contingencies or options*: | Two 5-year options to renew |

### SITE B

**FACILITIES USE (Check one or more)**

- [ ] All Dealership Operations
- [ ] New Vehicle Sales
- [ ] Used Vehicle Sales
- [ ] Parts Storage
- [x] Vehicle Storage
- [ ] Office & Administration
- [ ] Service

Other _____

**OWNERSHIP (Check one)**
Facilities are owned by:

- [ ] Dealer
- [x] Affiliate of Dealer
- [ ] Owner of Dealer
- [ ] Third Party

**LEASE INFORMATION (Complete, if leased)**

| | |
|---|---|
| Lease Expiration Date: | |
| Net Monthly Cost (Taxes, Insurance, etc.): | |
| Owner Name: | |
| Explain contingencies or options*: | Included in above lease |

### SITE C

**FACILITIES USE (Check one or more)**

- [ ] All Dealership Operations
- [ ] New Vehicle Sales
- [ ] Used Vehicle Sales
- [ ] Parts Storage
- [ ] Vehicle Storage
- [ ] Office & Administration
- [ ] Service

Other _____

**OWNERSHIP (Check one)**
Facilities are owned by:

- [ ] Dealer
- [ ] Affiliate of Dealer
- [ ] Owner of Dealer
- [ ] Third Party

**LEASE INFORMATION (Complete, if leased)**

| | |
|---|---|
| Lease Expiration Date: | |
| Net Monthly Cost (Taxes, Insurance, etc.): | |
| Owner Name: | |
| Explain contingencies or options*: | |

### SITE D

**FACILITIES USE (Check one or more)**

- [ ] All Dealership Operations
- [ ] New Vehicle Sales
- [ ] Used Vehicle Sales
- [ ] Parts Storage
- [ ] Vehicle Storage
- [ ] Office & Administration
- [ ] Service

Other _____

**OWNERSHIP (Check one)**
Facilities are owned by:

- [ ] Dealer
- [ ] Affiliate of Dealer
- [ ] Owner of Dealer
- [ ] Third Party

**LEASE INFORMATION (Complete, if leased)**

| | |
|---|---|
| Lease Expiration Date: | |
| Net Monthly Cost (Taxes, Insurance, etc.): | |
| Owner Name: | |
| Explain contingencies or options*: | |



**NISSAN MOTOR ACCEPTANCE CORPORATION**

Commercial Credit Department
8900 Freeport Parkway
Irving, Texas  75063-2438

November 25, 2014

NISSAN NORTH AMERICA, INC.
One Nissan Way
Franklin, TN 37067

Dear Sir/Madam:

The undersigned Financing Institution hereby authorizes NISSAN NORTH AMERICA, INC. formerly known as Nissan Motor Corporation in U.S.A. ("Nissan") to draw cash drafts on us in payment for Nissan motor vehicles sold, delivered, or shipped to the undersigned authorized Nissan Dealer (the "Dealer").

We authorize you to sell, deliver, or ship Nissan Motor vehicles to this dealer without our prior approval and we agree to pay Nissan therefore by paying at par upon presentation, provided that such drafts will be presented to Nissan Motor Acceptance Corporation ("NMAC") no later than three (3) days after shipment to the Dealer, Nissan's cash drafts drawn on us covering the said vehicle. Each draft will show information specifying among other things that the vehicle(s) appearing thereon is sold to the dealer, together with the invoice number, serial number, and amount for each vehicle. The foregoing applies to all forms of sale, delivery, release or shipment.  We understand and agree that this authorization and commitment to Nissan is unconditional and that it is in no way related to or limited by any payment obligation that the Dealer may have or incur pursuant to any agreement(s) with us.  We request that Manufacturer's Statement of Origin and invoice be sent to: Woodfield Nissan, Inc. , 700 W. Higgins Road, Hoffman Estates, IL 60195. These instructions remain in effect unless and until Nissan Motor Acceptance Corporation notifies Nissan of a change in delivery instructions.  Such change can be made at any time, in writing, to Nissan and does not require written approval or acknowledgment by the Dealer. We may notify Nissan to suspend or terminate this authorization at any time.  However, such suspension or termination shall not become effective until the close of your first business day following receipt of such notice by Nissan.  We agree to honor and pay all drafts covering vehicles sold, delivered, or shipped to the Dealer prior to such time.  If such notice is given by telephone or telegram, we will confirm in writing.  We understand that Nissan incurs no obligation hereunder to sell, deliver or ship vehicles to the Dealer and that Nissan reserves the right to suspend or discontinue shipments or deliveries to the Dealer at any time at Nissan's sole discretion and without notice.

All written notices permitted or required to be sent to Nissan hereunder shall be addressed to NISSAN NORTH AMERICA, INC. and shall be sent certified mail with the return receipt requested to One Nissan Way, Franklin, TN  37067, Attention: Dealer Agreements with a copy to MWR - 600 Enterprise Street, Aurora, IL 60504-8139, Attention: Market Representation Manager.

Dealer NMAC# **2379**, NNA# **3229**

NISSAN NORTH AMERICA, INC.
November 25, 2014

This authorization is effective immediately and supersedes any previous authorization whereby we have agreed to pay for motor vehicles sold, delivered, or shipped to the Dealer.

Dealer's flooring limit is **$11,500,000.00**. Daily maximum limit, if any is: <u>NONE</u>. This cash draft letter is only valid subsequent to the issuance of valid NMAC and NNA dealer numbers and NNA's approval of the Dealer. Special Restrictions: if any: <u>NONE</u>.

**FINANCING INSTITUTION:**
Nissan Motor Acceptance Corporation
8900 Freeport Parkway,
Irving, TX 75063

**FOR NNA USE ONLY:**
Bank of America
1450 W. Redondo Beach Blvd.
Gardena, CA 90746
Bank No. 16   Bank Code: 00661
Fed. Reserve: 1220
Account No.: 14944-90001

By: _____
Venise Edison, Manager, Commercial Credit

Date: _____12, 8_____, 2014

## NISSAN NORTH AMERICA, INC. DEALER ACKNOWLEDGMENT

The undersigned dealer acknowledges the above authorization and requests that Nissan North America, Inc. draft on the above-named financial institution for vehicles sold, shipped, or delivered to it. The undersigned Dealer understands that said financial institution's authorization does not affect its primary obligation to pay for said vehicles.

**Dealer:**
Woodfield Nissan, Inc.

700 W. Higgins Road
Hoffman Estates, IL 60195
**Telephone No.** (847) 310-1900

**NMAC Dealer No.** 2379
**NNA Region No.**   24
**NNA Dealer No.**   3229

By: _____
William A. Slevin, President

Date: ___12-1-14_____, 2014

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
(Domestic Mail Only; No Insurance Coverage Provided)

OFFICIAL USE

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | |
| Total Postage & Fees | $ |

Sent To: Woodfield Nissan, Inc.
WilliamSlevin
Street, Apt. No.; or PO Box No. 700 W. Higgins Rd.
City, State, ZIP+4 Hoffman Estates, IL 60195

7001 2510 0005 7973 2061

PS Form 3800, January 2001                    See Reverse for Instructions

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Woodfield Nissan, Inc.
Attn:Mr. William Slevin
700 W. Higgins Rd.
Hoffman Estates, IL 60195

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X _____   ☑ Agent  ☐ Addressee

B. Received by ( Printed Name)   C. Date of Delivery
                                 3-11-04

D. Is delivery address different from item 1?  ☐ Yes
   If YES, enter delivery address below:        ☐ No

3. Service Type
   ☑ Certified Mail   ☐ Express Mail
   ☐ Registered      ☐ Return Receipt for Merchandise
   ☐ Insured Mail    ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
   (Transfer from service labe    7001 2510 0005 7973 2061

PS Form 3811, August 2001        Domestic Return Receipt        102595-01-M-0381

**Certified Mail Provides:**

- A mailing receipt
- A unique identifier for your mailpiece
- A signature upon delivery
- A record of delivery kept by the Postal Service for two years

*Important Reminders:*

- Certified Mail may ONLY be combined with First-Class Mail or Priority Mail.
- Certified Mail is not available for any class of international mail.
- NO INSURANCE COVERAGE IS PROVIDED with Certified Mail. For valuables, please consider Insured or Registered Mail.
- For an additional fee, a *Return Receipt* may be requested to provide proof of delivery. To obtain Return Receipt service, please complete and attach a Return Receipt (PS Form 3811) to the article and add applicable postage to cover the fee. Endorse mailpiece "Return Receipt Requested". To receive a fee waiver for a duplicate return receipt, a USPS postmark on your Certified Mail receipt is required.
- For an additional fee, delivery may be restricted to the addressee or addressee's authorized agent. Advise the clerk or mark the mailpiece with the endorsement *"Restricted Delivery"*.
- If a postmark on the Certified Mail receipt is desired, please present the article at the post office for postmarking. If a postmark on the Certified Mail receipt is not needed, detach and affix label with postage and mail.

**IMPORTANT: Save this receipt and present it when making an inquiry.**

PS Form 3800, January 2005 (Reverse)                                                 102595-01-M-1049

---

UNITED STATES POSTAL SERVICE

| First-Class Mail |
| Postage & Fees Paid |
| USPS |
| Permit No. G-10 |

• Sender: Please print your name, address, and ZIP+4 in this box •

Nissan North America, Inc.
600 Enterprise St
Aurora, IL  60504



**PRODUCT ADDENDUM
TO
NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale the Nissan Products identified below:

1)    Nissan Cars and Trucks

| VERSA | MAXIMA | XTERRA | TITAN |
|-------|---------|------------|--------|
| SENTRA | 350Z | PATHFINDER | ARMADA |
| ALTIMA | FRONTIER | MURANO | QUEST |
| ROGUE | | | |

2)    Genuine Nissan Parts for Nissan Cars and Trucks,
3)    Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers), and.
4)    All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller. This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental Altima Hybrid Product Addendum issued to a limited number of Nissan Dealers exclusively in the states of California, Connecticut, Maine, Massachusetts, New Jersey, New York, Rhode Island, and Vermont, which shall remain in full force and effect).

This Product Addendum is effective as of September 1, 2007 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**

Doing Business As:


City:
**HOFFMAN ESTATES**

State:
**IL**

Dealer Code:
**3229**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.


By: William O. Bosley
    Vice President
    General Manager, Nissan Division


By: Eric Anderson
    Regional Vice President
    North Central Region

(File this Addendum with Current Sales & Service Agreement)



**NISSAN NORTH AMERICA, INC.**

North Central Region
600 Enterprise St.
Aurora, IL 60504

Mailing Address: P.O. Box 2060
Aurora, IL 60507-2060

Telephone: 630.851.8000

June 29, 2007


WOODFIELD NISSAN, INC.
700 W HIGGINS RD
HOFFMAN ESTATES, IL 60195


Attention: Principal Owner


Nationally, all Nissan dealers are receiving new Product Addenda as a result of the addition of the all new Nissan Rogue to our product line-up, scheduled for wholesale release on September 18, 2007.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement. This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental Altima Hybrid Product Addendum - if you are one of the limited number of Nissan Dealers operating in the states of California, Connecticut, Maine, Massachusetts, New Jersey, New York, Rhode Island, and Vermont to whom it was issued) all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact Chad Kirchhoff, Regional Market Representation Manager.

Sincerely,

Eric Anderson
Regional Vice President
North Central Region

## Dillon, Joyce

**From:**    TrackingUpdates@fedex.com
**Sent:**    Tuesday, July 10, 2007 1:25 PM
**To:**      Dillon, Joyce
**Subject:**  FedEx Shipment 791338687953 Delivered

---

This tracking update has been requested by:

Company Name: Nissan North America, Inc.

Name: JOHN MELISI

E-mail: joyce.dillon@nissan-usa.com

---

Our records indicate that the following shipment has been delivered:

Tracking number:          791338687953
Reference:                MARKET REP DEPT
Ship (P/U) date:          Jul 9, 2007
Delivery date:            Jul 10, 2007 1:20 PM
Sign for by:              J.COLEMAN
Delivered to:             Shipping/Receiving
Service type:             FedEx 2Day
Packaging type:           FedEx Envelope
Number of pieces:         1
Weight:                   0.50 lb.

Shipper Information              Recipient Information
JOHN MELISI                     ATTN: DEALER PRINCIPAL
Nissan North America, Inc.      WOODFIELD NISSAN, INC.
600 Enterprise Street           700 W. HIGGINS ROAD
Aurora                          HOFFMAN ESTATES
IL                              IL
US                              US
60504                           60195

Special handling/Services:
Deliver Weekday

Please do not respond to this message. This email was sent from an unattended
mailbox. This report was generated at approximately 1:25 PM  CDT
on 07/10/2007.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number  above,
or visit us at fedex.com.

This tracking update has been sent to you by FedEx on the behalf of the
Requestor noted above. FedEx does not validate the authenticity of the
requestor and does not validate, guarantee or warrant the authenticity of  the
request, the requestor's message, or the accuracy of this tracking update.  For
tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.

# AMENDMENT NO. 3
## TO
## NISSAN DEALER
## SALES AND SERVICE AGREEMENT

This Agreement of Amendment is entered into and effective September 30, 2004 by and between the Nissan Division of NISSAN NORTH AMERICA, INC., a California corporation (hereinafter "Seller"), and WOODFIELD NISSAN INC., an Illinois corporation (hereinafter "Dealer"). The terms of this Amendment will be effective for as long as Dealer or its principals are authorized Nissan dealers, and shall be binding on any successors.  As a condition of Seller's consent to any change in ownership, Dealer agrees to require any proposed buyer of Dealer's dealership assets to assume the rights, obligations and provisions in accordance with Seller's Guides and Policies in effect at that time, specifically including those set forth below.

## RECITALS

Effective October 19, 1993, Seller and Dealer entered into a Nissan Dealer Sales and Service Agreement (hereinafter "the Agreement") which was amended on April 29, 1996 and May 15, 2001.  Seller and Dealer desire to amend the Agreement to reflect an Executive Manager change and additions to Article Tenth.

THEREFORE, the parties hereby agree to amend the Agreement as follows:

1.     The identification of Owner(s) and Executive Manager in the Final Article is hereby amended to read as follows:

The Principal Owner(s) of Dealer are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| William A. Slevin | 24 Pentwater Dr South Barrington, IL 60010 | 100% |

The Other Owner(s) of Dealer are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
|      |           |                     |

The Executive Manager of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| Erwin C. Goldberg | 344 St. Andrews Lane Gurnee, IL 60031 | 0% |

2.     ARTICLE Tenth: Special Conditions is hereby amended to include the following:

## A. **TRADE DRESS ELEMENTS**

In addition to Section 6.K. of the Standard Provisions to this Agreement and the Dealership Identification Addendum, Dealer hereby acknowledges that upon termination of this Agreement or if Dealer moves, relocates, or changes the usage of the Dealership

Location or any of the Dealership Facilities, the use of any Nissan trademark, trade name, or other make or name owned, licensed, or associate with Nissan (collectively "Nissan Mark") or signature building elements ("Trade Dress Elements") at the facilities specified in the current Dealership Facilities Addendum is unauthorized. Any such unauthorized use by Dealer of Nissan Marks or Trade Dress Elements will be considered to have irreparably harmed Seller pursuant to any applicable federal and state trademark infringement and unfair competition laws. Upon termination of this Agreement or if Dealer moves, relocates, or changes the usage of the Dealership Location or any of the Dealership Facilities, Dealer is required to remove all signage bearing any Nissan Mark or Trade Dress Element or otherwise to cover, remove, obliterate, or return at Nissan's discretion any such Nissan Mark or Element. Section 9.C. of the Identification Addendum gives Nissan the right to enter the dealership premises and remove its main brand signs, its sign structures and equipment ("Signs"). Furthermore, if Dealer fails to remove any other signs bearing the Nissan Mark, Nissan has the right upon ten (10) days' written notice to do so. Dealer also agrees to cover, remove, obliterate, or return at Nissan's discretion any Trade Dress Elements from the Nissan signature building that may lead the public to believe that it is a Nissan dealership. Such Trade Dress Elements include, but are not limited to:

Exterior:

- All Nissan Signs
- Paint Color
- Entry Element
- Louvers

The terms and conditions of the Agreement, to the extent not modified herein, shall remain in full force and effect and shall continue to bind the parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate as of the day and year first above written.

DEALER

WOODFIELD NISSAN, INC.

By _____

William A. Slevin
Principal Owner

SELLER

NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By _____

Mark C. McNabb
Vice President
General Manager, Nissan Division

By _____

Thomas P. Hushek
Regional Vice President
North Central Region

# AMENDMENT NO. 2
# TO
# NISSAN DEALER
# SALES AND SERVICE AGREEMENT

This Agreement of Amendment is entered into and effective May 15, 2001 by and between the Nissan Division of NISSAN NORTH AMERICA, INC., a California corporation (hereinafter "Seller"), and WOODFIELD NISSAN, INC., an Illinois corporation (hereinafter "Dealer").

## RECITALS

Effective October 19, 1993, Seller and Dealer entered into a Nissan Dealer Sales and Service Agreement (hereinafter "the Agreement") which was amended April 29, 1996. Seller and Dealer desire to amend the Agreement to reflect changes to Article Tenth.

THEREFORE, the parties hereby agree to amend the Agreement as follows:

1.      ARTICLE TENTH: Article Tenth is hereby amended to read as follows:

A.      Exhibit A is deleted in its entirety.

B.      <u>Existing Dealership Facilities</u>

Currently Nissan is aware of and has only authorized, for the period up to **May 1, 2002** the conduct of Kia parts and service operations from the Nissan Dealership Facilities in the manner and layout approved by Nissan. This authorization does not constitute consent to and expressly denies consent to conduct Kia operations from the Dealership Facilities beyond May 1, 2002, or to modified or expanded sales, parts, and service operations, or to the substitution or addition of parts and service operations for another line-make or use to the Dealership Facilities at any time.

The following Facility Usage provision is made part of this Agreement and is effective until May 1, 2002, or until the Nissan Dealership Facilities are restored to full exclusivity in accordance with Nissan's Guides and Policies, whichever occurs first:

## **FACILITY USAGE**

In order for Dealer to maintain competitive Dealership Facilities to effectively market Nissan Products, Dealer hereby agrees to abide by and to never challenge the following provisions (hereinafter "Facility Usage Provisions"), which incorporate Nissan's Facilities Usage Policy as may be established by Seller from time to time. These Facility Usage Provisions shall be effective concurrent with the execution of a Nissan Dealer Sales and Service Agreement and shall continue in effect thereafter so long as Dealer (or its principals) are authorized Nissan dealers and shall be binding on any successors-in-interest, assignees or purchasers of Dealer:

a)      The only line-make of new, unused motor vehicles which Dealer shall display and sell at the Dealership Facilities shall be the Nissan line and make of motor vehicles. Dealer agrees not to conduct any dealership sales operations for any other make or line of new, unused vehicles from the Dealership Facilities.

b)      (1)      Nothing contained herein shall relieve Dealer of its obligation to provide fully exclusive sales and customer contact areas at the Dealership Facilities dedicated to the promotion of Nissan Products.

(2)      Dealer shall sell and maintain a full line of Genuine Nissan Parts and Accessories, including service contracts, at the Dealership Facilities and shall provide a full range of automotive servicing for Nissan vehicles at the Dealership Facilities pursuant to Section 5 of the Standard Provisions to the Agreement. Nothing contained herein, however, shall preclude Dealer from offering parts, accessories or servicing for vehicles of other lines or makes subject to Nissan's prior, written consent. Such consent is dependent upon Dealer's full compliance with Nissan's current guides for Parts and Service Operations, and subject to Nissan's approval of the appearance, layout, signage, and usage of the combined parts & service

Amendment Number : 2
Dealer : WOODFIELD NISSAN, INC.

operations.  Further, such operations shall not substitute for the sale of Nissan products.  Currently Nissan is aware of and has only authorized the conduct of Kia parts and service operations from the Dealership Facilities.

This authorization does not constitute consent to and expressly denies consent to expanded parts and service operations or to the substitution or addition of parts and service operations for another line-make or use to the Dealership Facilities.

c)     Dealer shall not advertise or promote any make or line of new, unused vehicles from Dealership Facilities other than the Nissan line.

d)     Dealer shall not install or maintain any sign at the Dealership Facilities which would tend to lead the public into believing that any line or make of vehicles other than the Nissan line is sold at the Dealership Facilities.

e)     Dealer agrees that under Article Third of the Agreement and Section 15 of the Standard Provisions, Nissan may reasonably require any proposed buyer of Dealer's assets to agree to Facility Usage Provisions in accordance with Nissan's Guides and Policies in effect at that time, as a condition of Nissan's consent to the change of ownership.

f)     Any failure by Dealer to abide by the foregoing subparts (a) through (e) shall constitute a material breach of the Agreement warranting its termination, and shall constitute "good cause" for its termination under Chapter 815, Section 710/2(v), et seq. of the Illinois Compiled Statutes, or any applicable successor statute.


