## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**NISSAN NORTH AMERICA, INC.,**

    **Plaintiff,**

**v.**

**WOODFIELD NISSAN, INC., and ROY CARR,**

    **Defendants.**

**Case No. 1:23-cv-16084**
**JURY DEMAND**

---

## AMENDED COMPLAINT

---

The Plaintiff, Nissan North America, Inc. ("NNA") brings this Complaint for injury to its business and property as a direct result of defendants' fraud, negligence, and breach of contract. NNA alleges as follows:

## NATURE OF THE ACTION

1.     Defendants engaged in a long-running scheme to defraud NNA. Defendant Woodfield Nissan, Inc. ("Woodfield Nissan"), is an authorized dealer of Nissan automobiles.   Defendant Roy Carr is a former service director of Woodfield Nissan.

2.     Defendants defrauded NNA out of millions of dollars by submitting fraudulent warranty and repair claims to NNA for payment.  These warranty and repair claims were fraudulent for a variety of reasons including, but not limited to: Woodfield Nissan did not perform the service work; the service work was not necessary; defendants used aftermarket parts (rather than genuine Nissan parts) to perform the work; the technicians who performed the work were not certified; the

1

service work was intentionally coded incorrectly (e.g., knuckle instead of wheel hub bearings); the service work was performed on vehicles with a branded title; and defendants intentionally and fraudulently altered warranty records they submitted to NNA.

3.      Irrespective of intent, these actions by Woodfield Nissan constituted a serious and obvious breach of Woodfield Nissan's obligations and responsibilities to NNA, resulting in significant damages.

## THE PARTIES

4.      NNA is a corporation duly organized and existing under the laws of the State of Delaware, with its principal place of business in Franklin, Williamson County, Tennessee.

5.      Woodfield Nissan is, and at all times mentioned herein has been, a corporation duly organized and existing under the laws of the State of Illinois. Woodfield Nissan's principal place of business is at 700 W. Higgins Road, Hoffman Estates, Illinois, 60195.

6.      Roy Carr is an individual who resides in Barrington, Illinois. Defendants Woodfield Nissan and Glendale Nissan employed Carr as service director during certain of the times relevant hereto.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §1332. The citizenship of the plaintiff is diverse from that of each defendant and the amount in controversy exceeds $75,000, exclusive of interest, costs, attorney's fees, and punitive damages.

8.     Venue is proper in this court pursuant to 28 U.S.C. §1391(b)(1) and (2) because each defendant resides in this district and a substantial part of the events giving rise to this action occurred in this district.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

9.     NNA is engaged in the business of manufacturing, distributing, wholesaling, advertising, and providing limited warranty coverage for new motor vehicles and related accessories and parts.  NNA distributes new Nissan vehicles to authorized dealers located throughout the United States for sale to the public.

10.     Woodfield Nissan holds an automobile dealer license from the Illinois Department of Motor Vehicles. NNA entered into a Nissan Dealer Sales and Service Agreement ("Dealer Agreement") with Woodfield Nissan. The Dealer Agreement incorporates Standard Provisions applicable to all NNA dealer agreements and any applicable policies, program rules, and Manuals and Instructions incorporated therein (collectively, the "Standard Provisions").  The Dealer Agreement authorized, among other things, Woodfield Nissan to sell Nissan products and to service those products from its facility located in Hoffman Estates, Illinois.

11.     A true and correct copy of the current Dealer Agreement entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 1. A true and correct copy of the Standard Provisions entered into between NNA and Woodfield Nissan is attached hereto as Exhibit 2.

12.     Under Article Second of the Dealer Agreement and Section 5 of the Standard Provisions, Woodfield Nissan agreed, in accordance with bulletins issued

from time to time by NNA, to perform both warranty and customer-paid maintenance and service on Nissan vehicles.

13.     Under Section 5 of the Standard Provisions, Woodfield also committed to "make every effort to build and maintain good relations between Dealer and owners and users of Nissan Products."

14.     Pursuant to Section 5 of the Standard Provisions, NNA pays Woodfield Nissan for all warranty repairs performed on Nissan vehicles, including payment for labor, diagnostics, and parts used in making such repairs, in accordance with a specified process.