C.     New Exclusive Dealership Facilities

In order for Dealer to provide competitive Dealership Facilities to effectively market the Nissan Products and Brand, Dealer hereby agrees to provide exclusive, separate and distinct (stand-alone) Nissan Sales, Parts and Service Dealership Facilities of a size, appearance and layout meeting Seller's approval and in compliance with the Facility Guides established by Seller, in accordance with the following schedule:

(1)     On or before December 1, 2001, Dealer shall submit written plans on how Dealer intends to restore the Nissan Dealership Facilities to full exclusivity in accordance with Nissan's Guides and Policies on or before the deadline set forth in (2) below, and

(2)     On or before May 1, 2002, Dealer shall provide fully operational, exclusive, separate and distinct (stand-alone) Nissan Dealership Facilities in accordance with Nissan's Guides and Policies at 700 W. Higgins Road, Hoffman Estates, IL.  No Kia signage shall be placed anywhere inside or outside the Nissan Dealership Facilities.


Failure by Dealer to meet any of the deadlines set forth above shall constitute a material breach of this Agreement and warranting termination and shall constitute good cause under Chapter 815, Section 710/2(v), et seq. of the Illinois Compiled Statutes, or any applicable successor statute.

Upon providing operational, exclusive Nissan Dealership Facilities, Dealer agrees to the following Exclusivity provisions which will be added to Article Tenth of the Agreement:


EXCLUSIVITY

In order for Dealer to maintain competitive Dealership Facilities to effectively market Nissan Products, Dealer hereby agrees to abide by and never challenge the following provisions (hereinafter "Exclusivity Provisions"), which

Amendment Number : 2
Dealer : WOODFIELD NISSAN, INC.

incorporate Nissan's Facilities Usage Policy as may be established by Seller from time to time. These Exclusivity Provisions shall be effective concurrent with the execution of the Agreement, and continue in effect for so long as Dealer (or its principals) are Authorized Nissan dealers and these provisions shall be binding on any successors-in-interest, assigns or purchasers of Dealer:

      a)      The only line-make of new, unused motor vehicles which Dealer shall display and sell at the Dealership Facilities shall be the Nissan line and make of motor vehicles. Dealer shall not conduct any dealership sales operations for any other make or line of new, unused vehicles from the Dealership Facilities;

      b)      Dealer shall sell and maintain a full line of Genuine Nissan Parts and Accessories, including service contracts, at the Dealership Facilities and shall provide a full range of automotive servicing for Nissan vehicles at the Dealership Facilities pursuant to Section 5 of the Standard Provisions to the Agreement. Nothing contained herein, however, shall preclude Dealer from offering parts, accessories or servicing for vehicles of other lines or makes so long as such products or services are incidental to Dealer's Nissan Dealership Operations and do not substitute for the sale of Nissan Products;

      c)      Dealer shall not advertise or promote any make or line of new, unused vehicles from the Dealership Facilities other than the Nissan line;

      d)      Dealer shall not install or maintain any sign at or near the Dealership Facilities which would tend to lead the public into believing that any line or make of vehicles other than the Nissan line is sold at the Dealership Facilities.

      e)      Dealer agrees that under Article Third of the Agreement and Section 15 of the Standard Provisions, Nissan may reasonably require any proposed buyer of Dealer's assets to agree to identical Exclusivity Provisions, in accordance with Nissan's Guides and Policies in effect at that time, as a condition of Nissan's consent to the change of ownership;

      f)      Any failure by Dealer to abide by the foregoing subparts (a) through (e) shall constitute a material breach of the Agreement warranting its termination and shall constitute "good cause" for termination under Chapter 815, Section 710/2(v), et seq. of the Illinois Compiled Statutes, or any applicable successor statute.

      The terms and conditions of the Agreement, to the extent not modified herein, shall remain in full force and effect and shall continue to bind the parties hereto.

Amendment Number : 2
Dealer : WOODFIELD NISSAN, INC.

        IN WITNESS WHEREOF, the parties have executed this Agreement in triplicate as of the day and year first above written.

DEALER

WOODFIELD NISSAN, INC.

By _____
William A. Slevin
Principal Owner

SELLER

NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By _____
W. J. Kirrane
Vice President
General Manager, Nissan Division

By _____
Thomas P. Hushek
Regional Vice President
North Central Region

**AMENDMENT NO. 1**

**TO**

**NISSAN DEALER**

**SALES AND SERVICE AGREEMENT**

This Agreement of Amendment is entered into and effective April 29, 1996 by and between the Nissan Division of NISSAN MOTOR CORPORATION U.S.A., a California corporation (hereinafter "Seller"), and WOODFIELD NISSAN, INC., an Illinois corporation (hereinafter "Dealer").

**RECITALS**

Effective October 10, 1993, Seller and Dealer entered into a Nissan Dealer Sales and Service Agreement (hereinafter "the Agreement"). Seller and Dealer desire to amend the Agreement to reflect a Minority Ownership Change.

THEREFORE, the parties hereby agree to amend the Agreement as follows:

1.      The identification of Owner(s) and Executive Manager in the Final Article is hereby amended to read as follows:

"The Principal Owner(s) of Dealer are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| William A. Slevin | 5 N. 210 Heritage Court Wayne, IL 60184 | 100% |

The Other Owner(s) of Dealer are as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| NONE | NONE | NONE |

The Executive Manager of Dealer is as follows:

| NAME | RESIDENCE | PERCENTAGE INTEREST |
|------|-----------|---------------------|
| William A. Slevin | 5 N. 210 Heritage Court Wayne, IL 60184 | 100% |

The terms and conditions of the Agreement, to the extent not modified herein, shall remain in full force and effect and shall continue to bind the parties hereto.

# NISSAN

**NISSAN NORTH AMERICA, INC.**
Corporate Office
P.O. Box 685001
Franklin, TN 37068-5001
Telephone: 615-725-1000

April 27, 2012

**VIA FEDEX**

Mr. William A. Slevin
Woodfield Nissan, Inc. 3229
700 W Higgins Rd
Hoffman Estates, IL 60195

Re:    Changes to Primary Market Area

Dear Mr. Slevin,

This letter is to inform you that Nissan North America, Inc. (Nissan) has revised your Primary Market Area (PMA) as provided in section 1.N of the standard provisions of your Dealer Sales and Service Agreement.

Every 10 years the US government releases new Census figures as called for by the constitution. The recently released 2010 census data reflect population shifts and other demographic trends that have occurred throughout the nation over the previous 10 years of time.

As a result, Nissan has completed a comprehensive review of all Nissan Dealer PMAs on a national basis. In addition to incorporating the revised census data, Nissan also reviewed your PMA based on additional criteria such as: air distance, drive distance, natural boundaries, buyer shopping patterns, and other objective factors. As a result of this review, the attached documents provide information detailing the PMA revisions and your new PMA geography. As you know, your PMA is an evaluation tool and does not affect where you sell vehicles.

Attached you will find the following;

      1.) Notice of PMA that includes all census tract detail in your new PMA geography

      2.) PMA Map outlining your new PMA, the census tracts and related geography with major road systems

If you have any questions, please contact your Dealer Operations Manager.

Regards,

Patrick W. Doody
Director, Market Representation
Nissan North America, Inc.

24_3229



## NOTICE OF PRIMARY MARKET AREA

Pursuant to Section 1.N of the Standard Provisions of the Nissan Dealer Sales & Service Agreement (the "Agreement"), the area described by 2010 census tracts in Exhibit A to this Notice, shall be deemed to be the Primary Market Area of the Dealer identified below. Exhibit A is incorporated by reference into this Notice.

This Primary Market Area will be used by Nissan North America, Inc. ("Seller"), to the extent applicable, in the establishment and evaluation of vehicle sales responsibilities of Dealer under Section 3 of the Agreement.

To the extent deemed relevant thereto, such Primary Market Area may also be employed in the establishment or amendment of Guides for the Dealership Facilities and other matters relating to Dealer's dealership operations.

The Primary Market Area described in Exhibit A hereto will be employed by Seller for the foregoing purposes until superseded by a new Notice of Primary Market Area issued to Dealer by Seller. This Notice of Primary Market Area cancels and supersedes any previous Notice of Primary Market Area furnished to Dealer by Seller.

This Notice of Primary Market Area is effective as of May 16, 2012, or such later date, as may be required by any applicable statute.

**DEALER:**
**Woodfield Nissan, Inc.**

Doing Business As:

City:
**Hoffman Estates**

State:
**IL**

Dealer Code:
**3229**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By: Albert Castignetti
    Vice President
    General Manager, Nissan Division

By: Bryan Dumais
    Regional Vice President
    Midwest Region

(File this Addendum with Current Sales & Service Agreement)

24_3229



Nissan North America

Chicago

**PMA HIGHLIGHT MAP**

23 Woodfield Nis  Schaumburg

Dealer Code: 3229

© 2012 Urban Science. All rights reserved. MS-4.8.6 CM-5.2.1.0 RF-4.0.15.0    |    Map data © 2006-2011 TomTom. All rights reserved.    |    Date Printed: Apr 27, 2012    |    Serial# 1408931

Geog Ref: P00-CHI_2010CT

URBAN SCIENCE



# Exhibit A
## To
## Notice of Primary Market Area

Dealer Name and Code: Woodfield Nissan, Inc.

3229

Geog. Ref.: CHI_2010CT

This Exhibit A is incorporated by reference in and is a part of the Notice of Primary Market Area issued to the above named Dealer effective 5/16/2012

| County: 17031 - COOK | | | | | | ILLINOIS |
|---|---|---|---|---|---|---|
| 7702.01 | 7702.02 | 7703.00 | 7704.00 | 7705.00 | 8036.03 | 8040.00 |
| 8041.02 | 8041.04 | 8041.05 | 8041.06 | 8041.08 | 8041.09 | 8042.01 |
| 8042.02 | 8043.05 | 8043.08 | 8043.09 | 8045.09 | 8045.10 | 8045.11 |
| 8046.03 | 8046.06 | 8046.07 | 8046.08 | 8046.09 | 8046.10 | 8046.11 |
| 8047.01 | 8047.05 | 8047.06 | 8047.09 | 8047.10 | 8047.11 | 8047.12 |
| 8047.13 | 8047.14 | 8047.15 | 8047.16 | 8048.03 | 8048.04 | 8048.05 |
| 8048.06 | 8048.07 | 8048.08 | 8048.09 | 8048.10 | 8050.02 | 8051.05 |
| 8051.06 | 8051.07 | 8051.08 | 8051.09 | 8051.11 | 8051.12 | |

| County: 17043 - DU PAGE | | | | | ILLINOIS |
|---|---|---|---|---|---|
| 8410.03 | 8411.02 | 8411.04 | 8413.15 | 8413.20 | |

## Total Tracts for this PMA: 60

This Exhibit shows the 2010 Census Tracts that compose the Dealer's Primary Market Area. Each full or partial County and the individual 2010 Census Tracts within those full or partial Counties that are included in the Dealer's assigned market are included for reference. Data on the Dealer's market is collected by Nissan based on this geography including the related levels of geography as required for full data collection.

The PMA (Primary Market Area) Map is attached for reference and shows by the area in the yellow tone the Dealer's assigned market as described by 2010 Census Tracts.

**Ezell, Scott**

| | |
|---|---|
| **From:** | trackingupdates@fedex.com |
| **Sent:** | Wednesday, May 02, 2012 11:28 AM |
| **To:** | Ezell, Scott |
| **Subject:** | FedEx Shipment 514802820936 Delivered |

This tracking update has been requested by:

| | |
|---|---|
| Company Name: | Nissan North America |
| Name: | D. PATIN MARKET REP A6C |
| E-mail: | 'not provided by requestor' |
| Message: | PMA NOTICE |

Our records indicate that the following shipment has been delivered:

| | |
|---|---|
| Reference: | D.PATIN/MARKET REP/11206 |
| Ship (P/U) date: | Apr 30, 2012 |
| Delivery date: | May 2, 2012 11:22 AM |
| Sign for by: | R.ANFARO |
| Delivery location: | Hoffman Estates, IL |
| Delivered to: | Shipping/Receiving |
| Service type: | FedEx 2Day |
| Packaging type: | FedEx Envelope |
| Number of pieces: | 1 |
| Weight: | 0.50 lb. |
| Special handling/Services: | Deliver Weekday |
| Tracking number: | 514802820936 |

| Shipper Information | Recipient Information |
|---|---|
| D. PATIN MARKET REP A6C | 24-3229 William A. Slevin |
| Nissan North America | Woodfield Nissan Inc. |
| 1 Nissan Way | 700 W Higgins Rd |
| Franklin | — |
| TN | Hoffman Estates |
| US | IL |
| 37067 | US |
| | 60195 |

Please do not respond to this message. This email was sent from an unattended mailbox. This report was generated at approximately 11:27 AM CDT on 05/02/2012.

To learn more about FedEx Express, please visit our website at fedex.com.

All weights are estimated.

To track the latest status of your shipment, click on the tracking number above, or visit us at fedex.com.

This tracking update has been sent to you by FedEx on the behalf of the Requestor noted above. FedEx does not validate the authenticity of the requestor and does not validate, guarantee or warrant the authenticity of the request, the requestor's message, or the accuracy of this tracking update. For tracking results and fedex.com's terms of use, go to fedex.com.

Thank you for your business.



**NISSAN NORTH AMERICA, INC.**

Midwest Region
600 Enterprise Street
Aurora, IL  60504-8139
Telephone: 630.851.8000

June 25, 2013

WOODFIELD NISSAN, INC.
700 W HIGGINS RD
HOFFMAN ESTATES, IL 60169

Attention: Principal Owner

Nationally, all Nissan dealers are receiving new Product Addenda as a result of the addition of the all new Nissan Versa Note to our product line-up.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement.  This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, and the supplemental NCV Product Addendum - if you are certified to sell and service the Nissan GT-R, Nissan LEAF, or Nissan Commercial Vehicles); all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact M. Scott Compton, Midwest Region Market Representation Manager.

Sincerely,

Bryan Dumais
Regional Vice President
Midwest Region



**PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections l.B, l.C and l.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale the Nissan Products identified below:

1)   Nissan Cars and Trucks

| | | | |
|---|---|---|---|
| VERSA NOTE | ALTIMA | FRONTIER | MURANO CROSSCAB |
| VERSA SEDAN | ALTIMA COUPE | XTERRA | ROGUE |
| SENTRA | MAXIMA | PATHFINDER | TITAN |
| CUBE | 370Z COUPE | JUKE | ARMADA |
| | 370Z ROADSTER | MURANO | QUEST |

2)   Genuine Nissan Parts for Nissan Cars and Trucks,
3)   Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers), and,
4)   All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller.  This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental LEAF Product Addendum issued to all certified LEAF Nissan Dealers, the supplemental GT-R Product Addendum issued to a limited number of certified GT-R Nissan Dealers, and the supplemental NCV Product Addendum issued to a limited number of certified Nissan Commercial Vehicle Dealers all of which shall remain in full force and effect).

This Product Addendum is effective as of June 1, 2013 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

Doing Business As:


City:
**HOFFMAN ESTATES**

By: Fred M. Diaz
     Divisional VP, Sales & Marketing,
     Parts & Service, Nissan

State:
**IL**

Dealer Code:
**3229**

By: Bryan Dumais
     Regional Vice President
     Midwest Region



**SUPPLEMENTAL PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale the Nissan Products identified below:

(1) Nissan Cars

LEAF

Note:  This vehicle's distribution is only to Certified Nissan LEAF Dealers and it should not be dealer traded to non-certified dealers.

(2) Genuine Nissan parts and accessories for the Nissan LEAF.

(3) All other products marketed by Nissan through certified dealers for the Nissan LEAF.

This Supplemental Product Addendum shall be effective only with respect to the LEAF and shall remain in effect until it is revoked or replaced.  This Supplemental Product Addendum is in addition to any other currently effective Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement.

This Supplemental Product Addendum is effective as of October 1, 2011 or such later date, as may be required by any applicable statute.

**DEALER:**                                              **SELLER:**
**WOODFIELD NISSAN, INC.**                   NISSAN DIVISION
                                                              NISSAN NORTH AMERICA, INC.

Doing Business As:


City:                                                       By: Albert Castignetti
**HOFFMAN ESTATES**                          Vice President,
                                                              General Manager, Nissan Division

State:
**IL**

Dealer Code:                                           By: Robert D. Grafton
**3229**                                                     Regional Vice President
                                                              Midwest Region


(File this Addendum with Current Sales & Service Agreement)



**NISSAN NORTH AMERICA, INC.**

Midwest Region
600 Enterprise Street
Aurora, IL  60504-8139
Telephone: 630.851.8000

March 11, 2014

WOODFIELD NISSAN, INC. 3229
700 W HIGGINS RD
HOFFMAN ESTATES, IL 60169

Attention: Principal Owner

Nationally, all Nissan dealers are receiving new Product Addenda as a result of the addition of the Nissan NV200 to our product line-up.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement.  This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, and the supplemental NCV Product Addendum - if you are certified to sell and service the Nissan GT-R, Nissan LEAF, or Nissan Commercial Vehicles); all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact M. Scott Compton, Midwest Region Market Representation Manager.

Sincerely,

Bryan Dumais
Regional Vice President
Midwest Region



**PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale the Nissan Products identified below:

1)  Nissan Cars and Trucks

| | | | |
|---|---|---|---|
| VERSA NOTE | MAXIMA | PATHFINDER | ROGUE |
| VERSA SEDAN | 370Z COUPE | PATHFINDER HEV | ROGUE SELECT |
| SENTRA | 370Z ROADSTER | JUKE | TITAN |
| CUBE | FRONTIER | MURANO | ARMADA |
| ALTIMA | XTERRA | MURANO CROSSCAB | QUEST |
| | | | NV200 |

2)  Genuine Nissan Parts for Nissan Cars and Trucks,
3)  Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers), and,
4)  All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller. This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental LEAF Product Addendum issued to all certified LEAF Nissan Dealers, the supplemental GT-R Product Addendum issued to a limited number of certified GT-R Nissan Dealers, and the supplemental NCV Product Addendum issued to a limited number of certified Nissan Commercial Vehicle Dealers all of which shall remain in full force and effect).

This Product Addendum is effective as of March 11, 2014 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

Doing Business As:

City:
**HOFFMAN ESTATES**

By: Fred M. Diaz
      Senior Vice President
      Sales & Marketing
      Parts & Service, U.S.A.

State:
**IL**

Dealer Code:
**3229**

By: Bryan Dumais
      Regional Vice President
      Midwest Region



**NISSAN NORTH AMERICA, INC.**
**Midwest Region**
600 Enterprise Street
Aurora, IL 60504-8139
Telephone: 630.851.8000

September 21, 2015

WOODFIELD NISSAN, INC. 3229
700 W HIGGINS RD
HOFFMAN ESTATES, IL 60169

Attention: Principal Owner

Nationally, all Nissan dealers are receiving new Product Addenda as a result of revisions to the Nissan product line-up.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement. This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum - if you are certified to sell and service the Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi); all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact M. Scott Compton, Midwest Region Market Representation Manager.

Sincerely,

Bryan Dumais
Regional Vice President
Midwest Region



**PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale solely in the United States the Nissan Products identified below:

1)   Nissan Cars and Trucks

| | | | |
|---|---|---|---|
| VERSA NOTE | MAXIMA | XTERRA | ROGUE SELECT |
| VERSA SEDAN | 370Z COUPE | PATHFINDER | TITAN |
| SENTRA | 370Z ROADSTER | JUKE | ARMADA |
| ALTIMA | FRONTIER | MURANO | QUEST |
| | | ROGUE | NV200 |

2)   Genuine Nissan Parts for Nissan Cars and Trucks,
3)   Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers), and,
4)   All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller. This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum issued to a limited number of certified Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi Dealers all of which shall remain in full force and effect).

This Product Addendum is effective as of September 01, 2015 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**


Doing Business As:


City:
**HOFFMAN ESTATES**


State:
**IL**


Dealer Code:
**3229**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.