15.     Pursuant to this process under Section 5 of the Standard Provisions, Woodfield Nissan submits written warranty claims to NNA seeking payment for necessary and qualifying warranty repairs made on customer-owned Nissan vehicles, and NNA compensates Woodfield Nissan for warranty service provided to customers, as well as for Nissan parts used for that purpose, in reliance on the information Woodfield Nissan's employees and agents submitted.

16.     Under Sections 5 and 6 of the Standard Provisions, Woodfield Nissan agreed to comply with all requests of NNA with respect to the performance of services pursuant to warranty claims and agreed to maintain detailed records of the repairs requested, repairs performed, and the time and parts consumption in performing specific warranty services.  Woodfield Nissan also agreed to maintain any other records used as the basis for submitting warranty claims or which can be used to verify the time spent on the repairs. Woodfield Nissan submitted warranty claims to

NNA electronically.  In return for Woodfield Nissan's compliance with such requests and maintenance of such records, NNA reimburses it, as it does each dealership, for work performed on warranty claims, in accordance with its policies and procedures. It is NNA that pays for such services and, as such, functions as the true "customer" of the warranty repairs performed on its products by its dealers, including the Woodfield Nissan, in accordance with the terms as set forth in NNA's warranties, policies, and procedures.

17.  Pursuant to the terms of the Dealer Agreement and Section 5 of the Standard Provisions, warranty repairs and such other inspections, repairs, service, or corrections to Nissan products to be made at NNA's expense shall be performed in accordance with the provisions of the Warranty Manual.  The Assurance Products Resource Manual ("APRM") sets forth the policies and procedures pertaining to administration of NNA's warranties and Finance and Insurance Products and is incorporated by reference into the Warranty Manual.  The Standard Provisions incorporate the Warranty Manual, in turn, by reference.

18.  Pursuant to Section 2.3 of the APRM, by submission of a claim to Nissan for reimbursement, a dealer, including Woodfield Nissan, certifies that: (i) all parts and/or labor described on the claim were furnished at no charge to the customer; (ii) the repairs performed were not required due to accidents involving property damage or personal injuries; (iii) all information on the claim is accurate; and (iv) the vehicle has never been issued a "salvage title."

5

19.     These same requirements govern repairs funded by NNA but not technically covered by NNA's limited warranties, including repairs performed pursuant to recalls, under extended-warranty service contracts offered by NNA or its affiliates, and authorized "goodwill" repairs.

20.     Woodfield Nissan is among approximately 1,200 authorized Nissan and Infiniti dealers in the United States.  Based on the significant warranty repair operations that these approximately 1,200 dealers perform annually (a number easily estimated to exceed one million repairs), it is neither practicable nor reasonable for NNA to monitor, audit, and/or verify each and every warranty repair operation claimed to be performed by every one of its dealers every year.  Therefore, NNA must rely upon its dealers, including Woodfield Nissan, to submit reimbursement claims that are fully substantiated for qualified repair operations that have been actually and properly performed.

21.     Employees of the Nissan dealers must use software programs to communicate with NNA's warranty system to submit warranty claims to NNA for payment.  Woodfield Nissan sent warranty claims to, and NNA received such claims at, NNA's corporate office in Tennessee.  Employees of Nissan dealers contact Nissan's call center located in Tennessee for questions on how to submit these claims.

22.     Upon receipt of a properly formatted and supported warranty claim, NNA immediately credits the dealer for the costs of providing the warranty service. Such credit is provided through a set-off in the dealer's non-vehicle account.

23.    During the period at issue, NNA paid Woodfield Nissan millions of dollars in reimbursement for different warranty repairs or otherwise reimbursable operations to which each such defendant was not entitled. By doing so, Woodfield Nissan's actions undermined consumer confidence. For example, by virtue of submitting claims for unnecessary repairs, Woodfield Nissan necessarily led customers to believe that their Nissan vehicles were more prone to breakdown and otherwise were not of the integrity expected or actually provided by NNA.

24.    A pervasive culture of fraud existed in the service department of Woodfield Nissan, thus undermining consumer confidence in NNA's vehicles.

25.    On September 24, 2018, NNA initiated an on-site audit to review the warranty and repair claims Woodfield Nissan had submitted to NNA for payment during the period September 24, 2017, to September 18, 2018. Woodfield Nissan was unable to substantiate 343 of the 358 claims NNA reviewed during the audit.