By: Leon Dorssers
    Vice President, Dealer Network
    Development
    Nissan North America


By: Bryan Dumais
    Regional Vice President
    Midwest Region



**NISSAN NORTH AMERICA, INC.**
**Midwest Region**
600 Enterprise Street
Aurora, IL  60504-8139
Telephone: 630.851.8000

August 11, 2016

WOODFIELD NISSAN, INC. 3229
700 W HIGGINS RD
HOFFMAN ESTATES, IL  60169

Attention: Principal Owner

Nationally, all Nissan dealers are receiving new Product Addenda as a result of revisions to the Nissan product line-up.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement.  This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum - if you are certified to sell and service the Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi); all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact Gregory Ebbs, Midwest Region Market Representation Manager.

Sincerely,

Bryan Dumais
Regional Vice President
Midwest Region



**PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale solely in the United States the Nissan Products identified below:

1) Nissan Cars and Trucks

| | | | |
|---|---|---|---|
| VERSA NOTE | MAXIMA | PATHFINDER | TITAN |
| VERSA SEDAN | 370Z COUPE | JUKE | ARMADA |
| SENTRA | 370Z ROADSTER | MURANO | QUEST |
| ALTIMA | FRONTIER | ROGUE | NV200 |

2) Genuine Nissan Parts for Nissan Cars and Trucks,
3) Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers), and,
4) All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller. This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum issued to a limited number of certified Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi Dealers all of which shall remain in full force and effect).

This Product Addendum is effective as of August 01, 2016 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**


Doing Business As:


City:
**HOFFMAN ESTATES**


State:
**IL**


Dealer Code:
**3229**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.


By: David Kershaw
Vice President, Dealer Network
Development
Nissan North America


By: Bryan Dumais
Regional Vice President
Midwest Region

(File this Addendum with Current Sales & Service Agreement)



**NISSAN NORTH AMERICA, INC.**
**Midwest Region**
600 Enterprise Street
Aurora, IL 60504-8139
Telephone: 630.851.8000

May 10, 2018

WOODFIELD NISSAN, INC. 3229
700 W HIGGINS RD
HOFFMAN ESTATES, IL 60169

Attention: Principal Owner

Nationally, all Nissan dealers are receiving new Product Addenda as a result of revisions to the Nissan product line-up.

The issuance of a new superseding Product Addendum is not a change to the Sales & Service Agreement but rather an update to the Product Addenda as provided for within the Agreement. This update is being conducted pursuant to Section 1.X., of the Standard Provisions to your Sales & Service Agreement, which provides that Nissan may issue new, superseding Product Addenda to you from time to time.

Please keep this revised Product Addendum with your Sales & Service Agreement (as well as the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum - if you are certified to sell and service the Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi); all other previously issued Product Addenda are no longer valid.

If you require any further information, please contact Robert Goetz, Midwest Region Market Representation Manager.

Sincerely,

Craig Keeys
Regional Vice President
Midwest Region



**PRODUCT ADDENDUM**
**TO**
**NISSAN SALES AND SERVICE AGREEMENT**

Pursuant to Sections I.B, I.C and I.X of the Nissan Dealer Sales & Service Agreement (the "Agreement") in effect between the Authorized Nissan Dealer named below and Nissan North America, Inc. ("Seller"), Seller hereby grants Dealer the non-exclusive right to buy for resale solely in the United States the Nissan Products identified below:

1)   Nissan Cars and Trucks

| | | | |
|---|---|---|---|
| VERSA NOTE | 370Z COUPE | MURANO | TITAN |
| VERSA SEDAN | 370Z ROADSTER | PATHFINDER | TITAN XD |
| SENTRA | KICKS | ARMADA | |
| ALTIMA | ROGUE | FRONTIER | |
| MAXIMA | ROUGE SPORT | NV200 | |

2)   Genuine Nissan Parts for Nissan Cars and Trucks,
3)   Genuine Nissan Accessories for such Vehicles (this includes all other products offered by Nissan for dealers and consumers) and,
4)   All other products and services branded with Nissan and offered by Nissan North America or Nissan Extended Service North America (NESNA) for sale to consumers; promoted through an authorized Nissan dealer.

This Product Addendum shall remain in effect unless and until superseded by a new Product Addendum issued to Dealer by Seller. This Product Addendum cancels and supersedes any previous Product Addendum furnished to Dealer by Seller pursuant to the existing terms of the Agreement (except for the supplemental GT-R Product Addendum, the supplemental LEAF Product Addendum, the supplemental NCV Product Addendum, and the supplemental NY Taxi Product Addendum issued to a limited number of certified Nissan GT-R, Nissan LEAF, Nissan Commercial Vehicles, or Nissan Taxi Dealers all of which shall remain in full force and effect).

This Product Addendum is effective as of May 01, 2018 or such later date, as may be required by any applicable statute.

**DEALER:**
**WOODFIELD NISSAN, INC.**

Doing Business As:

City:
**HOFFMAN ESTATES**

State:
**IL**

Dealer Code:
**3229**

**SELLER:**
NISSAN DIVISION
NISSAN NORTH AMERICA, INC.

By: Judith K. Wheeler
    Division Vice President
    U.S. and Canada Dealer Network Strategy

By: Craig Keeys
    Regional Vice President
    Midwest Region

(File this Addendum with Current Sales & Service Agreement)



August 11, 2022

**VIA CERTIFIED MAIL – RETURN RECEIPT REQUESTED**

Woodfield Nissan, Inc.
700 W Higgins Rd
Hoffman Estates, IL 60169

Re:     Change to Primary Market Area

Dear William A Slevin,

This letter is to inform you that Nissan North America, Inc. ("Nissan") intends to revise your Primary Market Area ("PMA") as provided in section 1.N of the standard provisions of your Dealer Sales and Service Agreement.

Every 10 years the US government releases new census figures as called for by the constitution.  The recently released 2020 census data reflect population shifts and other demographic trends that have occurred throughout the nation over the previous 10 years of time.

As a result, Nissan has completed a comprehensive review of all Nissan Dealer PMAs on a national basis.  In addition to incorporating the revised census data, Nissan also reviewed your PMA based on additional criteria such as:  drive distance, drive time, natural boundaries, buyer shopping patterns, and other objective factors.  As a result of this review, the attached documents provide information detailing the proposed PMA revisions and proposed new PMA geography.  As you know, your PMA is an evaluation tool and does not affect where you sell vehicles.

Attached you will find the following:

1.) Notice of PMA that includes all census tract detail in the proposed new PMA geography.  As noted, this change does not affect where your dealership may sell vehicles, and it is not the result of the realignment, relocation, addition, or reduction of new Nissan dealers in Illinois.  It is strictly the result of Nissan's comprehensive review of PMA assignments nationally, which review was precipitated by the results of the 2020 census.

Nissan North America, Inc.
One Nissan Way, Franklin, TN 37067
www.nissanusa.com

24 3229

2.) PMA Map outlining the proposed new PMA, the census tracts and related geography with major road systems.

Nissan intends for this PMA change to take effect on September 15, 2022. At that time, the enclosed Notice of PMA will supersede any previous Notices of PMA issued to Dealer.

If you have any questions, please contact your Dealer Operations Manager.

Regards,

Brian Maragno
Director, Dealer Network Development
Nissan North America, Inc.



## NOTICE OF PRIMARY MARKET AREA

_____

   Pursuant to Section 1.N of the Standard Provisions of the Nissan Dealer Sales & Service Agreement (the "Agreement"), the area described by 2020 census tracts in Exhibit A to this Notice, shall be deemed to be the Primary Market Area of the Dealer identified below.  Exhibit A is incorporated by reference into this Notice.

   This Primary Market Area will be used by Nissan North America, Inc. ("Seller"), to the extent applicable, in the establishment and evaluation of vehicle sales responsibilities of Dealer under Section 3 of the Agreement.

   To the extent deemed relevant thereto, such Primary Market Area may also be employed in the establishment or amendment of Guides for the Dealership Facilities and other matters relating to Dealer's dealership operations.

   The Primary Market Area described in Exhibit A hereto will be employed by Seller for the foregoing purposes until superseded by a new Notice of Primary Market Area issued to Dealer by Seller.  This Notice of Primary Market Area cancels and supersedes any previous Notice of Primary Market Area furnished to Dealer by Seller.

   This Notice of Primary Market Area is effective as of September 15, 2022, or such later date, as may be required by any applicable statute.


**DEALER:**                                          **SELLER:**
**Woodfield Nissan, Inc.**                           NISSAN DIVISION
                                                     NISSAN NORTH AMERICA, INC.

Doing Business As:

City:                                                By:   Jeffrey J. Pope
**Hoffman Estates**                                        Divisional Vice President
                                                           Dealer Network Development & Customer Quality

State:
**Illinois**


Dealer Code:                                         By: Tiago Castro
**3229**                                                  Regional Vice President
                                                          Midwest Region
                                                          ☒ I understand that checking this box constitutes a
                                                          legal signature on behalf of the Regional Vice President


(File this Addendum with Current Sales & Service Agreement)

# NISSAN

Schaumburg

## PMA Highlight Map

**Dealers**

3229    Woodfield Nis    Schaumburg



URBAN SCIENCE® | Ni2® ©2021 Urban Science, All Rights Reserved
Serial Number: 446833

© 1992 - 2019 TomTom. All Rights Reserved.
Geog RefH - 2020CTAudit_5101012_23

# NISSAN

Schaumburg

## Exhibit A To Notice of Primary Market Area

*23 - Schaumburg*
*Woodfield Nissan, Inc. - 3229*

STATE/COUNTY CODE: 17031
TRACT/ZIP CODE: 170318047.13

### County: 17031 - Cook   ILLINOIS

| | | | | | | |
|---|---|---|---|---|---|---|
| 170317702.01 | 170317702.02 | 170317703.00 | 170317704.00 | 170318041.02 | 170318041.04 | 170318041.05 |
| 170318041.06 | 170318041.08 | 170318041.09 | 170318042.02 | 170318042.03 | 170318042.04 | 170318043.05 |
| 170318043.08 | 170318043.09 | 170318045.10 | 170318045.11 | 170318046.03 | 170318046.06 | 170318046.07 |
| 170318046.08 | 170318046.09 | 170318046.10 | 170318046.11 | 170318047.01 | 170318047.05 | 170318047.06 |
| 170318047.09 | 170318047.10 | 170318047.11 | 170318047.12 | 170318047.13 | 170318047.14 | 170318047.15 |
| 170318047.16 | 170318048.03 | 170318048.04 | 170318048.05 | 170318048.06 | 170318048.07 | 170318048.08 |
| 170318048.09 | 170318048.10 | 170318050.02 | 170318051.05 | 170318051.06 | 170318051.07 | 170318051.08 |
| 170318051.11 | 170318051.12 | | | | | |

### County: 17043 - DuPage   ILLINOIS

| | | | | |
|---|---|---|---|---|
| 170438410.03 | 170438411.02 | 170438411.04 | 170438411.08 | 170438413.20 |

**Total Geography Definitions for this PMA: 56**



# NISSAN DEALER
# SALES AND SERVICE AGREEMENT

# STANDARD PROVISIONS

## NISSAN DIVISION
## NISSAN NORTH AMERICA, INC.

FORM # NDA-4S/9-99

EXHIBIT 2

# NISSAN DEALER SALES AND SERVICE AGREEMENT
## STANDARD PROVISIONS
### TABLE OF CONTENTS

1. Definitions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 01
2. Dealership Location and
   Dealership Facilities. . . . . . . . . . . . . . . . . . . . . . . 03
   A. Location and Facilities . . . . . . . . . . . . . . . . . . . 03
   B. Dealership Facilities Addendum . . . . . . . . . . 03
   C. Changes and Additions . . . . . . . . . . . . . . . . . . 03
   D. Assistance Provided by Seller . . . . . . . . . . . . 03
   E. Evaluation of Dealership Facilities
      and Location . . . . . . . . . . . . . . . . . . . . . . . . . . 03
3. Vehicle Sales Responsibilities
   of Dealer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 04
   A. General Obligations of Dealer . . . . . . . . . . . . 04
   B. Sales of Nissan Cars and Nissan Trucks . . . . 04
   C. Metropolitan Markets . . . . . . . . . . . . . . . . . . . 04
   D. Additional Factors for Consideration . . . . . . . 04
   E. Used Motor Vehicle Sales . . . . . . . . . . . . . . . 05
   F. Dealer Sales Personnel . . . . . . . . . . . . . . . . . 05
   G. Assistance Provided by Seller . . . . . . . . . . . . 05
   H. Evaluation of Dealer's Sales
      Performance . . . . . . . . . . . . . . . . . . . . . . . . . . 05
4. Determination of Dealer
   Representation . . . . . . . . . . . . . . . . . . . . . . . . . 05
   A. Development of Market Studies . . . . . . . . . . . 05
   B. Appointment of New Authorized
      Nissan Dealers to Fill Open Points . . . . . . . . 06
5. Responsibilities of Dealer With
   Respect to Service and Parts . . . . . . . . . . . . . . 07
   A. General Service Obligations of Dealer . . . . . . 07
   B. Specific Service Obligations of Dealer . . . . . . 07
   C. Service Operations of Dealer . . . . . . . . . . . . . 09
   D. Parts Operations of Dealer . . . . . . . . . . . . . . . 10
   E. Assistance Provided by Seller . . . . . . . . . . . . 10
   F. Evaluation of Dealer's Service
      and Parts Performance . . . . . . . . . . . . . . . . . . 11
6. Other Seller and Dealer Responsibilities . . . . . . 11
   A. Advertising and Promotion . . . . . . . . . . . . . . . 11
   B. Dealer Disclosures and Representations
      Concerning Nissan Products and
      Other Products or Services . . . . . . . . . . . . . . 12
   C. Signs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
   D. Hours of Operation . . . . . . . . . . . . . . . . . . . . . 12
   E. Capital and Financing . . . . . . . . . . . . . . . . . . . 12
   F. Accounting System . . . . . . . . . . . . . . . . . . . . . 13
   G. Records and Reports . . . . . . . . . . . . . . . . . . . 13
   H. Nissan Datanet System . . . . . . . . . . . . . . . . . 14
   I. Right of Inspection . . . . . . . . . . . . . . . . . . . . . 14
   J. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . 14
   K. Use of Nissan Marks . . . . . . . . . . . . . . . . . . . 14
7. Purchase and Delivery . . . . . . . . . . . . . . . . . . . 15
   A. Dealer Purchases . . . . . . . . . . . . . . . . . . . . . . 15
   B. Delays in Delivery . . . . . . . . . . . . . . . . . . . . . . 15
   C. Shipment of Nissan Products . . . . . . . . . . . . . 15
   D. Passage of Title . . . . . . . . . . . . . . . . . . . . . . . 16
   E. Security Interest . . . . . . . . . . . . . . . . . . . . . . . 16
   F. Charges For Storage and Diversions . . . . . . . 17
   G. Changes in Nissan Products . . . . . . . . . . . . . . 17
8. Pricing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
   A. Nissan Vehicles . . . . . . . . . . . . . . . . . . . . . . . 17
   B. Genuine Nissan Parts
      and Accessories . . . . . . . . . . . . . . . . . . . . . . . 17
9. Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
   A. Payment for Vehicles . . . . . . . . . . . . . . . . . . . 18
   B. Payment for Parts and Accessories . . . . . . . . 18
   C. Accounts Payable . . . . . . . . . . . . . . . . . . . . . . 18
   D. Collection of Taxes by Dealer . . . . . . . . . . . . . 19

10. Warranties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
11. Indemnification . . . . . . . . . . . . . . . . . . . . . . . . . 19
    A. Indemnification of Dealer . . . . . . . . . . . . . . . . 19
    B. Indemnification of Seller . . . . . . . . . . . . . . . . . 20
    C. Conditions and Exceptions to
       Indemnification . . . . . . . . . . . . . . . . . . . . . . . . 21
12. Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    A. Termination Due to Certain Acts
       or Events . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
    B. Termination by Seller for
       Non-Performance by Dealer . . . . . . . . . . . . 23
    C. Termination Because of Death or Physical
       or Mental Incapacity of Principal Owner . . . . 24
    D. Termination for Failure of Seller or
       Dealer to be Licensed . . . . . . . . . . . . . . . . . . 24
    E. Termination by Dealer . . . . . . . . . . . . . . . . . . 24
    F. Termination by Seller Because of
       a Change of Seller's Method of
       Distribution or Decision by Seller to
       Cease Distribution of Nissan Vehicles . . . . . . 24
    G. Termination Upon Entering Into a
       New Sales and Service Agreement . . . . . . . . 25
13. Rights and Liabilities Upon Termination . . . . . . 25
    A. Termination Procedures . . . . . . . . . . . . . . . . . 25
    B. Repurchases by Seller
       Upon Termination . . . . . . . . . . . . . . . . . . . . . . 26
    C. Dealer's Responsibilities with
       Respect to Repurchase . . . . . . . . . . . . . . . . . 26
    D. Title to Repurchased Property . . . . . . . . . . . . 27
    E. Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    F. Cancellation of Deliveries . . . . . . . . . . . . . . . 27
14. Establishment of Successor Dealer . . . . . . . . . 27
    A. Because of Death of Principal Owner . . . . . . 27
    B. Consideration of Successor
       Addendum . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    C. Termination of Successor Addendum . . . . . . 28
    D. Evaluation of Successor Dealership . . . . . . . 28
    E. Termination of Market
       Representation . . . . . . . . . . . . . . . . . . . . . . . . 28
    F. Termination of Offer . . . . . . . . . . . . . . . . . . . . 29
15. Sale of Assets or Ownership
    Interests in Dealer . . . . . . . . . . . . . . . . . . . . . . 29
    A. Sale or Transfer . . . . . . . . . . . . . . . . . . . . . . . 29
    B. Seller's Evaluation . . . . . . . . . . . . . . . . . . . . . 29
    C. Effect of Termination . . . . . . . . . . . . . . . . . . . 30
16. Policy Review Board . . . . . . . . . . . . . . . . . . . . . 30
    A. Establishment of Policy
       Review Board . . . . . . . . . . . . . . . . . . . . . . . . . 30
    B. Appeal of Dealer Appointment to
       Policy Review Board . . . . . . . . . . . . . . . . . . . 31
    C. Appeal of Termination to Policy
       Review Board . . . . . . . . . . . . . . . . . . . . . . . . . 31
    D. Effect of Other Proceedings . . . . . . . . . . . . . 31
17. General . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    A. Notices . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    B. No Implied Waivers . . . . . . . . . . . . . . . . . . . . 31
    C. No Agency . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
    D. Limitations of Seller's Liability . . . . . . . . . . . . 32
    E. Entire Agreement . . . . . . . . . . . . . . . . . . . . . . 32
    F. California Law . . . . . . . . . . . . . . . . . . . . . . . . . 32
    G. Changes Required by Law . . . . . . . . . . . . . . . 32
    H. Severability . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    I. Assignment . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    J. No Franchise Fee . . . . . . . . . . . . . . . . . . . . . . 32
    K. Captions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
    L. Benefit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# NISSAN
# DEALER SALES & SERVICE AGREEMENT

The following Standard Provisions have by reference been incorporated in and made a part of the Nissan Dealer Sales & Service Agreement which they accompany and which has been executed on behalf of Seller and Dealer.

## Section 1. Definitions

Seller and Dealer agree that the following terms, as used in this Agreement, shall be defined exclusively as set forth below.

A. "Authorized Nissan Dealers" shall mean dealers located in the Territory that are authorized by Seller to conduct Dealership Operations in connection with the sale of Nissan Products, pursuant to a duly executed Nissan Dealer Sales and Service Agreement.

B. "Nissan Cars" shall mean the new passenger cars specified in the current Product Addendum.

C. "Nissan Trucks" shall mean the new trucks, cab and chassis, utility vehicles, buses or vans specified in the current Product Addendum.

D. "Nissan Vehicles" shall mean Nissan Cars and Nissan Trucks.

E. "Genuine Nissan Parts and Accessories" shall mean such parts, accessories and other products for Nissan Vehicles as are from time to time offered for sale by Seller to Authorized Nissan Dealers for resale under this Agreement.

F. "Nissan Products" shall mean Nissan Vehicles and Genuine Nissan Parts and Accessories.

G. "Competitive Vehicles" shall mean those new vehicles which are considered by Seller to be directly competitive with Nissan Vehicles.

H. "Industry Cars" shall mean all new cars of all manufacturers which are sold and distributed within the United States, to the extent data relating to registration thereof are reasonably available.

I. "Competitive Truck Segment" shall include all compact pickup trucks, compact utility vehicles, and compact buses of all manufacturers which are sold and distributed within the United States, to the extent data relating to registration thereof are reasonably available.