26.    Numerous former technicians, service advisors and service managers have confirmed to NNA that the service department at Woodfield Nissan engaged in a pattern of false and/or fraudulent warranty practices for many years prior to and running at least through 2019. Roy Carr, the service director at Woodfield Nissan, was the architect of many of the fraudulent warranty schemes Woodfield Nissan used.  Two service advisors at the dealership, Mike Bartolic and Jose Rodriquez, actively aided Roy Carr in his fraudulent schemes. A used car technician, Kazimierz ("Casey") Michon, and several other technicians, David Michalski, Daniel Jacob, and Michael Flansburgh, also provided material assistance to defendants in carrying out

7

their fraudulent schemes. Roy Carr and, *inter alia*, the foregoing service advisors and technicians routinely manufactured false and/or fraudulent repairs under factory- and extended-warranty programs as a means to increase the revenues generated in the service department.

27.     Woodfield Nissan routinely and repeatedly engaged in more than a dozen fraudulent practices in order to obtain money from NNA under false pretenses, including but not limited to the following practices.  First, during the period January 1, 2016, through December 31, 2019, (the "False Claims Period") defendants routinely used aftermarket parts, including but not limited to radiators, brake pads, alternators, and other parts, to perform warranty and repair services, despite the fact that the APRM expressly prohibits such practices. Defendants falsified the warranty claims electronically submitted to NNA in Tennessee to indicate that genuine Nissan parts were used to complete the warranty and repair services.

28.     NNA, however, paid Woodfield Nissan's claims in reliance on the representation that genuine Nissan parts had been used and thus reimbursed Woodfield Nissan for the costs of genuine parts that Woodfield Nissan never in fact purchased.

29.     Second, during the False Claims Period, defendants used technicians to perform warranty and repair services who, in violation of the APRM, are not certified to perform such repairs.  Woodfield Nissan, nevertheless, in the warranty claims submitted to NNA electronically in Tennessee, altered the identification number of the technician who performed the work, and falsified the warranty claim to indicate

8

that a certified technician provided the warranty and repair services. NNA's audit revealed that the certified technician whom defendants claimed to have performed many of the warranty repairs was not even employed at the dealership at the time the repairs were performed.

30. Third, during the False Claims Period, defendants routinely "added on" bogus warranty repairs to a repair order. Defendants invented alleged defects out of whole cloth and misrepresented to customers that a vehicle needed a repair under warranty, when in fact the vehicle was not defective in any respect. Defendants then submitted unnecessary and bogus warranty claims to NNA, which paid Woodfield Nissan for the alleged warranty repairs. In some cases, Woodfield Nissan "added-on" bogus warranty repairs to work orders without the customer's knowledge and after the customer and the vehicle have left the dealership. Defendants then submitted such warranty claims to NNA, which paid the bogus claims.

31. Fourth, during the False Claims Period, Woodfield Nissan routinely invented alleged warranty defects with respect to used cars held in inventory. The used car technician at Woodfield Nissan, Casey Michon, for example, manufactured alleged defects with transfer cases, doors, window regulators, and other automotive systems. Woodfield Nissan did not repair any such alleged defects but submitted warranty claims to NNA requesting payment as if it had. Such defects never existed, and no warranty services were ever provided, yet Defendants submitted warranty claims for such alleged repairs to NNA and received payment.

32.     Fifth, during the False Claims Period, every warranty claim Woodfield Nissan submitted to NNA contained an operation code that dictated the amount NNA would reimburse Woodfield Nissan for having properly performed a repair under warranty. In order to inflate the reimbursement it received from NNA, Woodfield Nissan routinely falsified the operation codes stated in the warranty claims submitted to NNA. For example, Woodfield Nissan repeatedly used the operations code for a more-expensive "knuckle" repair under warranty when in fact Woodfield Nissan performed a less-expensive repair or replacement of wheel hub bearings or other components of a wheel hub assembly.

33.     Sixth, NNA on occasion, and in accordance with the provisions of the APRM, reimburses a dealer for a repair under "goodwill," that is, a repair that a warranty, service contract, or campaign does not otherwise cover. The purpose of providing a repair under "goodwill" is to promote customer loyalty. During the False Claims Period, Woodfield Nissan routinely abused the policies and procedures regarding goodwill repairs set out in the APRM. A dealer is permitted to perform a repair under "goodwill" only on a case-by-case basis after consideration of all factors relevant to a specific repair.  Woodfield Nissan, however, used free repairs under "goodwill" as a marketing device to attract customers to its service department.  It then submitted repairs under "goodwill" to NNA for payment, misrepresenting that such repairs met the criteria under the APRM for a permissible repair under goodwill.