J. "Dealership Location" shall mean the place or places of business of Dealer established and described in accordance with Section 2 of this Agreement.

K. "Dealership Facilities" shall mean the land areas at the Dealership Location and the buildings and improvements erected thereon provided by Dealer in accordance with Section 2 of this Agreement.

L. "Dealership Facilities Addendum" shall mean the addendum executed by Seller and Dealer pursuant to Section 2 of this Agreement.

M. "Dealership Operations" shall mean all dealer functions contemplated by this Agreement including, without limitation, sale and servicing of Nissan Products, use and display of Nissan Marks and Nissan Products, rental and leasing of Nissan Vehicles, sales of used vehicles, body shop work, financing or insurance services and any other activities undertaken by Dealer in connection with Nissan Products whether conducted directly or indirectly by Dealer.

N. "Primary Market Area" shall mean the geographic area which is designated from time to time as the area of Dealer's sales and service

responsibility for Nissan Products in a Notice of Primary Market Area issued by Seller to Dealer. Seller reserves the right, in its reasonable discretion, to issue new, superseding "Notices of Primary Market Area" to Dealer from time to time. Such geographic area may at any time be applicable to Dealer and to other Authorized Nissan Dealers.

O. "Principal Owner(s)" shall mean the person(s) named as Principal Owner(s) in the Final Article of this Agreement upon whose personal qualifications, expertise, reputation, integrity, experience, ability and representations concerning the management and operation of Dealer, Seller has relied in entering this Agreement.

P. "Other Owner(s)" shall mean the person(s) named as Other Owner(s) in the Final Article of this Agreement who will not be involved in the operation or management of Dealer.

Q. "Executive Manager" shall mean the person named as Executive Manager in the Final Article of this Agreement upon whose personal qualifications, expertise, reputation, integrity, experience, ability and representations that he or she shall devote his or her primary efforts to and have full managerial authority and responsibility for the day-to-day management and performance of Dealer, Seller has relied in entering into this Agreement.

R. "Successor Addendum" shall mean the Successor Addendum, if any, executed by Seller and Dealer pursuant to Section 14 of this Agreement.

S. "Guides" shall mean such reasonable standards as may be established by Seller for Authorized Nissan Dealers from time to time under its standard procedures with respect to such matters as dealership facilities, tools, equipment, financing, capitalization, inventories, operations and personnel. The execution of this Agreement or of any addenda hereto (including, without limi-

tation, any Dealership Facilities Addendum) shall not, however, be construed as evidence of Dealer's fulfillment of or compliance with said Guides or of Dealer's fulfillment of its responsibilities under this Agreement.

T. "Warranty Manual" shall mean the publication or publications of Seller, as the same may from time to time be amended, revised or supplemented, which set forth Seller's policies and procedures concerning the administration of Seller's warranties and related matters.

U. "Nissan Marks" shall mean those trademarks, service marks, names, logos and designs that Seller may, from time to time, use or authorize for use by Dealer in connection with Nissan Products or Dealership Operations including, without limitation, the name "Nissan".

V. "Seller's Manuals and Instructions" shall mean those bulletins, manuals or instructions issued by Seller to all Authorized Nissan Dealers advising them of Seller's policies or procedures under this Agreement including, without limitation, the Parts and Accessories Policy and Procedures Manual and the Nissan Dealer Accounting System Manual.

W. "Territory" shall mean the geographic area in which Seller has been authorized by Manufacturer to distribute Nissan Products.

X. "Product Addendum" shall mean the Product Addendum issued by Seller to Dealer which specifies those Nissan Vehicles which shall be offered for sale by Seller to Dealer for resale. Seller reserves the right, in its sole discretion, to issue new, superseding Product Addenda to Dealer from time to time.

Y. "Dealer Identification Addendum" shall mean the Dealer Identification Addendum executed by Seller and Dealer pursuant to Section 6.C of this Agreement.

2

## Section 2. Dealership Location and Dealership Facilities

A. Location and Facilities.

Dealer shall provide, at the Dealership Location approved by Seller in accordance with Section 2.B hereof, Dealership Facilities that will enable Dealer to effectively perform its responsibilities under this Agreement and which are reasonably equivalent to those maintained by Dealer's principal competitors in the geographic area in which Dealer's Primary Market Area is located. In addition, the Dealership Facilities shall be satisfactory in space, appearance, layout, equipment, signage and otherwise be substantially in accordance with the Guides therefor established by Seller from time to time. Dealer shall conduct its Dealership Operations only from the Dealership Location specified in the Dealership Facilities Addendum. If the Dealership Location is comprised of more than one place of business, Dealer shall use each such place of business only for the purposes specified therefor in the current Dealership Facilities Addendum.

B. Dealership Facilities Addendum.

Dealer and Seller will execute a Dealership Facilities Addendum which will include a description of the Dealership Location and the Dealership Facilities, the approved use for each such place of business and facility, and the current Guides therefor.

C. Changes and Additions.

Dealer shall not move, relocate, or change the usage of the Dealership Location or any of the Dealership Facilities, or substantially modify any of the Dealership Facilities, nor shall Dealer or any person named in the Final Article of this Agreement directly or indirectly establish or operate any other locations or facilities for the sale or servicing of Nissan Products or for the conduct of any other of the Dealership Operations contemplated by this Agreement, without the prior written consent of Seller. Any changes in the Dealership Location or the Dealership Facilities that may be agreed to by Seller and Dealer shall be reflected in a new, superseding Dealership Facilities Addendum executed by Seller and Dealer.

D. Assistance Provided by Seller.

To assist Dealer in planning, establishing and maintaining the Dealership Facilities, Seller, at the request of Dealer, will from time to time make its representatives available to Dealer to provide standard building layout plans, facility planning recommendations, and counsel and advice concerning location and facility planning.

E. Evaluation of Dealership Facilities and Location.

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 2. In making such evaluations, Seller will give consideration to: the actual land and building space provided by Dealer for the performance of its responsibilities under this Agreement; the current Guides established by Seller for the Dealership Facilities; the appearance, condition and layout of the Dealership Facilities; the location of the Dealership Facilities relative to the sales opportunities and service requirements of the Primary Market Area; equivalence with facilities maintained by Dealer's principal competitors; and such other factors, if any, as may directly relate to Dealer's performance of its responsibilities under this Section 2. Evaluations prepared pursuant to this Section 2.E will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations, and Seller will consider Dealer's comments. Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 2.

**Section 3. Vehicle Sales**

**Responsibilities of Dealer**

A. General Obligations of Dealer.

Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale at retail (and if Dealer elects, the leasing and rental) of Nissan Vehicles to customers located within Dealer's Primary Market Area. Dealer's Primary Market Area is a geographic area which Seller uses as a tool to evaluate Dealer's performance of its sales obligations hereunder. Dealer agrees: that it has no right or property interest in any such geographic area which Seller may designate; that, subject to Section 4 of this Agreement, Seller may add, relocate or replace dealers in Dealer's Primary Market Area; and that Seller may, in its reasonable discretion, change Dealer's Primary Market Area from time to time.

B. Sales of Nissan Cars and Nissan Trucks. Dealer's performance of its sales responsibility for Nissan Cars and Nissan Trucks will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including for example:

1. Achievement of reasonable sales objectives which may be established from time to time by Seller for Dealer as standards for performance;

2. Dealer's sales of Nissan Cars and Nissan Trucks in Dealer's Primary Market Area and/or the metropolitan area in which Dealer is located, as applicable, or Dealer's sales as a percentage of:

(i) registrations of Nissan Cars and Nissan Trucks;

(ii) registrations of Competitive Vehicles;

(iii) registrations of Industry Cars;

(iv) registrations of vehicles in the Competitive Truck Segment;

3. A comparison of Dealer's sales and/or registrations to sales and/or registrations of all other Authorized Nissan Dealers combined in Seller's Sales Region and District in which Dealer is located and, where Section 3.C applies, for all other Authorized Nissan Dealers combined in the metropolitan area in which Dealer is located; and

4. A comparison of sales and/or registrations achieved by Dealer to the sales or registrations of Dealer's competitors.

The sales and registration data referred to in this Section 3 shall be those utilized in Seller's records or in reports furnished to Seller by independent sources selected by it and generally available for such purpose in the automotive industry. If such reports of registration and/or sales are not generally available, Seller may rely on such other registration and/or sales data as can be reasonably obtained by Seller.

C. Metropolitan Markets.

If Dealer is located in a metropolitan or other marketing area where there are located one or more Authorized Nissan Dealers other than Dealer, the combined sales performance of all Nissan Dealers in such metropolitan or other marketing area may be evaluated as indicated in Sections 3.B.2 and 3.B.3 above, and Dealer's sales performance may also be evaluated on the basis of the proportion of sales and potential sales of Nissan Vehicles in the metropolitan or other marketing area in which Dealer is located for which Dealer fairly may be held responsible.

D. Additional Factors for Consideration.

Where appropriate in evaluating Dealer's sales performance, Seller will take into account such reasonable criteria as Seller may determine from time to time, including, for example, the following: the Dealership Location; the general shopping habits of the public in such market area; the

availability of Nissan Vehicles to Dealer and to other Authorized Nissan Dealers; any special local marketing conditions that would affect Dealer's sales performance differently from the sales performance of other Authorized Nissan Dealers; the recent and long term trends in Dealer's sales performance; the manner in which Dealer has conducted its sales operations (including advertising, sales promotion, and treatment of customers); and the other factors, if any, directly affecting Dealer's sales opportunities and performance.

E. Used Motor Vehicle Sales.

Dealer shall engage in used motor vehicle operations as and to the extent reasonably required for Dealer to effectively perform its responsibilities for the sale of Nissan Vehicles. Subject to requirements and guidelines established by Seller, Dealer shall be entitled to identify such used motor vehicle operations as a part of its Dealership Operations and to apply the Nissan Marks relating to used motor vehicle operations.

F. Dealer Sales Personnel.

Dealer shall organize and maintain a sales organization that includes a sufficient number of qualified and trained sales managers and sales people to enable Dealer to effectively fulfill its responsibilities under this Section 3. Seller may, from time to time, comment on or advise Dealer concerning the qualifications, performance and ability of Dealer's sales personnel as the same affect Dealer's performance of its obligations under this Section 3.

G. Assistance Provided by Seller.

1. Sales Training Courses.

Seller will offer from time to time sales training courses for Dealer sales personnel. Based on its need therefor, Dealer shall, without expense to Seller, have members of Dealer's sales organization attend such training courses and Dealer shall cooperate in such courses as may from time to time be offered by Seller.

2. Sales Personnel.

To further assist Dealer, Seller will provide to Dealer advice and counsel on matters relating to new vehicle sales, sales personnel training and management, merchandising, and facilities used for Dealer's vehicle sales operations.

H. Evaluation of Dealer's Sales Performance.

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 3. Evaluations prepared pursuant to this Section 3.H will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations. Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 3.

## Section 4. Determination of Dealer Representation

A. Development of Market Studies.

Seller may, from time to time and in its sole discretion, conduct studies of various geographic areas to evaluate market conditions. Such market studies may, where appropriate, take into account such factors as geographical characteristics, consumer shopping patterns, existence of other automobile retail outlets, sales opportunities and service requirements of the geographic area in which Dealer's Primary Market Area is located, trends in marketing conditions, current and prospective trends in population, income, occupation, and such other demographic characteristics as may be determined by Seller to be relevant to its study. Such studies will make recommendations concerning the market, the Dealership Facilities, and the Dealership Location. Prior to conducting a study which includes the geographic area in which Dealer's

Primary Market Area is located, Seller will notify Dealer of its intention to conduct such a study. Dealer will be given the opportunity to present to Seller such information pertaining to such study as Dealer believes may be relevant. Seller will consider all relevant information timely provided by Dealer before concluding its study.

B. Appointment of New Authorized Nissan Dealers to Fill Open Points.

1. If any study conducted pursuant to Section 4.A recommends that an open point be established at a location that is within ten (10) miles driving distance, by the shortest publicly traveled route, of Dealer's main Dealership Location, Seller will so notify Dealer. Dealer will have thirty (30) days from Dealer's receipt of notice of the recommendations of the study in which to object to them. Upon Dealer's request, Seller will review the results of the study with Dealer (excluding information considered by Seller to be confidential). Seller will consider all objections to the recommended open point timely made by Dealer. Prior to entering into a Nissan Dealer Sales and Service Agreement with a New Authorized Nissan Dealer filling such an open point, Seller will give Dealer written notice of its intent to fill the open point (hereinafter the "Notice of Appointment"). If Dealer timely files a Notice of Appeal (as defined in Section 16.B hereof) with the Policy Review Board (as defined in Section 16.A hereof) in accordance with the procedures established in Section 16.B therefor, Seller will not enter into a Nissan Dealer Sales and Service Agreement appointing such New Authorized Nissan Dealer until the Policy Review Board has rendered its decision on the matter.

2. Nissan reserves the right to sell Nissan Products to others and to appoint Authorized Nissan Dealers within and outside the ten (10) miles driving distance described above. However, Seller agrees that it will not enter into a Nissan Dealer Sales and Service Agreement appointing a New Authorized Nissan Dealer filling an open point which is located within the ten (10) miles driving distance described above unless the study made pursuant to Section 4.A demonstrates in Seller's good faith opinion that the declaration of an open point is warranted by market or economic conditions.

3. Nothing in this Agreement shall be construed to require Dealer's consent to the appointment of a New Authorized Nissan Dealer at a location that is within the ten (10) miles driving distance described above. Nothing in this Agreement shall be construed to grant Dealer any rights in connection with the appointment of an Authorized Nissan Dealer at a location that is not within the ten (10) miles driving distance described above. In addition, this Section 4.B does not apply to, nor shall it be construed to grant Dealer any rights in connection with any of the events or transactions excluded from the definition of "New Authorized Nissan Dealer" in Section 4.B.4(a), (b) or (c) below.

4. "New Authorized Nissan Dealer" shall mean an Authorized Nissan Dealer that has not previously executed a Nissan Dealer Sales and Service Agreement or done business as an Authorized Nissan Dealer; provided, however, that "New Authorized Nissan Dealer" shall not include an Authorized Nissan Dealer who: (a) is a Successor Dealer appointed pursuant to Section 14, (b) is a purchaser or transferee of the assets of or ownership interests in an Authorized Nissan Dealer that is appointed as an Authorized Nissan Dealer pursuant to Section 15, or (c) who is approved as a Nissan Dealer following or resulting from:

(i) a change in name or form of an Authorized Nissan Dealer;

(ii) any other sale, exchange or other transfer of any ownership interests in or any assets of any other Authorized Nissan Dealer, by operation of law or otherwise and whether voluntary and involuntary;

(iii) an assignment, sale or other transfer of any interest in a Nissan Dealer Sales and Service Agreement, by operation of law or otherwise and whether voluntary or involuntary;

(iv) the relocation of an existing Authorized Nissan Dealer; or

(v) the replacement of a former Authorized Nissan Dealer where the appointment of such replacement Dealer takes place within two (2) years of the date on which the former Dealer ceased doing business and where such replacement Dealer's main Dealership Location is located within a five (5) mile driving distance by the shortest publicly traveled route of the former Dealer's main Dealership Location;

regardless of whether any of the foregoing actions, individually or collectively, result in the appointment of an Authorized Nissan Dealer at a location that is within or without the ten (10) miles driving distance described above.

## Section 5. Responsibilities of Dealer with Respect to Service and Parts

A. General Service Obligations of Dealer.

Dealer understands and acknowledges that future sales of Nissan Products depend, in part, upon the satisfaction of Dealer's customers with its servicing of such Products. Dealer further recognizes that Seller has entered into this Agreement in reliance upon Dealer's representations concerning its ability and commitment to fair dealing and professional servicing. Accordingly, Dealer shall develop and maintain a quality service organization and shall render at the Dealership Facilities prompt, efficient and courteous service to owners and users of Nissan Products, regardless of the origin of purchase, including, without limitation, the specific obligations described in Section 5.B. In this regard, Dealer shall take all reasonable steps to insure that: the service needs of its customer's Nissan Vehicles are accurately

diagnosed; Dealer's customers are advised of such needs and that each customer's consent is obtained prior to initiation of any repairs; necessary repairs and maintenance are professionally performed; and Dealer's customers are treated courteously and fairly.

B. Specific Service Obligations of Dealer.

1. Pre-Delivery Inspections and Service.

Dealer shall perform or be responsible for the performance of pre-delivery inspections and service on each Nissan Vehicle prior to sale and delivery thereof by Dealer, in accordance with the standards and procedures relating thereto set forth in the applicable pre-delivery inspection schedules furnished by Seller to Dealer from time to time. The completion of such inspection and service shall be verified by Dealer on forms supplied or approved by Seller for this purpose. Dealer shall retain the original or a legible copy of each such form in its records and shall furnish a copy to the purchaser.

2. Warranty Repairs and Goodwill Adjustments.

Dealer shall promptly, courteously and efficiently perform: (i) warranty repairs on each Nissan Product which qualifies for such repairs under the provisions of any warranty furnished therewith by Seller, Manufacturer or the manufacturer of the Product; and (ii) such other inspections, repairs or corrections on Nissan Products as may be approved or authorized by Seller to be made at Seller's expense (hereinafter referred to as "goodwill adjustments"). Dealer shall perform such repairs and service on each such Nissan Product as and when required and requested by the owner or user (or in the case of goodwill adjustments when requested by Seller), without regard to its origin of purchase and in accordance with the provisions relating thereto set forth in the Warranty Manual or in Seller's Manuals or Instructions issued to Dealer from time to time. In performing such repairs and service on Nissan Products for which Seller has agreed to reimburse Dealer, Dealer shall use Genuine Nissan Parts and Accessories unless

Dealer receives prior authorization from Seller to use non-genuine parts or accessories. Dealer will provide to each owner or user of a Nissan Product upon which any such repairs or service are performed a copy of the repair order reflecting all services performed.

3. Campaign Inspections and Corrections.

Dealer shall promptly, courteously and efficiently perform such campaign inspections and/or corrections for owners and users of Nissan Products, regardless of their origin of purchase, as are: (i) described in owner notifications and recall campaigns conducted by Seller in furtherance of any federal or state law, regulation, rule or order; or (ii) requested by Seller on Nissan Products that qualify for such inspections and/or corrections. Once Dealer has been notified that a recall or service campaign affects a particular class or type of Nissan Product, Dealer shall perform such campaign inspections and/or corrections on all affected Nissan Products then in or which thereafter come into Dealer's inventory or which are delivered to Dealer for repair or service. Dealer shall inquire, through the Nissan Datanet system or otherwise, with respect to each such Nissan Product to determine whether all applicable campaign inspections and/or corrections have been performed on such Nissan Product and, if they have not been performed, Dealer shall perform them.

Dealer shall advise Seller as and when such campaign inspections and/or corrections are performed, in accordance with Seller's Manuals or Instructions relating thereto and in accordance with the provisions relating thereto set forth in the Warranty Manual. To enable Dealer to perform required corrections as promptly as practicable, parts and /or other materials required for each such campaign may be shipped in quantity and billed to Dealer. Dealer shall accept and retain such parts and/or other materials for use in such campaign. Upon completion of the campaign program, Dealer shall have the right to return excess parts shipped by Seller to Dealer for such campaign, but only to the extent that Dealer has not ordered and received additional parts from Seller. Such a return of parts shall be apart from any other parts return policies or programs which may be instituted by Seller. In performing such campaign corrections for which Seller has agreed to reimburse Dealer for parts and materials used in making such corrections, Dealer shall use Genuine Nissan Parts and Accessories unless Dealer receives prior authorization from Seller to use non-genuine parts and accessories.

4. Maintenance and Repair Service.

Dealer shall promptly, courteously and efficiently maintain and repair Nissan Products as and when required and requested by the owner or user thereof, without regard to their origin of purchase. Dealer shall provide all owners and users for whom Dealer provides maintenance and repair service itemized invoices reflecting all the services performed. In connection with its sale or offering for sale of any maintenance services recommended by Seller for the maintenance of a Nissan Product, Dealer shall advise each customer requesting such recommended maintenance service of. (i) a description of the items included in maintenance recommended by Seller and Dealer's price therefor; and (ii) the price and description of such additional maintenance or repair being sold or recommended by Dealer which are in addition to that recommended by Seller in published owner's manuals.