34.     Seventh, during the False Claims Period, Woodfield Nissan operated a car wash that was defective and would frequently damage the side moldings on

certain Nissan Maxima models. Rather than repair the damage its car wash did to such Maxima automobiles at its own expense, Woodfield Nissan instead submitted false claims to NNA seeking reimbursement for repair of such Maxima models under warranty. Woodfield Nissan concealed the fact that its own car wash damaged the vehicles and falsely represented to NNA that the moldings on such vehicles were defective.

35.    Eighth, during the False Claims Period, in cases where a customer had purchased a Nissan Security Plus service contract with no deductible, Woodfield Nissan simply manufactured alleged defects with a customer's Nissan automobile and submitted a false and fraudulent warranty claim to NNA without ever touching the car. NNA reimbursed Woodfield Nissan for the alleged repair under the Security Plus service contract. Defendants perpetrated such fraud without advising customers that the dealership had submitted a claim under the customer's service contract.

36.    Ninth, during the False Claims Period, on occasion, a vehicle for which Woodfield Nissan had submitted a bogus warranty claim or a claim under a Security Plus service contract needed to be repaired under warranty or under a service contract. In order to obtain the parts and services needed to repair such a vehicle, Woodfield Nissan used the vehicle identification number (or "VIN") of another customer's vehicle, or of a vehicle in defendants' used car inventory, to obtain reimbursement for the parts and services from NNA.

37.    Tenth, during the False Claims Period, to obtain reimbursement from NNA for alleged repairs under warranty, Woodfield Nissan falsified the VIN numbers

on vehicles with a "branded" title, i.e., a salvage title. Vehicles with a branded title are not eligible for repair under warranty. Nevertheless, in order to replace the transmission of a vehicle with a branded title, Defendants on at least one occasion used the VIN of an unrelated vehicle and submitted a warranty claim to NNA with such false information.

38.     During the False Claims Period up through September 2018, Woodfield Nissan's monthly warranty-reimbursement numbers were at least approximately twice the national average for all but four months, and they were approximately three times or greater than that average in seven months. Moreover, examination of Woodfield Nissan's supporting documentation during the 2018 audit revealed evidence of false-claim manufacturing, such as time-clock logs, which ought to be printed contemporaneously with work performed, being printed on the copy of work orders that prepared only after the work is completed.

39.     All of these actions served to undermine the credibility of NNA to consumers by creating the false belief that Nissan vehicles were in need of repairs they were not, in fact, in need of, thus impacting NNA's ability to compete in the marketplace.

## TOLLING OF STATUTE OF LIMITATIONS

40.     On August 1, 2022, NNA and Woodfield Nissan entered into a Tolling Agreement that excluded the period August 1, 2022, through October 20, 2022, from being considered in determining the applicability of the expiration of any statute of limitations or other defense based upon the passage of time. The parties thereafter

executed eight further agreements that collectively tolled the running of any statute of limitations for the periods between November 1, 2022, and June 28, 2023. The Tolling Agreement and the eight amendments thereto are attached hereto as Collective Exhibit 3.

41.     On June 28, 2023, NNA initially filed this action in the Chancery Court for Williamson County, Tennessee. Woodfield Nissan removed the action to the U. S. District Court for the Middle District of Tennessee on July 18, 2023, and on August 31, 2023, filed a Motion to Dismiss for Lack of Personal Jurisdiction, or, in the alternative, Transfer Venue, and to Dismiss pursuant to Rule 12(b)(6). On November 9, 2023, NNA voluntarily dismissed that action without prejudice pursuant to Fed. R. Civ. P. 41(a)(1)(A)(i). Accordingly, the period June 28, 2023, to the present is excluded from consideration in determining the applicability of the expiration of any statute of limitations pursuant to Illinois' Savings Statute, 735 Ill. Compiled Stat. Ann. § 5/13-217. *See, e.g., Stephan v. Selvic Marine Towing Co.*, 559 N.E.2d 147, 148 (Ill. App. Ct. 1990) ("Section 13-217 applies not only to actions initially filed in Illinois, but it also applies to actions originally brought in foreign courts if the dismissal in the foreign court is equivalent to the types of dismissals enumerated in section 13-217.")