5. Payments by Seller to Dealer.

For pre-delivery inspections and service, warranty repairs, goodwill adjustments, and campaign inspections and corrections performed by Dealer in accordance with this Section 5.B, Seller shall fairly and adequately reimburse Dealer for the parts and/or other materials (or shall provide Dealer with the parts and/or other materials) and the labor required and used in connection therewith in accordance with the provisions relating thereto set forth in the Warranty Manual. Dealer understands and acknowledges that such repairs are provided for the benefit of owners and users of Nissan Products, and Dealer shall not impose any charge on such owners or users for parts, materials, or labor for

which Dealer has received or will receive compensation from Seller hereunder.

Dealer shall comply with the disposition instructions contained in the Warranty Manual with respect to any Genuine Nissan Parts or Accessories acquired by Dealer as a result of its performance of warranty repairs, goodwill adjustments and campaign adjustments and/or corrections.

C. Service Operations of Dealer.

1. Dealer Personnel.

Dealer shall organize and maintain, substantially in accordance with Seller's Guides, a complete service organization that includes a competent, trained service manager and a sufficient number of trained service and customer relations personnel to enable Dealer to fulfill its responsibilities for service and customer relations under this Section 5. Dealer shall designate at least one member of its staff who shall be responsible for resolving consumer complaints on behalf of Dealer. Dealer shall, without expense to Seller, have members of Dealer's service organization attend training courses offered by Seller and Dealer shall cooperate with and participate in such training courses as may from time to time be offered by Seller. Dealer agrees that its personnel will meet such educational, management and technical training standards as Seller may establish or approve. Seller may, from time to time, comment on or advise Dealer concerning the qualifications, performance and ability of Dealer's service personnel as the same affect Dealer's performance of its obligations under this Section 5.

2. Compliance with Laws.

In performing the maintenance and service obligations specified in Section 5.B, Dealer shall comply with all applicable provisions of federal, state and local laws, ordinances, rules, regulations and orders affecting Nissan Products including, but not limited to, laws relating to safety, emissions control, noise control and customer service. Seller shall provide to Dealer, and Dealer shall provide to Seller, such information and assistance as may be reasonably requested by the other in connection with the performance of obligations of the parties under such laws, ordinances, rules, regulations and orders. If applicable law requires the installation or supply of equipment not installed or supplied as standard equipment by Seller or the manufacturer of a Nissan Vehicle, Dealer shall, prior to its sale of the Nissan Vehicles on or for which such equipment is required, install or supply such equipment at its own expense and in conformance with such standards as may be adopted by Seller. Dealer shall comply with all applicable laws pertaining to the installation or supply of such equipment including, without limitation, the reporting thereof.

3. Tools and Equipment.

Dealer shall provide for use in its service operations such service equipment and special tools, comparable to the type and quality recommended by Seller from time to time, as are necessary to meet Dealer's service responsibilities hereunder and as are substantially in accordance with Seller's Guides. In addition, Dealer shall obtain and maintain for use in its service operations all tools which are essential to the proper service, repair and maintenance of Nissan Vehicles and are identified by Seller as essential tools. Seller shall ship such essential tools to Dealer as required due to new model and component introductions and Dealer shall pay Seller therefor as invoiced. If Dealer is in possession of a tool equivalent to any essential tool shipped by Seller, Dealer may so notify Seller and Seller will exempt Dealer from purchasing such essential tool from Seller upon Seller's determination that Dealer's tool will satisfy the need for the specific repair procedure or procedures for which the essential tool is intended. Dealer shall maintain all such equipment and tools in good repair and proper calibration so as to enable Dealer to meet its service responsibilities under this Section 5.

4. Owner Relations.

In providing service on Nissan Products, Dealer shall make every effort to build and maintain good

relations between Dealer and owners and users of Nissan Products. Dealer shall promptly investigate and handle all matters brought to its attention by Seller, owners or users of Nissan Products, or any public or private agency, relating to the sale or servicing of Nissan Products, so as to develop and maintain owner and user confidence in Dealer, Seller and Nissan Products.

Dealer shall promptly report to Seller the details of each inquiry or complaint received by Dealer relating to any Nissan Product which Dealer cannot handle promptly and satisfactorily. Dealer will take such other steps with respect to such customer complaints as Seller may reasonably require. Dealer will do nothing to affect adversely Seller's rights or obligations under applicable laws, rules and/or regulations. Furthermore, Dealer shall participate in and cooperate with such dispute resolution procedures as Seller may designate from time to time and such other procedures as may be required by law.

Seller will promptly investigate all matters brought to its attention by Dealer, owners or users of Nissan Products, or any public or private agency, relating to the design, manufacture or sale by Seller of Nissan Products, and Seller will take such action as it may deem necessary or appropriate so as to develop and maintain owner confidence in Seller, Dealer and Nissan Products.

D. Parts Operations of Dealer.

1. Parts Sales Responsibility of Dealer.

Dealer shall actively and effectively promote through its own advertising and sales promotion activities the sale of Genuine Nissan Parts and Accessories to service, wholesale, retail and other customers within Dealer's Primary Market Area.

2. Dealer Personnel.

Dealer shall organize and maintain, substantially in accordance with Seller's recommendations with respect thereto, a complete parts organization that includes a competent, trained parts manager and a sufficient number of trained parts personnel to enable Dealer to fulfill its responsibilities under this Section 5. Based on its need therefor, Dealer shall, without expense to Seller, have members of Dealer's parts organization attend training courses offered by Seller and Dealer shall cooperate in such training courses as may from time to time be offered by Seller. Seller may, from time to time, comment on or advise Dealer concerning the qualifications, performance and ability of Dealer's parts personnel as the same affect Dealer's performance of its obligations under this Section 5.

3. Inventories of Parts and Accessories.

Dealer shall maintain at all times a stock of parts and accessories which is adequate to meet its service and wholesale and retail parts sales responsibilities under this Section 5. Dealer shall also maintain, subject to the ability of Seller to supply the products ordered by Dealer, a stock of Genuine Nissan Parts and Accessories of an assortment and in quantities adequate to meet customer demand and for warranty repairs, goodwill adjustments and campaign corrections made pursuant to this Section 5.

E. Assistance Provided by Seller.

1. Service and Parts Manuals.

Seller will make available to Dealer, for use by Dealer's service and parts personnel, Seller's Manuals or Instructions concerning Dealer's service and parts operations and other sources of information and technical data as Seller deems necessary to permit Dealer to perform its service and parts responsibilities under this Section 5. Dealer shall keep such information and data current and available for consultation by Dealer's service and parts employees.

2. Service and Parts Field Personnel.

To further assist Dealer, Seller will provide to Dealer the advice and counsel of its service and parts field personnel on matters relating to service,

parts and accessories, including technical diagnosis, service and parts management, merchandising, personnel training, owner relations, and facilities used for Dealer's service and parts operations.

F. Evaluation of Dealer's Service and Parts Performance.

Dealer's performance of its service and parts responsibilities will be evaluated by Seller on the basis of such reasonable criteria as Seller may develop from time to time, including for example:

1. Dealer's performance in building and maintaining consumer confidence in Dealer and in Nissan Products as measured by surveys or indices of consumer satisfaction as compared with performance levels achieved by other Authorized Nissan Dealers in Seller's Region or District in which Dealer is located or such other means as may be deemed appropriate by Seller;

2. Reasonable parts purchase or sales performance objectives which may be established from time to time by Seller for Dealer;

3. Dealer's advertising and promotion of its parts and service operations;

4. Dealer's performance of its service responsibilities and Dealer's conduct of its service operations including, without limitation, the financial results of its service operations, labor sales, warranty claims practices training of service personnel, qualification, performance and ability of service personnel, and inventory of special and essential tools and service equipment, as compared with Seller's Guides therefor where such have been established and/or as compared with performance levels achieved by other Authorized Nissan Dealers in Seller's Region or District in which Dealer is located;

5. Dealer's performance of its parts sales responsibilities and Dealer's conduct of its parts operations including, without limitation, the financial results of its parts operations, training of parts personnel, and inventory of parts, as compared

with Seller's Guides therefor where such have been established and/or as compared with performance levels achieved by other Authorized Nissan Dealers in Seller's Region or District in which Dealer is located; and

6. Evaluation reports resulting from any audit or review of Dealer's service or parts operations by Seller's representatives.

Seller will periodically evaluate Dealer's performance of its responsibilities under this Section 5. Evaluations prepared pursuant to this Section 5 will be discussed with and provided to Dealer, and Dealer shall have an opportunity to comment, in writing, on such evaluations. Dealer shall promptly take such action as may be required to correct any deficiencies in Dealer's performance of its responsibilities under this Section 5.

## Section 6. Other Seller and Dealer Responsibilities

A. Advertising and Promotion.

1. Advertising Standards.

Both Seller and Dealer recognize the need for maintaining the highest standards of ethical advertising which is of a quality and dignity consonant with the reputation and standing of Nissan Products. Accordingly, neither Seller nor Dealer shall publish or cause to be published any advertising relating to Nissan Products that is not in compliance with all applicable federal, state and local laws, ordinances, rules, regulations and orders or that is likely to mislead, confuse or deceive the public or impair the goodwill of Manufacturer, Seller or Dealer or the reputation of Nissan Products or the Nissan Marks.

2. Display by Dealer.

Dealer shall prominently state upon its stationery and other printed matter that it is an Authorized Nissan Dealer.

3. Sales Promotion.

Seller will establish and maintain comprehensive advertising programs to promote the sale of Nissan

Vehicles and will from time to time offer advertising, sales promotion and sales campaign materials to Dealer. In addition, to effectively promote the sale of Nissan Products and the availability of service for Nissan Vehicles, Dealer shall establish and maintain its own advertising and sales promotion programs including, but not limited to, effective showroom displays, and Dealer will have available in showroom ready condition at least one vehicle in each model line of Nissan Vehicles for purposes of demonstration to potential customers.

B. Dealer Disclosures and Representations Concerning Nissan Products and Other Products or Services.

Dealer understands and acknowledges that it is of vital importance to Seller that Nissan Products are sold and serviced in a manner which promotes consumer satisfaction and which meet the high quality standards associated with Seller, Manufacturer, the Nissan Marks and Nissan Products in general. Accordingly, Dealer shall fully and accurately disclose to its customers all material information concerning the products and services sold by Dealer and the terms of purchase and sale including, without limitations the items making up the purchase price; the source of products sold; and all warranties affecting products sold. Dealer shall not make any misleading statements or misrepresentations concerning the products sold by Dealer, the terms of sale, the warranties applicable to such products, the source of the products, or the recommendations or approvals of Seller or Manufacturer.

Nothing in this Agreement shall limit or be construed to limit the products or services which Dealer may sell to its customers. Seller acknowledges that Dealer is free to sell whatever products or services Dealer may choose in connection with its sale and servicing of Nissan Products, subject to Dealer obligations under Sections 5 and

6 of this Agreement.

C. Signs.

Dealer shall, at its expense, display at its Dealership Location, in such number and at such locations as Seller may reasonably require, signs which are compatible with the design standards established by Seller and published in Seller's Manuals or Instructions from time to time. Dealer's use and operation of signs displayed by Dealer at the Dealership Location and Dealer's display of any Nissan Mark shall be subject to Seller's approval and shall be in accordance with the terms and conditions of Section 6.K and the Dealership Identification Addendum.

D. Hours of Operations.

Dealer recognizes that the service and maintenance needs of the owners of Nissan Products and Dealer's own responsibilities to actively and effectively promote the sale of Nissan Products can be met properly only if Dealer keeps its Dealership Facilities open and conducts all of its Dealership Operations required by this Agreement during hours which are reasonable and convenient for Dealer's customers. Accordingly, Dealer shall maintain its Dealership Facilities open for business and shall conduct all Dealership Operations required under this Agreement during such days and hours as automobile dealers' sales and service facilities are customarily and lawfully open in Dealer's Primary Market Area or in the metropolitan area in which Dealer is located.

E. Capital and Financing.

Dealer recognizes that its ability to conduct its Dealership Operations successfully on a day-to-day basis and to effectively perform its other obligations under this Agreement including, without limitation, its obligations with respect to Dealership Facilities, new vehicle sales, and service and parts sales, depends to a great extent upon the adequate capitalization of Dealer, including its maintaining sufficient net working capital and net worth and

employing the same in its Dealership Operations. Dealer shall at all times maintain and employ such amount and allocation of net working capital and net worth as are substantially in accordance with Seller's Guides therefor and which will enable Dealer to fulfill all of its responsibilities under this Agreement. Dealer shall at all times during the term of this Agreement have flooring arrangements (wholesale financing) satisfactory to Seller, in an amount substantially in accordance with Seller's Guides therefor, with a financial institution acceptable to Seller, and which will enable Dealer to fulfill its obligations under this Agreement.

F.  Accounting System.

It is in the mutual interest of Seller and Dealer that all Authorized Nissan Dealers install and maintain uniform accounting systems and practices, so that Seller can develop standards of operating performance which will assist Dealer in obtaining satisfactory results from its Dealership Operations and which will assist Seller in formulating policies in the interests of Seller and all Authorized Nissan Dealers. Accordingly, Dealer shall install and maintain an accounting system, not exclusive of any other system, in accordance with Seller's Nissan Dealer Accounting System Manual, as the same may from time to time be amended, revised or supplemented.

G.  Records and Reports.

1.  Financial Statements.

Dealer shall furnish to Seller, on or before the tenth (10th) day of each month, in a manner acceptable to Seller, complete and accurate financial and operating statements which fairly present, in accordance with generally accepted accounting principles, Dealer's financial condition as of the end of the preceding month and the results of Dealer's Dealership Operations for the preceding month and for that portion of Dealer's fiscal year then ended. Dealer shall also furnish for such periods reports of Dealer's sales and inventory of Nissan Products. Dealer shall also promptly furnish to Seller a copy of any adjusted annual financial or operating statement prepared by or for Dealer.

2.  Sales Records and Reports.

Dealer shall prepare and retain for a minimum of two (2) years, complete and up-to-date records covering its sales of Nissan Products. To assist Seller in evaluating, among other things, current market trends, to provide information for use in the adjustment of production and distribution schedules, to provide information used by Seller in providing Nissan Vehicles to Dealer, and to provide Seller with accurate records of the ownership of Nissan Vehicles for various purposes including warranty records and ownership notification, Dealer shall accurately submit to Seller such information with respect to Dealer's sales of Nissan Products as Seller may reasonably require as and in the form or manner specified by Seller, at or as soon as possible after the close of each business day on which such Nissan Products are sold by Dealer. If Dealer becomes aware that any information submitted by Dealer to Seller hereunder is or has become inaccurate, Dealer will immediately take all steps necessary to advise Seller of and to correct such inaccuracy. Should Seller determine or discover that any report submitted hereunder by Dealer is or has become inaccurate, Seller may take any steps it deems necessary or appropriate to correct such inaccuracy and to adjust its records, calculations or procedures with respect to Dealer's reported sales to correct the effect of such inaccuracy or to prevent additional inaccurate reports from being made.

3.  Service Records.

Dealer shall prepare and retain for a minimum of

two (2) years, in accordance with the procedures specified in the Warranty Manual: records in support of applications for payment for pre-delivery inspection and service, warranty repairs and goodwill adjustments, and campaign inspections and corrections performed by Dealer; claims for parts compensation; and applications for discounts, allowances, refunds or credits.

4. Other Reports.

Dealer shall furnish to Seller such other records or reports concerning its Dealership Operations as Seller may reasonably require from time to time.

H. Nissan Datanet System.

Seller has developed the Nissan Datanet system, which is an electronic data communication and processing system designed to facilitate accurate and prompt reporting of dealership operational and financial data, submission of parts orders and warranty claims and processing of information with respect to the Dealership Operations. Such data is used by Seller, among other things, to develop composite operating statistics which are useful to Dealer and Seller in assessing Dealer's progress in meeting its obligations under this Agreement, to provide a basis for recommendations which Seller may make to Dealer from time to time to assist Dealer in improving Dealership Operations, to assist Seller in developing standards of operating performance which will assist Dealer in obtaining satisfactory results from its Dealership Operations, to assist Seller in formulating policies in the interest of Seller and all Authorized Nissan Dealers, and to provide sales reporting information relied upon by Seller in providing Nissan Vehicles to Dealer. Accordingly, Dealer shall install and maintain electronic data processing facilities which are compatible with the Nissan Datanet system.

1. Right of Inspection.

Seller shall have the right, at all reasonable times during regular business hours, to inspect the Dealership Facilities and to examine, audit and make and take copies of all records, accounts and supporting data relating to the sale, sales reporting, service and repair of Nissan Products by Dealer. When practicable, Seller shall attempt to provide Dealer with advance notice of an in-dealership audit of Dealer's records or accounts.

J. Confidentiality.

Seller will not furnish to any third party financial statements or other confidential data, excluding sales records or reports, submitted by Dealer to Seller, except as an unidentified part of a composite or coded report, unless disclosure is authorized by Dealer or is required by law, or unless such information is pertinent to judicial or governmental administrative proceedings or to proceedings conducted pursuant to Section 16 of this Agreement.

K. Use of Nissan Marks.

Seller grants Dealer the non-exclusive right to identify itself as an Authorized Nissan Dealer and to display at the Dealership Location and use, in connection with the sale and service of Nissan Products, the Nissan Marks. The Nissan Marks may not be used as part of Dealer's name or trade name without Seller's written consent. No entity owned by or affiliated with Dealer or any of its owners may use any Nissan Mark without Seller's prior written consent. Dealer shall not make any use of any Nissan Mark which is inconsistent with Seller's policies concerning trademark use. Dealer may not, either directly or indirectly, display any Nissan Marks at any location or facility other than those identified in the Dealership Facilities Addendum to this Agreement, without the prior written consent of Seller. Except as authorized herein, Dealer shall not make use of any Nissan Mark, and Dealer shall neither have nor claim any rights in respect of any Nissan Mark. Dealer shall comply with any of Seller's Manuals or Instructions regarding the use of Nissan Marks as may be issued

to Dealer from time to time. Dealer shall promptly change or discontinue its use of any Nissan Marks upon Seller's request. Any authorization granted may be withdrawn by Seller at any time and, in any event, shall cease immediately upon the effective date of termination of this Agreement.

If Seller institutes litigation to effect or enforce compliance with this Section 6.K, the prevailing party in such litigation shall be entitled to reimbursement for its costs and expenses in such litigation, including reasonable attorney's fees.

## Section 7. Purchase and Delivery

A. Dealer Purchases.

1. Nissan Vehicles.

From time to time Seller will advise Dealer of the number and model lines of Nissan Vehicles which Seller has available for sale to Dealer and, subject to this Section 7, Dealer shall have the right to purchase such Nissan Vehicles. Seller will distribute Nissan Vehicles to Authorized Nissan Dealers in accordance with Seller's written distribution policies and procedures as the same may be in effect from time to time. Seller will provide to Dealer an explanation of the method used by Seller to distribute Nissan Vehicles to Authorized Nissan Dealers. Dealer recognizes that there are numerous factors which affect the availability of Nissan Vehicles to Seller and to Dealer including, without limitation, production capacity, sales potential in Dealer's and other Primary Market Areas, varying consumer demand, weather and transportation conditions, and state and federal government requirements. Since such factors may affect individual dealers differently, Seller reserves to itself sole discretion to distribute Nissan Vehicles in a fair and consistent manner, and its decisions in such matters shall be final.

2. Genuine Nissan Parts and Accessories.

Dealer shall submit to Seller firm orders for Genuine Nissan Parts and Accessories in such quantity and variety as are reasonably necessary to fulfill Dealer's obligations under this Agreement. All orders shall be submitted by Dealer in the manner specified by Seller and in accordance with Seller's Parts and Accessories Policy and Procedures Manual, may be accepted in whole or in part by Seller, and shall be effective only upon acceptance thereof by Seller at its home office in California (but without necessity of any notice of acceptance by Seller to Dealer). Such orders shall not be cancelable by Dealer after acceptance and shipment by Seller, except in accordance with Section 8 of this Agreement.

B. Delays in Delivery.

Seller shall not be liable for failure or delay in delivery to Dealer of Nissan Products which Seller has previously agreed to deliver to Dealer where such failure or delay is due to cause or causes beyond the control or without the fault or negligence of Seller.

C. Shipment of Nissan Products.

1. Nissan Vehicles.

Seller will ship Nissan Vehicles to Dealer by whatever mode of transportation, by whatever route, and from whatever point Seller may select. Dealer shall pay to Seller in connection with Nissan Vehicles delivered to Dealer the applicable destination charges that are established for Dealer by Seller and that are in effect at the time of shipment. Dealer shall bear the risk of loss and damage to Nissan Vehicles during transportation from the point of shipment; however, Seller will, if requested by Dealer in such manner and within such time as Seller shall from time to time specify, prosecute claims for loss of or damage to Nissan Vehicles during said transportation against the responsible carrier for and on behalf of Dealer.