**LEGAL CLAIMS[1]**

**COUNT I –FRAUD**

42.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

43.     Defendants submitted sham warranty repair claims to NNA that stated the service referenced in each claim was completed for Nissan vehicle owners and customers and performed in compliance with the applicable policies and procedures.

44.     Defendants submitted claims to NNA for warranty repairs that Defendants knew to be false and/or fraudulent.  The sham warranty repairs were either not performed, were unnecessarily performed, or were knowingly performed in violation NNA's written policies and procedures.

45.     Defendants knew that its representations and submissions to NNA were false and/or fraudulent at the time they were made.  Defendants made such misrepresentations in order to mislead NNA and to produce a false impression in NNA.  Defendants made such misrepresentations with fraudulent intent.

46.     Defendants intended that NNA would rely on these materially false and/or fraudulent submissions made through Defendants to qualify—improperly— for reimbursement payments.

47.     NNA reasonably relied on Defendants' false and/or fraudulent submissions.

---

[1] On August 7, 2024, this Court heard oral argument as to defendant Woodfield's Motion to Dismiss (*See* Dkt. 15) and ruled from the bench at the conclusion thereof that the statute of limitations applicable to Counts I through IV below limits plaintiff's claims to damages suffered after August 1, 2019.

48. Because of these submissions, actions, and inactions of Defendants, NNA incurred monetary damages.

49. In 2016, NNA incurred monetary damages of at least $313,211 as a direct and proximate result of Defendants' submission of intentionally false warranty claims.

50. In 2017, NNA incurred monetary damages of at least $492,887 as a direct and proximate result of Defendants' submission of intentionally false warranty claims.

51. In 2018, NNA incurred monetary damages of at least $534,072 as a direct and proximate result of Defendants' submission of false warranty claims.

52. In 2019, NNA incurred monetary damages of at least $887,263 as a direct and proximate result of Defendants' submission of false warranty claims.

53. Defendants fraudulently concealed their wrongdoing from NNA by engaging in elaborate and creative misrepresentations and material omissions in its communications with NNA.

54. Defendants' actions were intentional, and Defendants knew that its actions would cause NNA to suffer substantial damages, in knowing disregard of the lawfulness of its actions. Defendants' willful, malicious, and fraudulent conduct and the ratification of that conduct by one or more managing agent(s) of Defendants entitle NNA to a recovery of compensatory and exemplary damages in an amount to be determined at trial.

## COUNT II – NEGLIGENT MISREPRESENTATION

55.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

56.     In connection with the submission of warranty claims to NNA, Defendants had a duty to exercise reasonable care represent facts to NNA accurately. In violation of this duty, Defendants falsely represented material facts to NNA concerning the warranty claims presented.  Such representations were false when made and were made in the course of Defendants' business and in transactions in which Defendants had a pecuniary interest.

57.     Defendants, in the exercise of ordinary and reasonable care, should have known that such representations were untrue when made.  Defendants failed to exercise reasonable care either in obtaining or communicating the information.  NNA did not know that such representations were false when made.

58.     Defendants provided such false and faulty information to NNA to guide NNA in its business.  NNA reasonably and justifiably relied upon the truth of such representations.

59.     As a direct and proximate result of NNA's reliance upon Defendants' negligent misrepresentation of material facts, NNA sustained damages of at least $313,211 in 2016; damages of at least $492,887 in 2017; damages of at least $534,072 in 2018; damages of at least $887,263 in 2019.

## COUNT III – BREACH OF CONTRACT

60.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

16

61.     In violation of the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, the information Woodfield Nissan provided to NNA concerning the warranty repairs at issue was not accurate.

62.     In 2016, Woodfield Nissan submitted to NNA at least $313,211 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

63.     In 2017, Woodfield Nissan submitted to NNA at least $492,887 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

64.     In 2018, Woodfield Nissan submitted to NNA at least $534,072 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

65.     In 2019, Woodfield Nissan submitted to NNA at least $887,263 in warranty claims that were not eligible for reimbursement. NNA paid all such claims. Woodfield Nissan's submissions of such claims failed to comply with the Dealer

Agreement, the Standard Provisions, and Section 2.3 of the APRM, and constitutes a breach of contract.

66.     In addition to submission of claims that were not eligible for reimbursement, Woodfield Nissan's actions by and through its employees undermined consumer confidence in the Nissan brand, in breach of the Dealer Agreement.