2. Genuine Nissan Parts and Accessories.

Seller will ship Genuine Nissan Parts and Accessories to Dealer by whatever mode of transportation, by whatever route, and from whatever point Seller may select. Dealer shall bear the risk of loss and damage to Genuine Nissan Parts and Accessories during transportation from the point of shipment.

D. Passage of Title.

Title to each Nissan Product shall pass from Seller to Dealer, or to the financial institution designated by Dealer, upon delivery of said Product to Dealer or to a carrier for transportation to Dealer, whichever occurs first.

E. Security Interest.

1. Grant of Security Interest

As security for the full payment of all sums from time to time owed by Dealer to Seller under this Agreement, whether such sums are now, or hereafter become, due and owing, Dealer hereby grants to Seller a security interest in the following (collectively referred to as "Collateral"):

(i) All non-vehicle inventory of Dealer including, without limitation, all Genuine Nissan Parts and Accessories delivered by Seller to Dealer hereunder on account (all such inventory hereinafter referred to collectively as "Inventory" and individually as "Item of Inventory"); and

(ii) All proceeds from any of the foregoing including, without limitation, insurance payable by reason of the loss, damage or destruction of any Item of Inventory; and all accounts and chattel paper of Dealer arising from sale, lease, or other disposition of Inventory now existing or hereafter arising, and all liens, securities, guarantees, remedies and privileges pertaining thereto, together with all rights and liens of Dealer relating thereto.

2. Default in Payment.

Dealer shall be in default of this Section 7 if: (i)

Dealer shall fail to pay any amounts secured hereby when due or fail to perform any obligations under this Section 7 in a timely manner; (ii) there shall occur any material adverse change in the financial condition of Dealer; (iii) Dealer shall dissolve or become insolvent or bankrupt; or (iv) Seller shall have determined in good faith that the prospect of such payment or performance is impaired; and in any such case Seller may declare all sums secured by this Section 7.E immediately due and payable and Seller shall have all rights and remedies afforded to a secured party after default under the Uniform Commercial Code or other applicable law in effect on the date of this Agreement.

3. Assembly of Collateral, Payment of Costs, Notices.

Dealer shall, if requested by Seller upon the occurrence of any default under the foregoing Section 7.E.2 assemble the Collateral and make it available to Seller at a place or places designated by Seller. Dealer also shall pay all costs of Seller including, without limitation, attorneys' fees incurred with respect to the enforcement of any of Seller's rights under this Section 7.

4. Recording, Further Assurances.

Dealer shall execute and deliver such financing statements and such other instruments or documents and take any other action as Seller may request in order to create or maintain the security interest intended to be created by this Section 7.E or to enable Seller to exercise and enforce its rights hereunder. A carbon, photographic or other reproduction of this Agreement shall be sufficient as a financing statement and may be filed in lieu of a financing statement in any and all jurisdictions which accept such reproductions.

5. Records and Schedules of Inventory.

Dealer shall keep accurate records itemizing and describing the kind, type and quantity of Inventory and shall furnish to Seller within five (5) days

of receipt of Seller's request therefor, with a current schedule of inventory in form and substance satisfactory to Seller ("Schedule of Inventory"), which shall be true and accurate in all respects. A physical inventory shall be conducted no less than annually in connection with preparation of year-end financial statements of Dealer and, at Seller's request, a report of such inventory shall be promptly provided to Seller.

F.   Charges for Storage and Diversions.

Dealer shall be responsible for and shall pay all charges for demurrage, storage and other expense accruing after shipment to Dealer or to a carrier for transportation to Dealer. If diversions of shipments are made upon Dealer's request or are made by Seller as a result of Dealer's failure or refusal to accept shipments made pursuant to Dealer's orders, Dealer agrees to pay all additional charges and expenses incident to such diversions.

G.   Changes in Nissan Products.

Seller shall have the right in its sole discretion to discontinue the supply, or make changes in the design or component materials, of any Nissan Product at any time. Seller shall be under no liability to Dealer on account of any such changes and shall not be required as a result of any such changes to make any changes to Nissan Products previously purchased by Dealer. No change shall be considered a model year change unless so specified by Seller.

## Section 8. Pricing

A.   Nissan Vehicles.

At any time prior to shipment (or delivery to a carrier for transportation to Dealer) of any Nissan Vehicle, Seller may, without prior notice and without incurring any liability to Dealer or anyone else, including any customer of Dealer, change at any time and from time to time the price, discount, allowance or other terms of sale of any Nissan Vehicle offered for sale by Seller. Except with respect to the establishment of initial prices for a new model year vehicle or for any new model or body type, Seller will notify Dealer by mailgram or other acceptable means of any such change in price as soon as reasonably practicable, and Dealer may, by notice to Seller within ten (10) days after such notification, cancel any offer to purchase Nissan Vehicles affected by such change, provided that Seller has not notified Dealer of its acceptance of Dealer's offer on or prior to the date such notification by Dealer is received by Seller.

B.   Genuine Nissan Parts and Accessories.

Seller may, without prior notice and without incurring any liability to Dealer or anyone else, including any customer of Dealer, change at any time and from time to time the price, discount, allowance or other terms of sale of any Genuine Nissan Part or Accessory offered for sale by Seller, and any such change in price, discount, allowance or other terms of sale shall apply to all such Genuine Nissan Parts and Accessories whether or not an order has been submitted by Dealer, but not to Genuine Nissan Parts and Accessories for which Seller has accepted and processed Dealer's order prior to the effective date of such change. Seller will notify Dealer of any such change in price as soon as is reasonably practicable. Dealer may, by notice to Seller, cancel any order for Genuine Nissan Parts and Accessories affected by such change which was placed before such notification was given, provided that such Genuine Nissan Parts and Accessories have not been shipped to Dealer or delivered to a carrier for transportation to Dealer on or prior to the date such notification by Dealer is received by Seller.

## Section 9. Payment

A. Payment for Vehicles.

Payment by Dealer for Nissan Vehicles must be made in accordance with the applicable prices, charges, discounts, allowances and other terms of sale established by Seller either: (i) in accordance with wholesale financing arrangements that at the time of delivery to Dealer or to a carrier for transportation to Dealer of such Nissan Vehicles, whichever shall first occur, are in effect between Seller, Dealer and a financing institution; or (ii) prior to delivery to Dealer or to a carrier for transportation to Dealer, whichever shall first occur, by cash or such other medium of payment as Seller may agree to accept.

B. Payment for Parts and Accessories.

Parts, equipment, accessories and other products and services will normally be billed by Seller to Dealer on Seller's invoices, which shall be due the tenth (10th) of the month following the month of shipment of such products and services; provided, however, Seller reserves the right to place any and all sales of such items on a C.O.D. or cash in advance basis, without notice; provided further, however, that Seller will endeavor to provide Dealer with prior notice if in Seller's sole judgement such notice would be practicable.

C. Accounts Payable.

1. Right of Set Off.

In addition to any right of set off provided by law, all sums due Dealer shall be considered net of indebtedness of Dealer to Seller, and Seller may deduct any amounts due or to become due from Dealer to Seller or any amounts held by Seller from any sums or accounts due from Seller to Dealer.

2. Liquidated Damages.

(i) Liquidated Damages for Delinquent Payments.

In the event that Dealer fails to pay Seller in full any amounts owed by Dealer to Seller when due, Dealer shall pay Seller a delinquency charge of one percent (1%) per month of such amount or amounts to compensate Seller for its costs of carrying and collection; provided, however, that Seller agrees that it will not assess any delinquency charge on an overdue account which has a total outstanding balance of less than $1,000.00, unless such account is more than ninety (90) days overdue. Dealer and Seller agree that such charge is to be assessed not as a penalty, but as liquidated damages under California Civil Code § 1671(b) based on Seller's reasonable estimate of the losses which will be suffered by Seller as a result of such delinquent payment or payments. The imposition of such delinquency charges shall not imply or constitute any agreement to forbear collection of a delinquent account.

(ii) Liquidated Damages for Improper Payments to Dealer.

Seller may, from time to time, conduct audits or reviews of Dealer's books and records pursuant to Section 6.I of this Agreement. If any such audit or review results in a determination by Seller that Dealer was or is not entitled to received payment from Seller, Seller may debit Dealer's account in such amounts as Seller shall determine were improperly paid to Dealer. Such a determination may be based on Dealer's failure to comply with applicable rules or procedures or on Dealer's submission of false or inaccurate information to Seller. In addition, Seller may assess and, if it does, Dealer will pay a delinquency charge of one percent (1%) per month of such amount or amounts improperly paid by Seller to Dealer to compensate Seller for its costs of auditing, loss of funds and collection. Dealer and Seller agree that such charge is to be assessed not as a penalty, but as liquidated damages under California Civil Code § 1671(b) based on Seller's reasonable estimate of the losses

18

which will be suffered by Seller as a result of such improper payment or payments. The imposition of such delinquency charges shall not imply or constitute any agreement to forbear collection of a delinquent account.

D. Collection of Taxes by Dealer.

Dealer hereby represents and warrants that all Nissan Products purchased from Seller are purchased for resale in the ordinary course of Dealer's business. Dealer further represents and warrants that Dealer has obtained all licenses and complied with all other requirements to collect sales, use and or other taxes incurred in any such resale transaction, and that Dealer will furnish evidence thereof to Seller, at Seller's request. If Dealer purchases any Nissan Products other than for resale, or puts any Nissan Products to a taxable use, Dealer shall pay directly to the appropriate taxing authority any sales, use or similar taxes incurred as a result of such use or purchase, to file any tax returns required in connection therewith and to hold Seller harmless from any claims or demands with respect thereto.

## Section 10. Warranties

The only warranties that shall be applicable to Nissan Products (or any components thereof) shall be such written warranty or warranties as may be furnished by Seller and as stated in the Warranty Manual or Seller's Parts and Accessories Policy and Procedures Manual, as the same may be revised from time to time. Except for its express limited liability under such written warranties, neither Manufacturer nor Seller assumes, or authorizes any other person or party including, without limitation, Dealer, to assume on their behalf any other obligation or liability in connection with

any Nissan Product (or component thereof). Any obligations or liabilities assumed by Dealer which are in addition to Seller's written warranties shall be solely the responsibility of Dealer. Dealer shall expressly incorporate in full and without modification any warranty furnished by Seller with a Nissan Vehicle as a conspicuous part of each order form or other contract for the sale of such Nissan Vehicle by Dealer to any buyer. Dealer shall make available to the buyer of each Nissan Product prior to the purchase of such Nissan Product, copies of such applicable warranties as may be furnished by Seller. Dealer shall also provide to the buyer of each Nissan Product, in full and without modification, any owner's manual, warranty booklet or other owner information which Seller may provide to Dealer for delivery with such Nissan Product. Dealer agrees to abide by and implement in all other respects Seller's warranty procedures then in effect.

## Section 11. Indemnification

A. Indemnification of Dealer.

Subject to Section 11. C, and upon Dealer's written request, Seller shall:

1. Defend Dealer against any and all claims that during the term of this Agreement may arise, commence or be asserted against Dealer in any action concerning or alleging:

(a) Bodily injury or property damage arising out of an occurrence caused solely by a manufacturing defect or alleged manufacturing defect in a Nissan Product supplied by Seller, except for any manufacturing defect in tires, provided that the defect could not have reasonably been discovered by Dealer during the pre-delivery inspection of the product required by Section 5.B.1 of this Agreement;

(b) Bodily injury or property damage arising out of an occurrence caused solely by a defect or alleged defect in the design of a Nissan Product supplied by Seller, except for a defect or alleged defect in the design of tires; and

(c) Any substantial damage occurring to a new Nissan Product and repaired by Seller from the time the product left the manufacturer's assembly plant to the time it was delivered to Dealer's designated location or to a carrier for transportation to Dealer, whichever occurred first, provided Seller failed to notify Dealer of such damage and repair prior to delivery of the product to the first retail customer; and

(d) Breach of Seller's warranty of a Nissan Product which is not, in whole or part, the result of Dealer's sales, service or repair practices or conduct; and

2. Indemnify and hold Dealer harmless from any and all settlements made which are approved by Seller and final judgments rendered with respect to any claims described in Section 11.A.1; provided, however, that Seller shall have no obligation to indemnify or hold Dealer harmless unless Dealer: (i) promptly notifies Seller of the assertion of such claim and the commencement of such action against Dealer; (ii) cooperates fully in the defense of such action in such manner and to such extent as Seller may reasonably require; (iii) consents to the employment of attorneys selected by Seller and agrees to waive any conflict of interest then existent or which may later arise, thereby enabling Seller's selected attorneys to represent Seller and/or the manufacturer of a Nissan Product throughout the defense of the claim; and (iv) withdraws any actions (including cross-claims) filed against Seller or the manufacturer of a Nissan Product arising out of the circumstances for which Dealer seeks indemnity. Dealer shall pay all costs of its own defense incurred prior to Seller's assumption of Dealer's defense and thereafter to the extent that Dealer employs attorneys in addition to those selected by Seller.

3. Seller may offset any recovery on Dealer's behalf against any indemnification that may be required under this Section 11 including, without limitation, attorneys' fees paid by Seller pursuant to this Section 11.A and the amount of any settlement or judgment paid by Seller.

B. Indemnification of Seller.

Subject to Section 11.C and upon Seller's written request, Dealer shall:

1. Defend Seller against any and all claims that during the term of this Agreement may arise, commence or be asserted against Seller in any action concerning or alleging:

(a) Dealer's failure to comply, in whole or in part, with any obligation of Dealer under this Agreement;

(b) Any negligence, error, omission or act of Dealer in connection with the preparation, repair or service (including warranty service, goodwill adjustments, and campaign inspections and corrections) by Dealer of Nissan Products;

(c) Any modification or alteration made by or on behalf of Dealer to a Nissan Product, except those made pursuant to the express written instruction or with the express written approval of Seller;

(d) Dealer's breach of any agreement between Dealer and Dealer's customer or other third party;

(e) Misleading, libelous or tortious statements, misrepresentations or deceptive or unfair practices by Dealer, directly or indirectly, to Seller, a customer or other third party including, without limitation, Dealer's failure to comply with Section 6.B of this Agreement;

(f) Dealer's breach of any contract or warranty other than a contract with or warranty of Seller or the manufacturer of a Nissan Product; or

(g) Any change in the employment status or in the terms of employment of any officer, employee or agent of Dealer or of any Principal

Owner, Other Owner or Executive Manager including but not limited to, claims for breach of employment contract, wrongful termination or discharge, tortious interference with contract or economic advantage, and similar claims; and

2. Indemnify and hold Seller harmless from any and all settlements made and final judgments rendered with respect to any claims described in Section 11.B.1; provided, however, that Dealer shall have no obligation to indemnify or hold Seller harmless unless Seller: (i) promptly notifies Dealer of the assertion of such claim and the commencement of such action against Seller; (ii) cooperates fully in the defense of such action in such manner and to such extent as Dealer may reasonably require; (iii) consents to the employment of attorneys selected by Dealer and agrees to waive any conflict of interest then existent or which may later arise, thereby enabling Dealer's selected attorneys to represent Dealer throughout the defense of the claim; and (iv) withdraws any actions (including cross-claims) filed against Dealer arising out of the circumstances for which Seller seeks indemnity. Seller shall pay all costs of its own defense incurred prior to Dealer's assumption of Seller's defense and thereafter to the extent that Seller employs attorneys in addition to those selected by Dealer.

C. Conditions and Exceptions to Indemnification.

1. If the allegations asserted in any action or if any facts established during or with respect to any action would require Seller to defend and indemnify Dealer under Section 11.A and Dealer to defend and indemnify Seller under Section 11.B, Seller and Dealer shall each be responsible for its own defense in such an action and there shall be no obligation or responsibility in connection with any defense, judgment, settlement or expenses of such action as between Seller and Dealer.

2. In undertaking its obligations to defend and/or indemnify each other, Dealer and Seller

may make their defense and/or indemnification conditional on the continued existence of the state of facts as then known to such party and may provide for the withdrawal of such defense and/or indemnification at such time as facts arise which, if known at the time of the original request for a defense and/or indemnification, would have caused either Dealer or Seller to refuse such request. In the event that subsequent developments in a case make clear that the allegations which initially justified acceptance of a request for a defense and/or indemnification are no longer at issue therein or that the claims no longer meet the description of those for which indemnification is required hereunder, any party providing a defense and/or indemnification hereunder may terminate such defense and/or indemnification of the other party. The party withdrawing from its defense and/or indemnification to defend and/or indemnify shall give notice of its withdrawal to the indemnifying party. Moreover, the withdrawing party shall be responsible for all costs and expenses of defense up to the date of the other party's receipt of the notice of withdrawal.

## Section 12. Termination

A. Termination Due to Certain Acts or Events.

The following represent events which are within the control of or originate from actions taken by Dealer or its management or owners and which are so contrary to the intent and purpose of this Agreement that they warrant its termination:

1. Any actual or attempted sale, transfer, assignment or delegation, whether by operation of law or otherwise, by Dealer of an interest in or right, privilege or obligation under this Agreement, or of the principal assets necessary for the performance of Dealer's responsibilities under this Agreement, without, in either case, the prior

written consent of Seller having been obtained, which consent shall not be unreasonably withheld;

2. Subject to the provisions of Section 14 hereof, a change, by operation of law or otherwise, in the direct or indirect ownership of Dealer, whether voluntary or involuntary, from that set forth in the Final Article of this Agreement, except as expressly permitted herein, without the prior written consent of Seller having been obtained, which consent shall not be unreasonably withheld;

3. Removal, resignation, withdrawal or elimination from Dealer for any reason of the Executive Manager of Dealer; provided, however, Seller shall give Dealer a reasonable period of time within which to replace such person with an Executive Manager satisfactory to Dealer and Seller in accordance with Article Fourth of this Agreement; or the failure of Dealer to retain an Executive Manager who, in accordance with Article Fourth of this Agreement, in Seller's reasonable opinion, is competent, possesses the requisite qualifications for the position, and who will act in a manner consistent with the continued best interests of both Seller and Dealer;

4. The failure of Dealer to maintain the Dealership Facilities open for business or to conduct all the Dealership Operations required by this Agreement during and for not less than the hours customary and lawful in Dealer's Primary Market Area or in the metropolitan area in which Dealer is located for seven (7) consecutive days, unless such failure is caused by fire, flood, earthquake or other act of God;

5. Any undertaking by Dealer to conduct, directly or indirectly, any of the Dealership Operations at a location or facility other than that which is specified in the current Dealership Facilities Addendum for that Dealership Operation;

6. The failure of Dealer to establish or maintain wholesale financing arrangements which are in accordance with Seller's Guides and which are reasonably acceptable to Seller with banks or other financial institutions approved by Seller for use in connection with Dealer's purchase of Nissan Vehicles, unless Seller shall have agreed to accept another medium of payment;

7. Insolvency of Dealer; voluntary institution by Dealer of any proceeding under the federal bankruptcy laws or under any state insolvency law; institution against Dealer of any proceeding under the federal bankruptcy laws or under any state insolvency law which is not vacated within thirty (30) days from the institution thereof; appointment of a receiver, trustee or other officer having similar powers for Dealer or Dealer's business, provided such appointment is not vacated within thirty (30) days of the date of such appointment; execution by Dealer of an assignment for the benefit of creditors; or any levy under attachment, foreclosure, execution or similar process whereby a third party acquires rights to a significant portion of the assets of Dealer necessary for the performance of Dealer's responsibilities under this Agreement or to the operation or ownership of Dealer, which is not within thirty (30) days from the date of such levy vacated or removed by payment or bonding;

8. Any material misrepresentation by Dealer or any person named in the Final Article of this Agreement as to any fact relied on by Seller in entering into, amending or continuing with this Agreement including, without limitation, any representation concerning the ownership, management or capitalization of Dealer;

9. The conviction in a court of original jurisdiction of Dealer or of any Principal Owner or Executive Manager of a crime affecting the Dealership Operations or of any felony; provided,

however, that a convicted Executive Manager's ownership interest in Dealer shall not be an event warranting termination of this Agreement if the individual is no longer employed by Dealer or involved in any way in the management or operation of Dealer and Dealer has made reasonable efforts to obtain the individual's divestiture of his ownership interest in Dealer; or any willful failure of Dealer to comply with the provisions of any laws, ordinances, rules, regulations, or orders relating to the conduct of its Dealership Operations including, without limitation, the sale and servicing of Nissan Products.