67.     NNA has complied with its obligations under the Dealer Agreement, the Standard Provisions, and the APRM.

68.     As a direct and proximate result of Woodfield Nissan's breach of the Dealer Agreement as alleged above, NNA has suffered harm in the form of monetary damages of at least $2,227,423, plus injury to its business, reputation, and goodwill, and will sustain financial loss.

## COUNT IV – UNJUST ENRICHMENT

69.     NNA incorporates by reference Paragraphs 1 through 41 of this Complaint as if fully set forth herein.

70.     Upon information and belief, Defendant Roy Carr earned commissions or similar revenue-sharing compensation based on revenue received from the service department at Woodfield Nissan's dealership.

71.     Such commission arrangements are common in the automotive-dealership field, are permitted by NNA, and are employed at other Nissan dealerships. The particulars of Mr. Carr's compensation agreement, however, are

uniquely within the knowledge of, and the documents evidencing the same are uniquely within the possession of, the Defendants.

72.     No contract concerning commissions or compensation exists between NNA and Mr. Carr.

73.     Mr. Carr, if he received commissions or revenue-sharing compensation at all, received funds via that mechanism on account of revenue generated by the Woodfield Nissan service department through its fraudulent activity described herein.

74.     Such fraudulent activity was wrongful as to NNA and the commissions or revenue sharing Mr. Carr received on account if it was obtained at NNA's expense.

75.     As between NNA and Mr. Carr, it would be unconscionable for Mr. Carr to retain the benefits of such funds, and he should accordingly be required to disgorge them in addition or in the alternative to the other remedies proper under this complaint.

### COUNT V – VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200 *et seq.*)

76.     NNA incorporates by reference Paragraphs 1 through 75 of this Complaint as if fully set forth herein.

77.     Alternatively, the Defendants are liable for violating California's Unfair Competition Law by engaging in acts of unfair competition.

78.     The Defendants have engaged in business practices that are prohibited by law.

79.     The Defendants have engaged in business practices that are unfair. The practices are contrary to public policy and are immoral, unethical, and unscrupulous. Additionally, they have caused substantial consumer injury, are not outweighed by any countervailing benefits to consumers or to competition and are not an injury which the consumers themselves could have avoided.

80.     The Defendants have engaged in business practices that were likely to deceive or mislead members of the public.

81.     As a direct and proximate result of the foregoing unfair competition practices, NNA has suffered injury in fact, and the Defendants have acquired money or property from NNA by means of such unfair competition.

82.     Equitable principles necessitate that the Court restore NNA's interest in the money or property wrongfully acquired by the Defendants.

83.     Legal remedies are inadequate to remedy the injury caused by the Defendants' unfair competition.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Nissan North America, Inc., prays that the Court enter judgment on its behalf and respectfully requests the following relief:

A.      For a judgment of actual, compensatory, and consequential damages against Defendants in an amount in excess of $2,500,000.

B.      For a judgment of restitution at law against the Defendants in the amount of $2,227,423.

C.      For a judgment of punitive damages against Defendants in an amount to be shown to the Court.

20

D. For a judgment against Defendants for its reasonable attorneys' fees and costs associated with this litigation.

E. For a judgment of pre-judgment interest and post-judgment interest; and

F. For such other and further relief as this Court deems just and equitable.

PLAINTIFF DEMANDS TRIAL BY JURY.

Respectfully submitted,

s/ Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr. (No. 12005)
Paul J. Krog (No. 29263)
BULSO PLC
155 Franklin Road, Suite 400
Brentwood, Tennessee 37027
(615) 913-5191
gbulso@bulso.com
pkrog@bulso.com
*Attorneys for Nissan North America, Inc.*

## CERTIFICATE OF SERVICE

I certify that the foregoing has been served by electronic means on the following on this day, January 23, 2025:

Ira M. Levin
Eric P. VanderPloeg
Christopher A. Verdugo
BURKE, WARREN, MACKAY & SERRITELLA PC
330 North Wabash Ave.
21st Floor
Chicago, IL 60611
312-840-7000
ilevin@burkelaw.com
evanderploeg@burkelaw.com
cverdugo@burkelaw.com
*Counsel for Woodfield Nissan Inc.*

s/Eugene N. Bulso, Jr.
Eugene N. Bulso, Jr.