10. Knowing submission by Dealer to Seller of: a false or fraudulent report or statement; (ii) a false or fraudulent claim (or statement in support thereof), for payment, reimbursement or for any discount, allowance, refund, rebate, credit or other incentive under any plan that may be offered by Seller, whether or not Dealer offers or makes restitution; (iii) false financial information; (iv) false sales reporting data; or (v) any false report or statement relating to pre-delivery inspection, testing, warranties, service, repair or maintenance required to be performed by Dealer.

Upon the occurrence of any of the foregoing events, Seller may terminate this Agreement by giving Dealer notice thereof, such termination to be effective upon the date specified in such notice, or such later date as may be required by any applicable statute.

B. Termination by Seller for Non-Performance by Dealer.

1. If, based upon the evaluations thereof made by Seller, Dealer shall fail to substantially fulfill its responsibilities with respect to:

a. Sales of new Nissan Vehicles and the other responsibilities of Dealer set forth in Section 3 of this Agreement;

b. Maintenance of the Dealership Facilities and the Dealership Location set forth in Section 2 of this Agreement;

c. Service of Nissan Vehicles and sale and service of Genuine Nissan Parts and Accessories and the other responsibilities of Dealer set forth in Section 5 of this Agreement;

d. The other responsibilities assumed by Dealer in this Agreement including, without limitation, Dealer's failure to:

(i) Timely submit accurate sales, service and financial information concerning its Dealership Operations, ownership or management and related supporting data, as required under this Agreement or as may be reasonably requested by Seller;

(ii) Permit Seller to make an examination or audit of Dealer's accounts and records concerning its Dealership Operations after receipt of notice from Seller requesting such permission or information;

(iii) Pay Seller for any Nissan Products or any other products or services purchased by Dealer from Seller, in accordance with the terms and conditions of sale; or

(iv) Maintain net worth and working capital substantially in accordance with Seller's Guides therefor; or

2. In the event that any of the following occur:

(i) any dispute, disagreement or controversy between or among Dealer and any third party or between or among the owners or management personnel of Dealer relating to the management or ownership of Dealer develops or exists which, in the reasonable opinion of Seller, tends to adversely affect the conduct of the Dealership Operations or the interests of Dealer or Seller; or

(ii) any other act or activity of Dealer, or any of its owners or management occurs, which substantially impairs the reputation or financial standing of Dealer or of any of its management subsequent to the execution of this Agreement:

Seller will notify Dealer of such failure and will

review with Dealer the nature and extent of such failure and the reasons which, in Seller's or Dealer's opinion, account for such failure.

Thereafter, Seller will provide Dealer with a reasonable opportunity to correct the failure. If Dealer fails to make substantial progress towards remedying such failure before the expiration of such period, Seller may terminate this Agreement by giving Dealer notice of termination, such termination to be effective at least ninety (90) days after such notice is given.

During such period Dealer will commence such actions as may be necessary so that the termination obligations of Seller and Dealer set forth in this Agreement may be fulfilled as promptly as practicable.

C. Termination Because of Death or Physical or Mental Incapacity of Principal Owner.

This Agreement is a personal services agreement and has been entered into by Seller in reliance on Dealer's being owned by the Principal Owner(s). Seller (subject to Section 14 hereof) may terminate this Agreement by giving notice to Dealer upon the death of any of the Principal Owner(s) or if Seller in good faith determines that any Principal Owner is so physically or mentally incapacitated as to be unable to discharge his or her responsibility to the operating management of Dealer. Unless deferred as hereinafter provided, the effective date of such termination shall be not less than ninety (90) days from the date such notice is given to Dealer.

To facilitate the orderly termination of the business relationship between Seller and Dealer and of the Dealership Operations, Seller may, in its sole discretion, defer the effective date of such termination and continue to operate with Dealer under the terms of this Agreement for a period of time, to be determined by Seller, of up to one (1) year from the date such notice of termination is

given if within sixty (60) days from the date of said notice, the executor or representative of the deceased or incapacitated Principal Owner or a surviving Principal Owner shall give to Seller written request for such deferment. This Agreement shall automatically terminate without further notice or action by Seller upon the expiration of any such deferment.

D. Termination for Failure of Seller or Dealer to be Licensed.

If Seller or Dealer shall fail to secure or maintain any license, permit or authorization required by either of them for their performance of any obligation under or in connection with this Agreement, or if such license, permit or authorization is suspended or revoked, irrespective of the cause, and such suspension or revocation continues for a period of seven (7) days, either party may immediately terminate this Agreement by giving notice to the other party.

E. Termination by Dealer.

Dealer has the right to terminate this Agreement at any time by giving notice to Seller, such termination to be effective thirty (30) days after the giving of such notice (unless the thirty (30) day notice period is waived in writing by Seller) or on such other date as may be mutually agreed to in writing by Seller and Dealer.

F. Termination by Seller Because of a Change of Seller's Method of Distribution or Decision by Seller to Cease Distribution of Nissan Vehicles.

If Seller should elect or be required to discontinue its present method of distributing Nissan Vehicles, or if Seller should elect or be required to cease selling or distributing Nissan Vehicles, Seller may terminate this Agreement by giving Dealer notice and such termination will be effective not less than one (1) year after such notice is given.

G. Termination Upon Entering Into a New Sales and Service Agreement.

Seller may terminate this Agreement at any time by giving Dealer at least ninety (90) days prior notice thereof and offering to enter into a new or amended form of Agreement with Dealer in a form being offered generally to Authorized Nissan Dealers.

Unless otherwise agreed in writing, the rights and obligations of Dealer that may otherwise become applicable upon termination or expiration of the term of this Agreement shall not be applicable if Seller and Dealer enter into a new or superseding Dealer Sales and Service Agreement, and the rights and obligations of the parties hereunder shall continue under the terms and provisions of the new agreement.

Dealer's performance under any prior agreement may be considered by Seller in evaluating Dealer's performance under this, or any succeeding, agreement.

## Section 13. Rights and Liabilities Upon Termination

A. Termination Procedures.

1. Upon termination of this Agreement by either Seller or Dealer for any reason, Dealer shall cease to be an Authorized Nissan Dealer, and Dealer shall: (i) immediately discontinue the distribution and sale of Nissan Products as an Authorized Nissan Dealer; and (ii) at its own expense (a) erase or obliterate all Nissan Marks and any word or words indicating that Dealer is an Authorized Nissan Dealer from the stationery, forms and other papers used by Dealer or any business associated or affiliated with Dealer; (b) discontinue all advertising of Dealer as an Authorized Nissan Dealer; (c) take all steps necessary to remove any listing in any telephone directory yellow pages advertisement indicating that Dealer is an Authorized Nissan Dealer; (d) discontinue any use of any Nissan Mark in Dealer's firm or trade name and take all steps necessary or appropriate in the opinion of Seller to change such firm or trade name to eliminate any Nissan Mark therefrom; (e) discontinue or cause to be discontinued all other use of the Nissan Marks; (f) refrain from doing anything, whether or not specified above, that would indicate that Dealer is or was an Authorized Nissan Dealer; and (g) refrain from using, either directly or indirectly, any Nissan Marks or any other confusingly similar marks, names, logos or designs in a manner likely to cause confusion or mistake or to deceive the public. If Dealer fails to comply with any requirements of this Section 13.A.1, Dealer shall reimburse Seller for all costs and expenses, including reasonable attorney's fees, incurred by Seller in effecting or enforcing compliance;

2. Termination of this Agreement will not release Dealer or Seller from the obligation to pay any amounts owing the other;

3. Subject to Section 13.E, Seller shall process all claims and make all payments due for all labor provided and all parts and/or other materials used by Dealer pursuant to Sections 5.B.2 and 5.B.3 prior to the effective date of termination as provided in the Warranty Manual. Dealer shall cease, as of the effective date of termination, to be eligible to receive reimbursement for any work thereafter performed or parts thereafter supplied under any warranty, campaign inspections or corrections and any other adjustment previously authorized by Seller.

4. Dealer shall, upon Seller's request, deliver to Seller or its designee copies of Dealer's records with respect to pre-delivery, warranty, goodwill campaign and other service work of Dealer.

B. Repurchases by Seller Upon Termination. Upon termination other than pursuant to a sale or transfer, Seller shall buy from Dealer and Dealer shall sell to Seller, within ninety (90) days after the effective date of termination:

1. All new, unused, undamaged, unlicensed, then current and immediate previous model year Nissan Vehicles which were purchased by Dealer from Seller and are then the unencumbered property of and in the possession of Dealer or Dealer's flooring and/or financing institution. The price for such vehicles shall be the invoice price previously paid by Dealer therefor, less Seller's destination charges, all allowances paid or applicable allowances offered thereon by Seller, any amount paid by Seller to Dealer for pre-delivery inspection and service with respect to such vehicles pursuant to Section 5.B, any dealer association collection, and any other charge for taxes or special items or service. Seller shall also repurchase Genuine Nissan Accessories which have been installed in such Nissan Vehicles which accessories are listed in the current parts and accessories price list (except those items marked "not eligible") at the prices set forth on Seller's then current parts and accessories price list.

2. Subject to Section 13.C, all new, unused, undamaged and resalable Genuine Nissan Parts and Accessories which are still in the original and undamaged packages, were purchased from Seller, are listed in the current parts and accessories price list (except those items marked "not eligible"), and are then the unencumbered property of and in the possession of Dealer. The prices for such Genuine Nissan Parts and Accessories shall be the prices set forth on Seller's then current parts and accessories price list.

3. Subject to Section 13.C, all special tools and equipment owned by Dealer and which are unencumbered and in the possession of Dealer on the effective date of termination which were designed especially for servicing Nissan Vehicles, are of the type recommended in writing by Seller and designated as "essential" tools in accordance with Seller's Guides or other notices pertaining thereto from Seller, are in usable and good condition, except for reasonable wear and tear, and were purchased by Dealer from Seller within the three (3) year period preceding the date of termination. Seller's purchase price for such essential tools shall be calculated at Dealer's purchase price reduced by straight-line depreciation on the basis of a useful life of thirty-six (36) months.

Dealer's and Seller's obligations with respect to the signs located at the Dealership Facilities shall be determined in accordance with the Dealership Identification Addendum between Seller and Dealer.

C. Dealer's Responsibilities with Respect to Repurchase.

Seller's obligation to repurchase Genuine Nissan Vehicles, Genuine Nissan Parts and Accessories, and essential tools from Dealer is conditioned on Dealer's fulfilling its responsibilities under this Section 13.C as follows:

1. Immediately following the effective date of termination of this Agreement, Dealer shall furnish to Seller a list of vehicle identification numbers and such other information and documents as Seller may require pertaining to the Nissan Vehicles subject to the repurchase obligations of Section 13.B.1. Dealer shall deliver all such vehicles in accordance with Seller's instructions.

2. Within thirty (30) days after the effective date of termination of this Agreement, Dealer shall deliver or mail to Seller a detailed inventory of all of the items referred to in Sections 13.B.2 and 13.B.3. Within thirty (30) days of its receipt of such inventory, Seller shall provide Dealer with instructions as to the procedures to be followed in returning such items to Seller. Dealer shall, at its

26

expense, tag, pack and deliver all such items to Seller at Seller's designated parts distribution center in accordance with such instructions.

Should Dealer fail to comply with the responsibilities listed above, Seller shall have no obligation to repurchase any such items from Dealer; provided, however, that Seller shall have the right, but no obligation, to enter into the Dealership Facilities for the purpose of compiling an inventory, tagging, packing and shipping such items to Seller's designated parts distribution center. If Seller undertakes any such responsibilities of Dealer, the repurchase prices of such items shall be fifteen percent (15%) less than the repurchase prices otherwise applicable under Section 13.B.

D. Title to Repurchased Property.

With respect to any items of property repurchased by Seller pursuant to this Section 13, Dealer shall take such action and shall execute and deliver such instruments as may be necessary: (i) to convey good and marketable title to all such items of property; (ii) to comply with the requirements of any applicable law relating to bulk sales and transfers; and (iii) to satisfy and discharge any liens or encumbrances on such items of property prior to delivery thereof to Seller.

E. Payment.

Seller shall make all payments to Dealer pursuant to this Section 13 within ninety (90) days after Seller's receipt of all items to be repurchased by it and provided Dealer has fulfilled all of its obligations under this Section 13; provided, however, that Seller shall be entitled to offset against such payments any and all indebtedness or other obligations of Dealer to Seller. Seller may make any payment for any property repurchased pursuant to this Section 13 directly to anyone having a security or ownership interest therein.

F. Cancellation of Deliveries.

Upon termination of this Agreement Seller shall have the right to cancel all shipments of Nissan Products scheduled for delivery to Dealer. After the effective date of termination, if Seller shall voluntarily ship any Nissan Products to Dealer, or otherwise transact business with Dealer, all such transactions will be governed by the same terms provided in this Agreement, insofar as those terms would have been applicable had the Agreement not been terminated. Nevertheless, neither the shipping of such Nissan Products nor any other acts by Seller shall be construed as a waiver of the termination or a renewal or extension of this Agreement.

## Section 14. Establishment of Successor Dealer

A. Because of Death of Principal Owner.

If Seller shall terminate this Agreement pursuant to Section 12.C because of the death of a Principal Owner, the following provisions shall apply:

1. Subject to the other provisions of this Section 14, Seller shall offer a two (2) year Term Sales and Service Agreement to a successor dealership ("Successor Dealership") comprised of the person nominated by such deceased Principal Owner as his or her successor, together with the other Principal Owner(s) and Other Owner(s), provided that:

(a) The nomination was submitted to Seller on a Successor Addendum, was consented to by the remaining Principal Owner(s) and Other Owner(s), and was approved by Seller prior to the death of such Principal Owner;

(b) Either (i) there has been no change in the Executive Manager of Seller; or (ii) Seller has approved a candidate for Executive Manager having the required qualifications, expertise, integrity, experience and ability to successfully operate the dealership and perform Dealer's obligations under this Agreement; and

27

(c) The Successor Dealership has capital and facilities substantially in accordance with Seller's Guides therefor at the time the Term Sales and Service Agreement is offered.

2. If the deceased Principal Owner has not nominated a successor in accordance with Section 14.A.l(a) above, but all of the beneficial interest of the deceased Principal Owner has passed by will or the laws of intestate succession directly to the deceased Principal Owner's spouse and/or children or to one (1) or more other Principal Owners who each held not less than a twenty-five percent (25%) beneficial ownership interest in the dealership prior to the death of the deceased Principal Owner (collectively "proposed New Owners"), subject to the other provisions of this Section 14, Seller shall offer a two (2) year Term Sales and Service Agreement to a Successor Dealership composed of the Proposed New Owner(s), together with the other Principal Owner(s) and Other Owner(s), provided that:

(a) Either (i) there has been no change in the Executive Manager of Dealer; or (ii) Seller has approved a candidate for Executive Manager having the required qualifications, expertise, integrity, experience and ability to successfully operate the dealership and perform Dealer's obligations under this Agreement; and

(b) The Successor Dealership has capital and facilities substantially in accordance with Seller's Guides therefor at the time the Term Sales and Service Agreement is offered.

(B) Consideration of Successor Addendum. To be named in the Successor Addendum, a proposed Principal Owner or Executive Manager must (i) be employed by Dealer or a comparable automotive dealership as his principal place of employment; (ii) be already qualified as a Principal Owner or Executive Manager, as the case may be;

and (iii) otherwise be acceptable to Seller as provided below.

Upon receipt of a request from Dealer that one or more individuals be named in a Successor Addendum, Seller shall request those named to submit an application and to provide all personal and financial information that Seller may reasonably and customarily require in connection with the review of such applications. Seller, upon the submission of all requested information, will determine whether to consent to a Successor Addendum naming such individuals by applying its criteria for considering the qualifications of Principal Owners or Executive Managers, as the case may be.

C. Termination of Successor Addendum. Dealer may, at any time, withdraw a nomination of a Successor even if Seller previously has qualified the candidate, or cancel an executed Successor Addendum by giving notice to Seller of such withdrawal at any time prior to the death or incapacity of any Principal Owner named in this Agreement. Seller may cancel an executed Successor Addendum only if the proposed Principal Owner or Executive Manager no longer complies with the requirements of this Section 14.

D. Evaluation of Successor Dealership. During the term of the Term Sales and Service Agreement, Seller will evaluate the performance of the Successor Dealership and periodically review with the new Dealer this evaluation. If the Successor Dealership's performance is deemed to be satisfactory to Seller during the Term Sales and Service Agreement, Seller will give first consideration to such Successor Dealership with respect to a new Sales and Service Agreement.

E. Termination of Market Representation. Notwithstanding anything stated or implied to the contrary in this Section 14, Seller shall not be obligated to offer a Term Sales and Service Agree-

ment to any Successor Dealership if Seller notified Dealer prior to the event causing the termination of this Agreement that Seller's market representation plans do not provide for continuation of representation in Dealer's Primary Market Area.

F. Termination of Offer.

If the person or persons comprising a proposed Successor Dealership to which any offer of a Term Sales and Service Agreement for Nissan Products shall have been made pursuant to this Section 14 do not accept same within thirty (30) days after notification to them of such offer, such offer shall automatically expire.

## Section 15. Sale of Assets or Ownership Interests in Dealer.

A. Sale or Transfer.

Article Third of this Agreement provides that neither this Agreement nor any right or interest herein may be assigned without the prior written consent of Seller. However, during the term of this Agreement, Dealer may negotiate for the sale of the assets of Dealer, or the owners of Dealer may negotiate the sale of their ownership interests in Dealer, upon such terms as may be agreed upon by them and the prospective purchaser. With respect to any sale or transfer which requires Seller's prior written consent under Article Third of this Agreement, Dealer shall notify Seller prior to any closing of the transaction called for by the purchase and sale agreement, and the prospective purchaser shall apply to Seller for a Sales and Service Agreement.

B. Seller's Evaluation.

Seller is responsible for establishing and maintaining an effective body of Authorized Nissan Dealers to promote the sale and servicing of Nissan Products. Accordingly, Seller has the right and obligation to evaluate each prospective dealer, its owner(s) and executive, manager, the dealership location and the dealership facilities to ensure that each of the foregoing is adequate to enable Dealer to meet its responsibilities hereunder. Seller will evaluate each prospective purchaser's qualifications and proposal for the conduct of the Dealership Operations by applying the standards set forth or referred to in this Agreement. In determining whether it shall consent to such a sale or transfer, Seller will take into account factors such as the personal, business and financial qualifications, expertise, reputation, integrity, experience and ability of the proposed Principal Owner(s) and Executive Manager as referred to in Articles Third and Fourth of this Agreement, the capitalization and financial structure of the prospective dealer, the prospective purchaser's proposal for conducting the Dealership Operations, and Seller's interest in promoting and preserving competition.

In evaluating the prospective purchaser's application for a Sales and Service Agreement, Seller may, without liability to Dealer, Dealer's Owners or the prospective purchaser, consult with the prospective purchaser regarding any matter relating to the proposed dealership.

Seller shall notify Dealer of Seller's consent or refusal to consent to Dealer's proposed sale or transfer within sixty (60) days after Seller has received from Dealer (i) Dealer's written request for Seller's approval; and (ii) all applications and information customarily or reasonably requested by Seller to evaluate such a proposal including without limitation, information concerning each proposed owner's and/or the replacement dealer's identity, character, business affiliations, business experience, financial qualifications and proposals for conducting the Dealership Operations. Any material change in such a proposal including,

without limitation, any change in the financial terms or in the proposed ownership or management of any proposed replacement dealer, shall be treated as a new proposal for purposes of this Section 15.B. If Seller does not consent to Dealer's proposed sale or transfer, Seller will specify in its notice to Dealer the reasons for its refusal to consent.

If Seller determines that the proposed dealership would not, at the commencement of its operations, have capital or facilities in accordance with Seller's Guides therefor and otherwise satisfactory to Seller, or if Seller reasonably determines that the proposed dealership might not meet Seller's performance standards in sales or service, Seller may, in its sole discretion and in lieu of refusing to consent to the proposed sale or transfer, agree to enter into a Term Sales and Service Agreement with the prospective purchaser. If Seller has recommended, pursuant to a market study conducted in accordance with Section 4.A, that Dealer relocate its Dealership Facilities, Seller may offer to the proposed dealer a Term Sales & Service Agreement subject to the condition that its Dealership Facilities shall be relocated within a reasonable time to a location and in facilities acceptable to Seller and in accordance with the market study recommendations.

Notwithstanding anything stated or implied to the contrary in this Section 15, Seller shall not be obligated to enter into a Sales and Service Agreement with any purchaser of the assets or ownership interests of Dealer if Seller has notified Dealer prior to its having received notice of the proposed sale or transfer that Seller's market representation plans do not provide for continuation of representation in Dealer's Primary Market Area.

C.  Effect of Termination.

This Agreement shall end on the effective date of termination and, except as otherwise set forth in Section 13, all rights, obligations, duties and responsibilities of Dealer and Seller under this Agreement shall cease as of the effective date of termination. No assignment, transfer or sale of Dealer's right or interest in this Agreement shall have the effect of granting the assignee, transferee or buyer any right or interest in this Agreement that is greater than or in addition to that then held by Dealer. Any such assignment, transfer or sale shall be subject to the terms of any written notice of deficiency under Section 12.B or any written notice of termination under Sections 12.A, 12.B, 12.C, 12.D, 12.E or 12.F that was previously received by Dealer, including but not limited to Dealer's obligation to correct any failure before the expiration date of any period established in any such notice of deficiency. No such assignment, transfer or sale shall correct any such deficiency or extend the effective date of termination specified in any written notice of termination.

## Section 16. Policy Review Board

A.  Establishment of Policy Review Board.

In the interest of maintaining harmonious relations between Seller and Dealer and to provide for the resolution of certain protests, controversies and claims with respect to or arising out of Section 4, Section 12 or Section 13 of this Agreement, Seller has established the Nissan North America, Inc. in U.S.A. Policy Review Board ("Policy Review Board"). The procedures of the Policy Review Board, as they may be revised by Seller from time to time, are incorporated herein by reference. At the time of execution of this Agreement, Seller will have furnished to Dealer a copy of such procedures, and Seller will furnish to Dealer a copy of each revision or modification that Seller may thereafter make to such procedures. Any decision of the

Policy Review Board shall represent the independent decision of Seller and shall be binding on Seller but not on Dealer.

B. Appeal of Dealer Appointment to Policy Review Board.

Any objections by Dealer to the proposed appointment of an additional Nissan dealer within the ten (10) mile driving distance described in Section 4.B shall be appealed to the Policy Review Board by filing a Notice of Appeal in accordance with the procedures established therefor within thirty (30) days from the date of Dealer's receipt of the Notice of Appointment.

C. Appeal of Termination to Policy Review Board.

Any protests, controversies or claims by Dealer (whether for damages, stay of action, or otherwise) with respect to any termination of this Agreement or the settlement of the accounts of Dealer with Seller after termination of this Agreement has become effective shall be appealed to the Policy Review Board by filing an appeal in accordance with the procedures established therefor within thirty (30) days after Dealer's receipt of notice of termination or, as to settlement of accounts after termination, within one (1) year after the termination has become effective.

D. Effect of Other Proceedings.

Because the purpose of the Policy Review Board is to assist in resolving issues between Seller and Dealer in a non-adversarial setting and to avoid litigation, if Dealer institutes or seeks any relief or remedy through legal, administrative or other proceedings as to any matter that is or could be the subject, of an appeal to the Policy Review Board, then the Policy Review Board may, in its sole discretion, elect to refuse to consider any appeal to the Policy Review Board then pending or thereafter filed by Dealer relating to such subject matter.

Dealer further agrees that Dealer's seeking such relief or remedy shall constitute a waiver of any right to an appeal to the Policy Review Board with respect to such subject matter and Seller and the Policy Review Board shall be forever released from any obligation they might otherwise have had to conduct any proceedings, render any decision or take any other action in connection with such subject matter.

## Section 17. General

A. Notices.

All notices or notifications required or permitted to be given by this Agreement to either party shall be sufficient only if given in writing and delivered personally or by mail to Dealer at the address set forth on the Dealership Facilities Addendum to this Agreement and to Seller at its national headquarters, or at such other address as the party to be addressed may have previously designated by written notice to the other party. Unless otherwise specified in the notice, such notices shall be effective upon receipt.

B. No Implied Waivers.

The waiver by either party, or the delay or failure by either party to claim a breach, of any provision of this Agreement shall not affect the right to require full performance thereafter, nor shall it constitute a waiver of any subsequent breach, or affect in any way the effectiveness of such provision.

C. No Agency.

Dealer is an independently operated business entity in which Seller has no ownership interest. This Agreement does not constitute Dealer the agent or legal representative of Seller or Manufacturer for any purpose whatsoever. Dealer is not granted any express or implied right or authority to assume or create any obligation on behalf of or in the name of Seller or Manufacturer or to bind

Seller or Manufacturer in any manner or thing whatsoever.

D. Limitations of Seller's Liability.

This Agreement contemplates that all investments by or in Dealer shall be made, and Dealer shall purchase and resell Nissan Products, in conformity with the provisions hereof, but otherwise in the discretion of Dealer. Except as herein specified, nothing herein contained shall impose any liability on Seller in connection with the business of Dealer or otherwise or for any expenditures made or incurred by Dealer in preparation for performance or in performance of Dealer's responsibilities under this Agreement.

E. Entire Agreement.

This agreement contains the entire understanding of the parties hereto with respect to the subject matter contained herein and may be amended only by a written instrument executed by each of the parties or their respective personal representatives, successors and/or assigns. This Agreement supersedes any and all prior agreements with respect to the subject matter hereof, and there are no restrictions, promises, warranties, covenants or undertakings between the parties other than those expressly set forth in this Agreement; provided, however, Seller shall have the right to amend, modify or change this Agreement in case of legislation, government regulations or changes in circumstances beyond the control of Seller that might affect materially the relationship between Seller and Dealer as further provided in Section 17.G.

F. California Law.

This Agreement shall be deemed to have been entered into in the State of California, and all questions concerning the validity, interpretation or performance of any of its terms or provisions, or of any rights or obligations of the parties hereof, shall be governed by and resolved in accordance with the internal laws of the State of California

including, without limitation, the statute of limitations.

G. Changes Required by Law.

Should Seller determine that any federal or state legislation or regulation or any condition referred to in Section 17.E requires a change or changes in any of the provisions of this Agreement, Seller may offer to Dealer an amendment or an amended Agreement embodying such change or changes. If Dealer shall fail to execute such amendment or amended Agreement and return it to Seller within thirty (30) days after it is offered Dealer, Seller may terminate this Agreement by giving notice to Dealer, such termination to effective upon receipt by Dealer of such notice.

H. Severability.

If any term or provision of this Agreement, or the application thereof to any person or circumstance, shall to any extent be found to be invalid, void or unenforceable, the remaining provisions and any application thereof shall nevertheless continue in full force and effect without being impaired or invalidated in any way.

I. Assignment.

Dealer shall not transfer or assign any right or transfer or delegate any obligation of Dealer under this Agreement without the prior written approval of Seller. Any purported transfer, assignment or delegation made without the prior written approval of Seller shall be null and void.

J. No Franchise Fee.

Dealer represents and warrants that it has paid no fee, nor has it provided any goods or services in lieu of a fee, as consideration for Seller's entering into this Agreement and that the sole consideration for Seller's entering into this Agreement was Dealer's Principal Owners' and Executive Manager's abilities, integrity, assurances of personal services and expressed intention to deal fairly and equitably with Seller and the public and any

other promises recited in this Agreement.

    K.  Captions.

The captions of the sections of this Agreement are for convenience and reference only and shall in no way be construed to explain, modify, amplify, or aid in the interpretation, construction or meaning of the provisions of this Agreement or to be a part of this Agreement.

    L.  Benefit.

This Agreement is entered into by and between Seller and Dealer for their sole and mutual benefit. Neither this Agreement nor any specific provision contained in it is intended or shall be construed to be for the benefit of any third party.

EXHIBIT 3

## TOLLING AGREEMENT

This Tolling Agreement (the "Agreement") is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin, ("the "Slevin Group"), on the other hand, as of August 31, 2022 (the "Effective Date").

**WHEREAS** NNA asserts that it has claims against the Slevin Group arising out of the conduct detailed in the Complaint attached as Exhibit 1 (referred to herein as the "Claims"); and

**WHEREAS** NNA and the Slevin Group (collectively referred to herein as the "Parties") mutually desire to toll any applicable statutes of limitations so that the Parties may discuss and attempt to resolve the Claims in order to avoid the cost and necessity of litigation, if reasonably possible;

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

1.   **Tolling Agreement**.  The period (the "Tolling Period") between the Effective Date of this Agreement and the Termination Date, as defined below in paragraph 2, will not be included in determining the applicability of expiration of any statute of limitations, laches, or any other defense based on the lapse of time (collectively, a "Timing Defense") in any action or proceeding brought by any party to this Agreement against any other party to this Agreement. Apart from this specific tolling agreement, the Slevin Group does not waive, and specifically reserves, its right to assert any and all defenses to NNA's claims, including any Timing Defenses that may

4857-0394-7058.1

1

have already accrued or may otherwise apply to NNA's claims without including the Tolling Period.

2.    **Termination Date**.  This Agreement shall remain in full force and effect until the earlier of (a) October 30, 2022; or (b) thirty (30) days following written notice sent by any Party of the termination of this Agreement (the "Termination Date").  Notice under this Agreement is sufficient if sent by email and shall be directed to counsel for the Parties as follows:

> **To NNA:**
> Gino Bulso
> Bulso PLC
> 155 Franklin Road, Suite 400
> Brentwood, TN 37027
> 615-913-5135
> gbulso@bulso.com
>
> **To the Slevin Group:**
> Ira M. Levin
> Burke, Warren, MacKay & Serritella, P.C.
> 330 North Wabash Avenue
> 21st Floor Chicago, Illinois 60611-3607
> Telephone: (312) 840-7000
> ilevin@burkelaw.com

A party may change the address at which it should be given notice by giving written notice of the change of address to the other party and to its counsel at the above addresses by certified mail, return receipt requested.

3.    **Justifiable Reliance**.  During the Tolling Period, NNA agrees to forebear from filing any claim in any forum against the Slevin Group or any member thereof. The Parties acknowledge and agree that each is justifiably and reasonably relying upon the terms and conditions set forth in this Agreement, that all unexpired Claims are subject to being tolled, and that this Agreement is enforceable in accordance with its

4857-0394-7058.1

2

terms.

4. **Preservation of Records**. The Parties agree that, during the Tolling Period, they shall honor their litigation preservation duties and responsibilities. This Agreement shall neither enlarge nor restrict any document preservation duties and responsibilities of either Party.

5. **No Admission**. Neither the execution of this Agreement nor any of the provisions herein shall operate in any way as an admission of fact, liability, or responsibility or participation in the case at issue by any Party in any way regarding the subject matter of this Agreement. Neither this Agreement nor any action taken pursuant to this Agreement shall be offered or received in evidence in any action or proceeding as an admission of fact, liability, or responsibility by any party.

6. **Governing Law.** This Agreement shall in all respects be construed and enforced in accordance with, and governed by, the laws of the State of Tennessee; provided, however, that by entering into this Agreement, the Slevin Group is not submitting to the jurisdiction of the State of Tennessee nor is it waiving any defense it has to personal jurisdiction in the State of Tennessee.

7. **Entire Agreement**. It is expressly understood and agreed that this Agreement contains the entire agreement and understanding of the Parties concerning the specific subject matter of this Agreement, and merges, supersedes, and replaces all prior discussions, understandings, negotiations, agreements, representations, conditions, warranties, covenants, and all other communications between the Parties, whether written or oral, relating to such subject matter.

4857-0394-7058.1

3

8.    **Waiver.**  No provision herein may be waived unless in writing and signed by the Party or Parties whose rights are thereby waived.  Waiver of any one provision herein shall not be deemed to be a waiver of any other provision herein.

9.    **Modification**.  This Agreement may be modified or amended only by written agreement executed by all of the Parties.

10.    **Successors.**  This Agreement shall bind, and shall inure to the benefit of, the Parties and their respective heirs, successors, and assigns.

11.    **Execution in Counterparts**.  This Agreement may be executed in counterparts, and when each Party has signed and delivered at least one such counterpart, each counterpart shall be deemed an original and, when taken together with other signed counterparts, shall constitute one Agreement, which shall be binding upon and effective as to all Parties.  Delivery of this document by facsimile or electronic mail bearing the signature of a party's representative shall have the same effect as the original.  Each Party represents and warrants that all legal action necessary for effectuation and execution of this Agreement has been validly taken and that the individuals whose signatures appear below on behalf of each Party are duly authorized to execute this Agreement on behalf of the respective Parties, and to bind them to the terms hereof.

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Agreement as of the Effective Date.

Nissan North America, Inc.:

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

Woodfield Nissan, Inc.

By: William A. Slevin
Its: President

Glendale Nissan, Inc.

By: William A. Slevin
Its: President

Slevin Automotive Group, LLC

By: William A. Slevin
Its: Managing Member

William A. Slevin

## FIRST AMENDMENT TO TOLLING AGREEMENT

This First Amendment to Tolling Agreement (the "Agreement") is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin, ("the "Slevin Group"), on the other hand, as of October 21, 2022 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022; and

**WHEREAS** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement;

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

1. **Termination Date**. Paragraph 2 of the Tolling Agreement is hereby amended such that "October 30, 2022" is hereby deleted from paragraph 2(a) and "November 30, 2022" is hereby substituted in its place.

2. **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Agreement as of the Effective Date.

Nissan North America, Inc.:

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

Woodfield Nissan, Inc.

By: William A. Slevin
Its: President

Glendale Nissan, Inc.

By: William A. Slevin
Its: President

Slevin Automotive Group, LLC

By: William A. Slevin
Its: Managing Member

William A. Slevin

4894-8241-3370.1

2

## SECOND AMENDMENT TO TOLLING AGREEMENT

This Second Amendment to Tolling Agreement (the "Agreement") is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin, ("the "Slevin Group"), on the other hand, as of November 28, 2022 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022; and

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the August 31, 2022 Tolling Agreement, as amended by the First Amendment to Tolling Agreement, hereinafter, the "Tolling Agreement"); and

**WHEREAS** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement; and

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "November 30, 2022" is hereby deleted from paragraph 2(a) and "January 16, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Agreement as of the Effective Date.

**Nissan North America, Inc.:**

*Justin O'Sullivan*
_____
By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**


_____
By: William A. Slevin
Its: Managing Member

**William A. Slevin:**


_____

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Agreement as of the Effective Date.

**Nissan North America, Inc.:**

_____

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

_____

By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

_____

By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

_____

By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

_____

## THIRD AMENDMENT TO TOLLING AGREEMENT

This Third Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of January 11, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment") (the August 31, 2022 Tolling Agreement, as amended by the First Amendment and Second Amendment, hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "January 16, 2023" is hereby deleted from paragraph 2(a) and "February 15, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*,

the Tolling Agreement shall continue in effect in accordance with its terms.

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this

Agreement as of the Effective Date.

**Nissan North America, Inc.:**

_Justin O'Sullivan_____
By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

2

## <u>FOURTH AMENDMENT TO TOLLING AGREEMENT</u>

This Fourth Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of February 9, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Third Amendment to Tolling Agreement effective January 11, 2023 (the "Third Amendment") (the August 31, 2022 Tolling Agreement, as amended by the First Amendment, Second Amendment, and Third Amendment, hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

1.     **<u>Termination Date</u>**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "February 15, 2023" is hereby deleted from paragraph 2(a) and "March 3, 2023" is hereby substituted in its place.

2.     **<u>No Other Modifications</u>**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this

Fourth Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

*Justin O'Sullivan*
_____
By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**


_____
By: William A. Slevin
Its: Managing Member

**William A. Slevin:**


_____

3

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Fourth Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

_____
By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

_____
By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

_____
By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

_____
By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

_____

3

## FIFTH AMENDMENT TO TOLLING AGREEMENT

This Fifth Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of February 28, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Third Amendment to Tolling Agreement effective January 11, 2023 (the "Third Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fourth Amendment to Tolling Agreement effective February 9, 2023 (the "Fourth Amendment") (the August 31, 2022 Tolling Agreement, as amended by the First Amendment, Second Amendment, Third Amendment, and Fourth Amendment, hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "March 3, 2023" is hereby deleted from paragraph 2(a) and "March 31, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

2

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Fifth Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

3

## SIXTH AMENDMENT TO TOLLING AGREEMENT

This Sixth Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of March 23, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Third Amendment to Tolling Agreement effective January 11, 2023 (the "Third Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fourth Amendment to Tolling Agreement effective February 9, 2023 (the "Fourth Amendment")

**WHEREAS**, NNA and the Slevin Group entered into that certain Fifth Amendment to the Tolling Agreement effective February 28, 2023 (the "Fifth Amendment") (the August 31, 2022 Tolling Agreement, as amended by the First

Amendment, Second Amendment, Third Amendment, Fourth Amendment, and Fifth Amendment hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "March 31, 2023" is hereby deleted from paragraph 2(a) and "April 30, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Sixth Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

*Justin O'Sullivan*
_____
By: Justin O'Sullivan
Its: Director, Assistant General Counsel, Legal Department

**Woodfield Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**


_____
By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**


_____
By: William A. Slevin
Its: Managing Member

**William A. Slevin:**


_____

## SEVENTH AMENDMENT TO TOLLING AGREEMENT

This Seventh Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of April 17, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Third Amendment to Tolling Agreement effective January 11, 2023 (the "Third Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fourth Amendment to Tolling Agreement effective February 9, 2023 (the "Fourth Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fifth Amendment to the Tolling Agreement effective February 28, 2023 (the "Fifth Amendment")

**WHEREAS**, NNA and the Slevin Group entered into that certain Sixth Amendment to the Tolling Agreement effective March 23, 2023 (the "Sixth Amendment") (the August 31, 2022 Tolling Agreement, as amended by the First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, and Sixth Amendment, hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "April 30, 2023" is hereby deleted from paragraph 2(a) and "May 31, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

2

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Seventh Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

_____

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

3

## EIGHTH AMENDMENT TO TOLLING AGREEMENT

This Eighth Amendment to Tolling Agreement is entered into by and between Nissan North America, Inc. ("NNA"), on the one hand, and Woodfield Nissan, Inc., Glendale Nissan, Inc., Slevin Automotive Group, LLC, and William A. Slevin ("the "Slevin Group"), on the other hand, as of May 19, 2023 (the "Effective Date").

**WHEREAS** NNA and the Slevin Group entered into that certain Tolling Agreement effective August 31, 2022;

**WHEREAS,** NNA and the Slevin Group entered into that certain First Amendment to Tolling Agreement effective October 21, 2022 (the "First Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Second Amendment to Tolling Agreement effective November 28, 2022 (the "Second Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Third Amendment to Tolling Agreement effective January 11, 2023 (the "Third Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fourth Amendment to Tolling Agreement effective February 9, 2023 (the "Fourth Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Fifth Amendment to the Tolling Agreement effective February 28, 2023 (the "Fifth Amendment");

**WHEREAS**, NNA and the Slevin Group entered into that certain Sixth Amendment to the Tolling Agreement effective March 23, 2023 (the "Sixth Amendment");

**WHEREAS,** NNA and the Slevin Group entered into that certain Seventh Amendment to the Tolling Agreement effective April 17, 2023 (the August 31, 2022 Tolling Agreement, as amended by the First Amendment, Second Amendment, Third Amendment, Fourth Amendment, Fifth Amendment, Sixth Amendment, and Seventh Amendment hereinafter, the "Tolling Agreement"); and

**WHEREAS,** NNA and the Slevin Group wish to modify paragraph 2(a) of the Tolling Agreement.

**NOW, THEREFORE,** in furtherance of the mutual desires set forth above, and in consideration of the mutual covenants and conditions set forth below, the Parties hereby agree as follows:

**1.** **Termination Date**. Paragraph 2 of the Tolling Agreement, as amended, is hereby amended such that "May 31, 2023" is hereby deleted from paragraph 2(a) and "June 30, 2023" is hereby substituted in its place.

**2.** **No Other Modifications**. Except as modified in paragraph 1 *supra*, the Tolling Agreement shall continue in effect in accordance with its terms.


[SIGNATURES APPEAR ON THE FOLLOWING PAGE]


4870-0018-1349.1

2

**IN WITNESS WHEREOF**, all Parties hereto have executed and delivered this Eighth Amendment to Tolling Agreement as of the Effective Date.

**Nissan North America, Inc.:**

*Justin O'Sullivan*

By: Justin O'Sullivan
Its: Senior Counsel, Legal Department

**Woodfield Nissan, Inc.:**

By: William A. Slevin
Its: President

**Glendale Nissan, Inc.:**

By: William A. Slevin
Its: President

**Slevin Automotive Group, LLC:**

By: William A. Slevin
Its: Managing Member

**William A. Slevin:**

4870-0018-1349.1

3